**Gary M. Berne**, OSB No. 774077
gberne@stollberne.com
**Jennifer S. Wagner**, OSB No. 024470
jwagner@stollberne.com
STOLL STOLL BERNE LOKTING
  & SHLACHTER P.C.
209 S.W. Oak Street, 5th Floor
Portland, OR  97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840

Local Counsel

**Shawn A. Williams**, *pro hac vice*
shawnw@rgrdlaw.com
**Willow E. Radcliffe**, *pro hac vice*
willowr@rgrdlaw.com
**Amanda M. Frame**, *pro hac vice*
aframe@rgrdlaw.com
**Kenneth J. Black**, *pro hac vice*
kennyb@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:    (415) 288-4545
Facsimile:    (415) 288-4534

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| GEORGE HAROUTUNIAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MENTOR GRAPHICS CORPORATION, et al.,<br><br>Defendants. | No. 3:16-cv-00470-PK<br><br>AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ACTION ................................................................................................1

BACKGROUND AND OVERVIEW ........................................................................................2

JURISDICTION AND VENUE ...............................................................................................9

PARTIES ..................................................................................................................................10

CONTROL PERSONS .............................................................................................................11

DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS DURING THE CLASS PERIOD .................................................................12

    Mentor Representatives' Admissions and Executives' Trial Testimony Confirm
    Defendants' Knowledge or Reckless Disregard of Defendants' False Statements ..........19

    Mentor Falsely Claims that Its Emulation Business Had Strengthened ...........................22

    Mentor Issues FY16 Financial Guidance that Lacks Any Reasonable Basis ..................27

    Mentor Falsely Affirms FY16 Revenue and EPS Guidance Touting Emulation
    Growth ...............................................................................................................................33

    Mentor Falsely Raises FY16 Financial Guidance Emphasizing Demand in Growth
    and Denies Negative Impact of Semiconductor Consolidations........................................40

THE RELEVANT TRUTH BEGINS TO BE DISCLOSED .......................................................47

POST-CLASS PERIOD EVENTS ...........................................................................................50

ADDITIONAL ALLEGATIONS OF SCIENTER....................................................................56

ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS.......................59

CLASS ACTION ALLEGATIONS ..........................................................................................61

THE STATUTORY SAFE HARBOR DOES NOT APPLY .......................................................63

PRESUMPTION OF RELIANCE ............................................................................................67

COUNT I ..................................................................................................................................68

COUNT II .................................................................................................................................68

PRAYER FOR RELIEF ...........................................................................................................69

JURY DEMAND ......................................................................................................................69

## SUMMARY OF THE ACTION

1.      Lead Plaintiff Western Pennsylvania Electrical Employees Pension Fund ("Western Pennsylvania" or "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Mentor Graphics Corporation ("Mentor" or the "Company"), as well as earnings call transcripts and media and analyst reports about the Company.  The investigation of facts pertaining to this case is ongoing.  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Mentor between August 21, 2014 and November 19, 2015, inclusive (the "Class Period"), for violations of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder, against Mentor, its Chief Executive Officer ("CEO") and Chairman Walden C. Rhines ("Rhines"), its President and Chief Financial Officer ("CFO") Gregory K. Hinckley ("Hinckley"), and its Vice President ("VP"), Corporate Development and Investor Relations Joseph Reinhart ("Reinhart").  Lead Plaintiff alleges that Defendants violated the securities laws by disseminating materially false and misleading statements and concealing material adverse facts regarding Mentor's current financial condition and growth prospects.

3.      Lead Plaintiff alleges that Defendants violated the securities laws by disseminating materially false and misleading statements concerning its current financial condition and future prospects, and concealing material adverse facts, including that: (i) Mentor had lost its largest emulation customer's business (Intel) to its competitor Synopsys, Inc. ("Synopsys"); (ii) the loss to Mentor was significant given that Intel accounted for 60-70% of Mentor's emulator sales; (iii) because Intel was the dominant customer in the industry its loss had a negative spillover effect on

sales to other customers; (iv) Synopsys with its well-established sales organization, was challenging Mentor for virtually all of its emulation business and, as a result, the evaluations were taking longer and Mentor was losing business and/or having to lower prices; (v) Mentor's competitor Cadence Design Systems, Inc.'s ("Cadence") new emulation product was imminent and was also causing customers to delay orders; and (vi) weakness in the semiconductor industry as well as the related extraordinary increase in the magnitude of semiconductor company consolidations and resulting reductions in expenditures were negatively impacting Mentor's sales.  By concealing these material adverse facts, Defendants created an impression that Mentor was growing its emulation business and would achieve FY16[1] financial guidance as a result, when, in fact, Mentor's emulation business was suffering and the guidance lacked any reasonable basis.

## BACKGROUND AND OVERVIEW

4.      Mentor develops, manufactures and distributes electronic design automation ("EDA") products – computer software and emulation hardware systems.  The Company's EDA products allow customers to test both hardware and software components of technologically complex products before they are mass produced.

5.      The EDA market is, and was during the Class Period, dominated by three firms: Mentor, Synopsys and Cadence, often referred to as the "Big 3."  The EDA industry, including Mentor, historically sold products to semiconductor companies: "[t]he [EDA] industry is about a $5 billion industry . . . [and] [t]he vast majority of the spend of that $5 billion in simple terms is in semiconductor."[2]

---

[1]    Mentor reports on a fiscal year that runs from February 1 to January 31.  As used herein "FY" means Mentor's fiscal year.  Thus, FY15 means Mentor's fiscal year 2015, which ran from February 1, 2014 to January 31, 2015.  The Company's 2Q FY15 ran from May 1, 2015 to July 31, 2015, its 3Q FY15 ran from August 1, 2015 to October 31, 2014, and its 4Q FY15 from November 1, 2015 to January 31, 2015.  Likewise, FY16 ran from February 1, 2015 to January 31, 2016.

[2]    All emphasis added and citations omitted throughout, unless stated otherwise.

6.      Mentor differentiated itself from its competitors by seeking to diversify its customer base to include sales to systems companies as well as to semiconductor companies.  Accordingly, a component of Defendants' stated business strategy was to diversify away from semiconductor companies and sell to systems companies, thereby distinguishing itself from competitors like Synopsys which primarily sold (95%) to semiconductor companies.  Mentor considered itself unique because according to Defendant Reinhart on December 16, 2014, "we get about 50% of our revenues from semiconductor companies and about 50% of our revenues coming from what we define as system companies . . . ."

7.      Mentor's product offerings to its customers were as follows:

|   | **Mentor's Product Segments (key product)** | **% of Revenue for FY15** |
|---|---|---|
| 1. | Integrated Circuit ("IC") Design to Silicon (Calibre) | 40% |
| 2. | Scalable Verification (Veloce2) | 25% |
| 3. | Integrated Systems Design | 20% |
| 4. | New and Emerging Products | 5% |
| 5. | Services and Other | 10% |

8.      More than half of Mentor's revenues were derived from Mentor's IC Design to Silicon (sold to semiconductor companies) and Scalable Verification (including emulation sold to semiconductor and systems companies) segments, with 65% of FY14 and FY15 revenues being derived from these two segments.

9.      While Defendants claimed that by focusing on systems companies, Mentor would be insulated from negative effects from consolidations and downturns in the semiconductor industry, the semiconductor business, in particular the top customers, were nonetheless critical to Mentor's financial success as reflected by Defendants' own admissions:

- "*[T]he top 50 IC companies represent approximately 80% of total R&D* spending."

- "Last year, *8 of our top 10 customers were semiconductor companies* . . . ."

- "[T]he *major customers that generate our revenue tend to be the Who's Who of the semiconductor industry*."

10.     Similarly, because software sales were generally made pursuant to long-term, non-cancelable contracts, and emulation hardware sales were characterized by a backlog of booked orders with long lead times for evaluation, manufacture and delivery before revenue was recognized, Mentor, according to Defendants, enjoyed clear visibility into future financial results, and current knowledge of what orders already existed to support revenues for the next quarter and beyond.  In fact, Defendants publicly boasted at a January 16, 2013 Needham Growth Conference that the Company had anywhere from 50% to 80% of its revenue in the bag at the beginning of any given quarter, including on term licenses for IC Design to Silicon and Scalable Verification products:

> [ANALYST:] *[W]hen you start a quarter, how much of your revenues are already identified when the quarter starts?*
>
> [REINHART:] *Anywhere from 50% to 80%*.  And when I say identified, I would include in the identified bucket contracts who are scheduled to expire during the quarter.

11.     With this background, the Class Period begins on August 21, 2014, when Defendants made, *inter alia*, the following materially false and misleading statements, signaling to investors that Mentor's emulation business was rapidly growing and downplaying any concerns about competitive emulation products impacting that growth when, in fact, Defendants knew that this growth could not be achieved because Mentor faced increased competition in the emulation business:

- "I think [emulation business growth] is *somewhere in the range of 20% to 25%* this year[.]"

- "We already know that we had more than 50% of the revenue in first quarter, so that almost guarantees that we are number one [in market share for emulation for FY15].  *It does guarantee we are number one*, I'm sorry."

- "*[I]t will take a long time for people to develop the capability that we have honed over the last 12 years to bring us to where we are in the virtual emulation side*."

12.     Thereafter, on September 5, 2014 in Mentor's 2Q FY15 Form 10-Q filed with the SEC and throughout the Class Period, Defendants falsely told investors that pre-announcing products "*can result* in customers canceling or deferring orders for currently offered products," and that "[o]ur competitors may acquire technology or companies offering competing or complementary

product offerings *which could* adversely impact our ability to compete in the marketplace" when unbeknownst to investors Mentor's customers were already delaying or cancelling orders as a result of increased competition in the emulation market.[3]

13.     On September 5, 2014, Defendants further told investors that "[o]ver time**, *no material portion of our business is dependent on a single or a few customers*.  We do not believe that *the competitive loss of one or more individual products at one or more of our customers would have a material adverse effect on our revenues*."  Defendants would repeat this false statement throughout the Class Period despite knowing that Mentor's revenues and emulation growth had already been materially and adversely impacted by the Company's loss of business from its largest emulation customer and, later, the announcement of the consolidation of its semiconductor customers' business reducing expenditures and prices.

14.     By November 20, 2014, Defendants continued to mislead investors by telling them that the outlook for Mentor's emulation business and revenue growth in the 20%-25% range for FY15 had "*improved*."  In truth, Defendants knew that the outlook had deteriorated.

15.     Two weeks later, in Mentor's 3Q FY15 Form 10-Q filed with SEC on December 4, 2014, and repeated in the Company's quarterly and annual SEC filings throughout the Class Period, Defendants would falsely tell investors that with respect to consolidations in the semiconductor industry that they could happen and "*could result in* fewer customers in the industries or the loss of some customers to competitors, or *reduced customer spending* on software and services *due to redundancies or stronger customer negotiating power, which could have an adverse effect on our business and future revenues*."  Defendants knew, however, that semiconductor consolidations for 2014 had nearly doubled from the prior year, $23 billion vs. $12 billion.  Mentor was heavily

---

[3]    Defendants repeated this false statement in Forms 10-Q filed with the SEC on December 4, 2014 (3Q FY15), June 3, 2015 (1Q FY16) and August 31, 2015 (2Q FY16), and in a Form 10-K for FY15 filed with the SEC on March 16, 2015**.

dependent on the semiconductor industry and knew that consolidations negatively impacted expenditures in that industry, particularly with its consolidating customer base.

16. Thereafter, on February 26, 2015, Defendants issued a press release falsely giving revenue guidance of ~ $1.282 billion and earnings per share ("EPS") guidance of ~ $1.45 for FY16. Guidance that was reiterated in Mentor's Form 10-K filed with the SEC on March 16, 2015. This guidance was bolstered by Defendants' false and misleading statements on an earnings call also held on February 26, 2015 and in Mentor's FY15 Form 10-K, including:

- "*[W]e do expect that we can probably grow emulation revenue in the year ahead* . . . ."

- Stating that any decline in the level of activity in Mentor's emulation business was "*quite isolated [to the loss of single-largest customer]*" and had "*nothing to do with what is going on in the overall emulation market*."

17. Defendants knew, but did not disclose throughout the Class Period to investors that, *inter alia*: (i) Cadence's anticipated new emulation product (Palladium Z1) and Synopsys's newly acquired emulation production (ZeBu 3) were causing customers to delay and cancel orders for Mentor's product (Veloce2); (ii) the magnitude and impact of the loss of Intel emulation business to Synopsys had not been disclosed to investors with the requisite intensity and credibility to offset Defendants' misleading statements; and (iii) that the unprecedented announcements of semiconductor consolidations was causing reduced expenditures and price erosion. Defendants also knew that early contract renewals did not translate to increased demand, they simply pushed revenue into earlier quarters.

18. In a May 22, 2015 press release and earnings call, Defendants continued to give false revenue guidance for FY16 of ~ $1.282 billion, reinforcing this guidance with additional materially false and misleading statements during the May 22, 2015 earnings call and in the Company's 1Q FY16 Form 10-Q filed with the SEC on June 3, 2015, including:

- "*We are expecting that, during the year, our revenue will grow for emulation.*"

- "[A]t this point, that the **activity for evaluations is so strong, that we are booked to capacity in the number of customers we can evaluate**."

- "*[W]e have to actually build emulators, so we ship to a build forecast.* Bookings for the quarter were, in fact, up 65%. **So, the business is robust**."

19.    On August 20, 2015, Defendants doubled down and **raised FY16 revenue** guidance to ~ $1.285 billion, and forecasted 4Q FY16 revenues of $440 million, despite not having any reasonable basis to do so in light of the true facts known to Defendants. When raising guidance, Defendants rejected any potential financial impact from semiconductor consolidations. Indeed, Defendants continued to assert that such consolidations would actually make the Company stronger during the August 20, 2015 earnings call:

- "**We were impressed by the breadth of demand growth** in our two largest and fastest-growing product categories, **Design to Silicon and Scalable Verification**, which grew 105% and 20% respectively."

- "While the actual number of mergers and acquisitions is up only modesty [sic] in 2015 compared to prior history, the magnitude of announced deals is up dramatically. Historically, **these changes simply add to the strength of the de facto standard leader in EDA in each tool category** . . . ."

20.    As detailed herein, each of Defendants' materially false statements and omissions, including the Company's raised FY16 revenue guidance on August 20, 2015, affirmed on August 31, 2015, caused the Company's stock price to trade at artificially inflated levels above $25.00 per share.

21.    Notwithstanding CEO Rhines' and President/CFO Hinckley's knowledge of facts that rendered Defendants' statements materially misleading, they seized the opportunity presented by Mentor's inflated stock prices to sell Mentor stock. Rhines and Hinckley sold Mentor stock during the Class Period for proceeds of more than $6.8 million and $3.8 million, respectively. For example, following Mentor's raised FY16 revenue guidance in August 2015, Rhines unloaded 170,000 shares at prices above $25 per share for proceeds of more than $4.3 million between October 9 and 12, 2015 – weeks before the close of the third quarter wherein Mentor saw bookings down 25% in Scalable Verification as a result of delays in emulation decisions and just over a month before Mentor reported that the Company would miss its FY16 revenue guidance by $104 million.

22.    On November 19, 2015, Mentor issued a press release informing the market that instead of $440 million in revenue for 4Q FY16, that its fourth quarter revenue forecast would be reduced by a whopping $104 million to $336 million, and that total bookings for the three months ended October 31, 2015 had decreased by ~ 20% compared to the three months ended October 31, 2014.  The Company also took down its guidance for FY16 by nearly $117 million from $1.285 billion to $1.118 billion and halved its FY16 EPS guidance from $1.25 to $0.63.

23.    More specifically, Defendants admitted in the November 19, 2015 press release and earnings call, and Mentor's 3Q FY16 Form 10-Q filed on December 3, 2015, that the Company's emulation business was not growing and that its financial prospects were not what Defendants had previously conveyed to investors.  Rather, Defendants instead blamed the disappointing bookings and massive 4Q FY16 reduction on, *inter alia*, the following:

- "*[A] decrease in term license contract renewals*. . . ."

- "*Total bookings were down 20% year-over-year and were flat to down across all product categories*. . . .  *Design to Silicon, which includes our Calibre product family, was down 35%* . . . ."

- "*Scalable Verification was down 25%.  It's probable that a competitor's recent announcement of the release of their next generation emulation product has temporarily frozen activity in that market*."

- "I think *there was a general fear in the market that there might be competition that could approach that kind of capability*."

- "'*Semiconductor consolidation and delays in emulator decisions are now having an adverse impact on our ability to close business* . . . .'"

- "*[I]mmediate demand for emulation has stalled as the result of the expected introduction of competitive products*."

24.    As a result of Defendants' fraud, on November 20, 2015, Mentor's stock price plunged 36%, closing at $17.85 per share, down from the previous day's close of $27.78 per share, on high trading volume as reflected in the following chart:



## JURISDICTION AND VENUE

25.    Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act.  The claims

asserted herein arise under §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and

Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

26.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because Mentor is

headquartered in this District and many of the acts and practices complained of herein occurred in

substantial part in this District.

## PARTIES

27.     Court-appointed Lead Plaintiff Western Pennsylvania purchased or otherwise acquired Mentor common stock during the Class Period as described in the attached certification, and was damaged by the conduct alleged herein.

28.     Defendant Mentor is incorporated in Oregon and trades on the NASDAQ Exchange ("NASDAQ") under the ticker symbol "MENT."   The Company's corporate headquarters are located at 8005 S.W. Boeckman Road, Wilsonville, Oregon 97070.

29.     Defendant Rhines is, and was at all relevant times during the Class Period, the Chairman, CEO and a director of the Company.  As CEO, Rhines spoke on Mentor's behalf in press releases and earnings conference calls.  Rhines signed and/or certified the SEC filings alleged herein to contain false and misleading statements, including the Company's FY14 Form 10-K filed March 17, 2014 and FY15 Form 10-K filed March 16, 2015.  He also certified that the  "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company" in these same Forms 10-K, as well as the Company's 2Q FY15 Form 10-Q filed September 5, 2014; 3Q FY15 Form 10-Q filed December 4, 2014; 1Q FY16 Form 10-Q filed June 3, 2015; and 2Q FY16 Form 10-Q filed August 31, 2015.  Rhines also participated in the following earnings calls wherein Defendants, including Rhines, made false and misleading statements on August 21, 2014; November 20, 2014; February 26, 2015; May 22, 2015; and August 20, 2015.

30.     Defendant Hinckley is, and was at all relevant times during the Class Period, President and CFO of the Company.  He signed Mentor's SEC filings and spoke on the Company's behalf in press releases and earnings conference calls.  Hinckley signed Mentor's SEC filings alleged herein to contain false and misleading statements, including the Company's FY14 Form 10-K filed March 17, 2014; FY15 Form 10-K filed March 16, 2015; 2Q FY15 Form 10-Q filed September 5, 2014; 3Q FY15 Form 10-Q filed December 4, 2014; 1Q FY16 Form 10-Q filed June 3, 2015; and 2Q FY16 Form 10-Q filed August 31, 2015.  Hinckley also made certifications in the same

documents that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." Hinckley also participated in the following earnings conference calls wherein Defendants, including Hinckley, made false and misleading statements on August 21, 2014; November 20, 2014; January 14, 2015; February 26, 2015; May 22, 2015; and August 20, 2015.

31.    Defendant Reinhart is, and was at all relevant times during the Class Period, VP, Corporate Development and Investor Relations of the Company. As a VP, Reinhart spoke on Mentor's behalf in earnings conference calls. Reinhart participated in the following conference calls wherein Defendants, including Defendant Reinhart, made false and misleading statements on August 21, 2014; November 20, 2014; February 26, 2015; May 22, 2015; and August 20, 2015.

32.    The Defendants named in ¶¶29-31 are referred to herein as the "Individual Defendants."

## CONTROL PERSONS

33.    As officers and controlling persons of a publicly held company whose common stock was and is traded on the NASDAQ and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

34.    The Individual Defendants participated in the drafting, preparation and/or approval of the various public statements, investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions, and were aware of their materially false and misleading nature. Because of their board of director

membership and/or executive and managerial positions with Mentor, each of the Individual Defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Mentor and its business or adopted by the Company materially false and misleading.

35.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made were then materially false and misleading. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD[4]

36.     On August 21, 2014, Mentor issued a press release announcing its financial results for 2Q FY15, the period ended July 31, 2014, and forecasting 3Q FY15 financial results:

### Mentor Graphics Reports Fiscal Second Quarter Results

Mentor Graphics Corporation today announced financial results for the company's fiscal second quarter ended July 31, 2014.  The company reported revenues of $260.2 million, non-GAAP earnings per share of $0.23, and GAAP earnings per share of $0.13.

---

[4]     The false statements alleged herein appear primarily in bold and italics and are identified as false and misleading.

*     *     *

"The second quarter was strong for Mentor and as a result we exceeded non-GAAP earnings guidance," said Gregory K. Hinckley, president of Mentor Graphics. "A four percent revenue upside to guidance, along with continued attention to expense control, drove an over 50 percent beat in earnings per share. . . ."

**Outlook**

For the third quarter of fiscal 2015, the company expected 3Q15 revenues of about $275 million, . . . GAAP earnings per share of approximately $0.07 . . . [and] for the full year fiscal 2015, the company expects revenues of about $1.237 billion, . . . and GAAP earnings per share of approximately $1.37.

37.   <u>False and Misleading Statement</u>: Following the issuance of the August 21, 2014 press release, Defendants held an earnings call with analysts and investors in which Defendants made false statements about the Company's business and prospects. When analysts directly asked about Mentor's emulation business, Defendants falsely assured investors that it would "grow substantially this year" to the tune of "the range of 20% to 25%":

> [ANALYST:] [J]ust wanted to get a feel for emulation. So scalable was down pretty significantly year-over-year off of an admittedly tough comp, but just wanted to get a sense for how you're seeing the year in terms of the emulation business, either on a bookings or a revenue perspective. Do you see this as a meaningful growth year again for your emulation business?
>
> [RHINES:] ***Yes, absolutely we do***. We expect we will grow substantially this year in the emulation business.
>
> [ANALYST:] And would you be willing to put a finer point on substantially or is that we are going to have to leave it at?
>
> [HINCKLEY:] I think it is ***somewhere in the range of 20% to 25%*** this year, Rich.

38.   <u>False and Misleading Statement</u>: Defendants also misled investors by representing that Mentor's emulation business was guaranteed number one in market share:

> [ANALYST:] Then given the strong growth you talked about in the emulation for this year, do you think you could exit the year with higher share in this market this year?
>
> *     *     *
>
> [RHINES:] ***In emulation, absolutely***. The numbers are out for first quarter. We already know that we had more than 50% of the revenue in first quarter, so that

almost guarantees that we are number one. *It does guarantee we are number one, I'm sorry*.

39.    <u>False and Misleading Statement</u>: When specifically asked about the impact of Cadence's new product on Mentor's growth, Defendants falsely assured investors that the release of a new emulation platform by competitor Cadence would not negatively affect Mentor's financial results:

> [ANALYST:]  It is expected sometime over the next six to nine months it is likely Cadence has a new platform and it could then negatively impact the growth of emulation on Mentor's platform.  Could you share your thoughts on that?

> [RHINES:]  Well, so I think I indicated earlier that there are really two kinds of emulation.  There is traditional in-circuit emulation and then there is the whole new generation of virtual emulation.  We have been in the virtual emulation business for quite some time, over a decade . . . .

> Now, I expect our competitors will ultimately offer many of the kinds of features that Mentor has with virtual stimulus and accelerated test benches and the ability to do software development.  At some time in the future when they do, I think we will see them more often with competitors.

> *But today we are not number one in in-circuit emulation; we are clearly number one in virtual emulation.  [] I think it will take a long time for people to develop the capability that we have honed over the last 12 years to bring us to where we are in the virtual emulation side.*

40.    The market understood Defendants' message that Mentor did not need to worry about competitors' products as reflected in an August 25, 2014 *Seeking Alpha* report stating: "As the list of products requiring EDA has grown and diversified, each of the industry's three largest players has been able to carve out its own empire, often with little worry of competitor intrusion."

41.    Mentor's stock price traded at artificially inflated prices above $21.00 per share as a result of Defendants' materially false statements and omissions.

42.    <u>False and Misleading Statement</u>: On September 5, 2014, Mentor filed its 2Q FY15 Form 10-Q for the period ending July 31, 2014 wherein Defendants continued to materially misrepresent the impact of Cadence's impending new emulation product and Synopsys' emulator:

> We or our competitors sometimes pre-announce or provide "road maps" of the expected availability of new hardware or software products or product features. *Such pre-announcements, whether offered by the pre-announcing company or*

***vendors of competitive products, can result in customers canceling or deferring orders for currently offered products as customers anticipate that currently offered products may be uncompetitive or lacking in features or performance***.

\*　　\*　　\*

***Our competitors may acquire technology or companies offering competing or complementary product offerings which could adversely impact our ability to compete in the marketplace*. *They may be able to*** deliver better or broader product offerings, ***offer better pricing, or otherwise make it more desirable for our customers to buy more of the tools in their design flow*** from the competitor after the acquisition.

43.    <u>False and Misleading Statement</u>: Also on September 5, 2014, Mentor filed a Form S-8 Registration Statement with the SEC.  The registration statement incorporated by reference a number of documents, including the Company's FY14 Mentor's Form 10-K filed on March 17, 2014.  The registration statement by incorporating by reference Form 10-K falsely stated:

- "*[N]o material portion of our business is dependent on a single or a few customers*."

- "We do not believe that ***the competitive loss of one or more individual products at one or more of our customers would have a material adverse effect on our revenues***."

44.    Mentor stock remained artificially inflated as a result of Defendants' materially false statements and omissions trading at $22.35 per share on September 19, 2014.

45.    <u>Reasons Why Defendants' Statements in ¶¶37-39, 42-43 Were Knowingly False and Misleading</u>.  Each of Defendants' statements and omissions in ¶¶37-39, 42-43, including: (i) that "no material portion of our business is dependent on a single or a few customers"; (ii) Mentor's emulation business would grow "in the range of 20% to 25% this year"; (iii) that "number one" in emulation market share for FY15 was "guaranteed"; (iv) that competitor acquisitions of competing product offerings "***could*** adversely impact" Mentor's ability to compete; (v) downplaying the negative impact of Cadence's new emulation product by telling investors that "it will take a long time for people to develop the capability that we have honed over the last 12 years"; and (vi) that the pre-announcement of competitor products "***can*** result" in customers deferring or cancelling orders were false and misleading when made as Defendants knew or recklessly disregarded the following:

AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)    Defendants represented to investors that "no material portion of our business is dependent on a single or a few customers" and that they did not believe that "the competitive loss of one or more individual products at one or more of our customers would have a material adverse effect on our revenues."  In truth, Defendants knew as Mentor's executives testified at the Synopsys Trial (described below at ¶¶46-55) that: (i) Mentor had already lost its largest emulation customer Intel's emulation business for the foreseeable future which adversely impacted the Company's emulation growth prospects; and (ii) that because Intel was the "dominant customer" in the industry, the loss had a spillover effect impacting sales from other customers.  Defendants also knew, but failed to disclose the magnitude of the loss of Intel's emulation business.  The importance of Intel's business to Mentor is illustrated by Intel's $80 million in orders from the Company in 2013, nearly one-third of the total $250 million emulator market emulation for the year.  For 2014, Intel had ordered a mere $500,000 of emulation products, and more importantly told Mentor it had no intent to order the Company's emulators in the foreseeable future.  Defendants did not disclose the material adverse impact of the loss of Intel's business to Synopsys as of August 21, 2014, rather investors were deceived into believing that Intel's emulation business was still in play.  For example, analysts at Griffin Securities wrote on August 22, 2014 "incremental bookings possibility depends on whether Intel comes back again for additional emulation capacity. . . .";

(b)    Defendants' representation and purported warning that Mentor's "competitors *may* acquire technology or companies offering competing or complementary product offerings which *could* adversely impact our ability to compete in the marketplace" was also materially misleading.  Defendants knew, but did not disclose, that Synopsys' acquisition and marketing of the ZeBu 3 emulator was already materially impacting the Company with the loss of Intel's emulation business and other business.  As Mentor executives testified at the Synopsys Trial (¶¶46-55), the Company knew that because Synopsys had a "much larger" sales and customer support organization that its acquisition of the ZeBu 3 rendered Synopsys a "competitive threat," and Mentor had already been "adversely impact[ed]" in its "ability to compete" in the marketplace;

(c)     Defendants' claims of guaranteed emulation market share and 20%-25% growth in emulation for FY15 were materially misleading.  Defendants had primed investors into believing that the emulation market only had two real competitors, Mentor and Cadence, including by stating: (i) on December 4, 2013 at the NASDAQ OMX Investor Program, when asked about "the competitive landscape [] in emulation," Hinckley responded "there is two.  It's Cadence and ourselves"; (ii) on May 22, 2014 Rhines dismissed the suggestion that Synopsys was increasing its emulation business by stating, "I think things are not going to change appreciably in the foreseeable future"; and (iii) on August 12, 2014 when asked about Synopsys release of ZeBu 3 and its impact on market share, Reinhart stated "[w]e tend not to hear a lot about ZeBu . . . I don't think [its 10% market share position will] really [have] a material change."  Defendants knew that the impression that they gave investors that Mentor was beating out the competition and experiencing rapid growth was false.   In truth, not only did Defendants know, as Mentor's representatives testified at the Synopsys Trial, of the negative impact of the loss of Intel's emulation business to Synopsys and its spillover effect to other customers but that Synopsys following its acquisition of the ZeBu 3 was a "competitive threat . . . challenging [Mentor] very significantly at virtually every account" and "things [had] changed very dramatically."  *See* ¶¶47-52, *infra*;

(d)     Defendants also knew that the introduction of Cadence's new emulation product (Palladium Z1) was imminent having been asked about its release beginning no later than August 2013, and repeatedly thereafter, including on August 21, 2014.  Based on: (i) Defendants' experience with Mentor's own announcement of its Veloce platform and the release of Mentor's new Veloce2 emulation product in 2012 and corresponding shifts in market share; and (ii) warnings by a leading industry analyst Gary Smith[5] in a September 20, 2012 online blog *DeepChip.com* (which

---

[5]   Defendants told investors that Gary Smith (who passed away in 2015) was "the leading industry analyst for EDA" and the person they relied on to measure market share in one EDA industry was Gary Smith.  *See,* e.g., Feb. 28, 2013 Earnings Conference Call (Rhines: "So we're anxiously awaiting the publication of results from Gary Smith EDA.  That's the only source in our industry that gives total market as well as competitive results."); *see also* Aug. 12, 2013 Pacific Crest Global

Defendant Rhines followed) that "[s]omewhere in 2013, the tables will turn because then Wally [Rhines] will have the old processor in Veloce 2, while Palladium 5 [*i.e.* Cadence] will have the new processor," Defendants knew that the anticipated release of its competitor's product would negatively impact sales and market share. In fact, at the end of the Class Period, Defendants admitted that "there was a general fear in the market that there might be competition that could approach [Veloce2's] capability," causing the deferral of orders. And Defendants later explained on March 3, 2016 that evaluations were taking six months longer and, in turn, bookings were deferred by customers because unlike a year or two ago (*i.e.*, March 2014), Mentor was not "the only game in town," and "there [were] now competitors to evaluate." ¶117. Accordingly, Defendants' statements about market share, emulation growth as well as their purported warning that that pre-announcing products "*can* result in customers canceling or deferring orders" were all false;

(e)    In addition, Defendants knew that Mentor was not guaranteed to be the leader in market share for FY15 given the adverse facts discussed above that were known to Defendants. Defendants knew on August 21, 2014, but did not disclose, for example, that Synopsys' acquisition of the ZeBu 3 emulator had resulted in the loss of Intel and other business, and that Cadence's anticipated emulator product was already negatively impacting orders. Defendant Hinckley later admitted during a January 14, 2015 Needham Growth Conference call that Mentor was not number one in market share: "So we are the market-share leader in four of the top 10 categories. Synopsys is the leader in three and ***Cadence is in two, and one of those are in emulation*** . . . ." Defendants, however, continued to mislead investors regarding the demand for and growth of Mentor's emulation business;

(f)    For the same reasons that Mentor was not guaranteed the number one market share position, Defendants had no reasonable basis to state that emulation revenue would grow 20%-25% growth in FY15. Defendant Rhines hinted that FY15 emulation revenue growth of 20%-25%

---

Tech. Leadership Forum (Reinhart noting with respect to emulation market share, "the real data doesn't come out from Gary Smith EDA for another week or two.").

had in fact not been achieved by evasively responding to a direct analyst question on February 26, 2015 to that effect. Rhines stated that Mentor was able only "to grow our emulation revenue this past year thereby conceding that the 20%-25% growth had not been achieved. However, coupled with Defendants' other statements, Rhines continued to give investors the impression that the Company's emulation business was robust with growing demand. Despite Defendants' knowledge to the contrary, investors understood from Defendants' statements that Mentor could benefit from Intel's emulation business, as reflected in a March 2, 2015 report by analysts at Summit Research: "Emulation business at Intel *has not been lost*, and Intel is *probably taking a pause* . . . ."; and

(g)    Defendants also knew, but failed to disclose, that emulation growth and sales were all being impacted by the weaknesses in the semiconductor industry that were driving significant consolidations, reducing EDA expenditures and causing price erosion as well as impacting the Company's contract renewals and ability to sell its products, as detailed in ¶¶9-10, 65, 76, 99, 108, 115.

<u>Mentor Representatives' Admissions and Executives' Trial Testimony Confirm Defendants'</u>
<u>Knowledge or Reckless Disregard of Defendants' False Statements</u>

46.    In 2012, Synopsys acquired EVE-USA, Inc., and EVE's "ZeBu" line of emulator products. Mentor was embroiled in litigation regarding the ZeBu 3 emulator against EVE and Synopsys in the United States District Court for the District of Oregon, Portland Division, Case Nos. 3:10-cv-00954-MO, 3:12-cv-01500-MO and 3:13-cv-0059-MO, before the Honorable Michael W. Mosman, prior to the Class Period, with trial commencing on September 29, 2014 (referred to herein as the "Synopsys Trial").

47.    Mentor's opening statement by its trial counsel George Riley ("Riley") described Intel as a dominant and important customer, who set the standard for the EDA Industry:

[RILEY:]  [T]here is *one 800-pound gorilla here in the room*. The largest and the most advanced chip maker in the world is Intel.

*Intel is the dominant customer.* Not only do they buy more EDA tools because they're making more chips, but Intel is making the most advanced chips…. And because Intel makes the most powerful, the fastest and the most chips, they demand

the most from the tools. ***They're the ones that set the standards for the EDA industry.*** They want more powerful tools, better tools, more rigorous tools.  Intel sets the standard. ***Believe me, Intel is really important, because if you can sell to Intel, you can sell to these other folks***.

48.   Mentor's counsel, Riley, also explained in his opening statement the significance and importance of having Intel's business, as Intel was Mentor's largest customer and purchased up to 70% of Mentor's Veloce2 product:

> [RILEY:]  Intel [] purchase[d] 60 to 70 percent of the ZeBu and Veloce emulators in the U.S. . . .  So you've got one customer that makes up 60 to 70 percent of all the sales of ZeBu and Veloce.

49.   A number of Mentor's executives also testified at the Synopsys Trial.  The trial testimony of Mentor's then VP of Enterprise Solutions Organization, Donald Cantow ("Cantow")[6] is particularly relevant to facts alleged herein, as are statements provided by Mentor's VP and General Counsel, Dean Freed ("Freed").[7]  Through his testimony, Cantow revealed that while Intel purchased $80 million in emulation products in 2013, it had cut purchases to a mere $500,000 in 2014 and told Mentor that it was no longer going to be purchasing emulation products from the Company in the future:

> [CANTOW:]  Sandra Connor of Intel, who is in charge of the procurement of emulation . . . shared with me that going forward for all next-generation purchases . . . their intent or plan is to purchase all of that from EVE/Synopsys [not Mentor].

*        *        *

> [CANTOW:]  After May of 2013, we [Mentor] haven't sold anything to Intel.  I shouldn't say anything.  We sold [$]500K."

---

[6]   Cantow has been an executive with Mentor since 1995 and is currently VP, Global Accounts, and a member of Mentor's executive team according to the Company's website.  Cantow testified that one of his primary responsibilities was working with Intel as a customer and that there were ~ 70 people in his organization with people onsite at various customers.

[7]   Defendant Hinckley has direct knowledge of the facts testified at trial as he was present at the trial, from the opening arguments ("And we have with us today the president of Mentor Graphics, Greg Hinckley.  Mr. Hinckley, would you stand again.") to the closing arguments ("Mr. Hinckley was sitting there throughout the entire day.  There he is.  He hasn't gone away.").

50.    By the time of the Synopsys Trial in September 2014, Defendants therefore knew that Mentor had lost Intel's emulation business to competitor Synopsys.

51.    Cantow also testified to the competitive threat that Synopsys posed to Mentor, noting that once Synopsys took Intel's business, it "became a large supplier" of emulators and started challenging Mentor "very significantly at virtually every account [*i.e.*, customer] and ***things changed very dramatically***" for Mentor as a result.

52.    Mentor General Counsel Dean Freed also testified that like Cadence, Synopsys had a "much larger" sales organization and customer support than Mentor, and as a result, "***[Mentor was] concern[ed] [] if Mentor technology were to be run through those sales forces in those companies, that it could be a significant competitive threat to Mentor and its emulation business***."

53.    The increased competition from Synopsys following its acquisition of the ZeBu 3 was no surprise to Mentor, however, as Cantow testified Mentor employees from the support organization were onsite at customers like Intel on a daily basis and that because EDA is a "small world," Mentor was always aware of its competition:

> [QUESTION:]  Do you follow what your competitors are doing at the customers where you're located?

> [CANTOW:]  Yes.  There's basically two other large [EDA] companies, so it's a very small world.  Our competitors will be at the very same location.  So there's a ***very realtime feedback on what's occurring in the competition***."

54.    Cantow also described what was meant when Mentor referred to its "backlog" and the visibility that backlog gave the company into revenue recognition:

> [CANTOW:]  [B]asically a schedule of our shipments for the future . . . . [I]t's basically a process where we will give visibility to our manufacturing organization of here's how many components I need to make, here's when I need to deliver them by . . . . [backlog at Mentor means] we have a contract that obligates the customer to take delivery and pay us for those units.

55.    Cantow further explained the lengthy negotiation process between Mentor and a potential customer:

> [QUESTION:]  Could you briefly describe how that process works, from interest to negotiation to actually inking the deal, signing on it.

[CANTOW:]  Yes. Typically it starts off with more of a technical focus, where the *customers will go through a technical qualification review.  And that can be anywhere from three months to sometimes it's a year.*  Sometimes you'll go through and actually implement an entire design with a customer on the tools and go into them.

And *then you move into a financial portion of the negotiations, and those will last anywhere from three months to maybe as long as nine months, depending on the size of the purchase.*  Some of the smaller purchases kind of happen more quickly once a contract is developed.

And it's a very rigorous process.

56.      Accordingly, Defendants knew that the time to procure a deal, and particularly a large complicated emulation deal, could take more than 18 months – representing a year for technical review and nine months for financial negotiations.

<u>Mentor Falsely Claims that Its Emulation Business Had Strengthened</u>

57.      On November 20, 2014, Mentor issued a press release announcing its financial results 3Q FY15, the period ended October 31, 2014.  The press release provided that:

**Mentor Graphics Reports Fiscal Third Quarter Results**

Mentor Graphics Corporation today announced financial results for the company's fiscal third quarter ended October 31, 2014.  The company reported revenues of $292.7 million, non-GAAP earnings per share of $0.34, and GAAP earnings per share of $0.18.

\*          \*          \*

"Mentor had another successful quarter which again demonstrated strong leverage.  A 6% revenue upside to guidance drove an over 60% increase in non-GAAP earnings per share," said Gregory K. Hinckley, president of Mentor Graphics.  "Renewals in our top ten bookings were up 55%, driven by strong transportation cabling demand and competitive replacement. . . ."

58.      <u>False and Misleading Statement</u>:  Following the issuance of the November 20, 2014 press release, Defendants held an earnings call with analysts and investors to discuss the Company's reported earnings, business and operations on the same day.  Defendants Rhines, Hinckley and Reinhart hosted the call.  During the call, Defendants falsely stated that Mentor's financial outlook for its FY15 growth in its emulation business had strengthened:

[ANALYST:] [J]ust wanted to get your sense of how you see the emulation business relative to a quarter ago. Something a little bit like bookings but very optimistic on the pipeline and the revenue potential fourth quarter.

I think the last quarter you talked about that business, and I believe this is in terms of revenue being maybe a 20% to 25% grower [sic] this year. Anything changed in the last quarter?

[RHINES:] *Of course the year-to-date revenue is quite strong, and from a bookings point of view, I would say it's strengthened*. . . .

*So if anything, I think I'd say that our outlook has improved* . . . .

59.    <u>False and Misleading Statement</u>: When specifically asked about the emulation business market share on the November 20, 2014 earnings call, Defendants misled investors regarding its market leadership:

[ANALYST:] Hi, thanks for taking my question. The first is on the emulation side. So, Wally, do think you will exit this year with a higher share in the emulation market? And you have seen a very -- Mentor has had a very strong growth in emulation two years back to back and given your strong [arpen] is it fair to think that you can grow the [debilit] even next year?

[RHINES:] The answer to your first question, you have seen reports in the markets that indicate Mentor is number one over the last year, and *we expect that that is a position in the market that we can sustain*. And then you said with regard to FY16 we don't give any outlook for FY16, but we will give an outlook for the business at our next conference call.

60.    Analysts commenting on the earnings call found Defendants' statements about the growing emulation business particularly significant, including:

(a)    Canaccord Genuity, on November 20, 2014, reported that "Management expects strength in transportation and IC Design to silicon to continue in Q4 of 2014 and highlighted the growing pipeline of emulation customers";

(b)    Summit Research, on November 21, 2014, reported that "Emulation and Automotive continue to be the stars in Mentor's portfolio. Mentor continues to maintain its lead in Emulation (mid 40% market share) and expects it to grow at 20%+ next year"; and

(c)    J.P. Morgan, on November 24, 2014, reported that "Momentum in automotive strength, the rapidly growing pipeline for emulation products, and strong contract renewal outlook are expected to fuel the fourth quarter."

61.    Following the Company's 2Q FY15 results, Mentor's stock price continued to trade at artificially inflated prices as a result of Defendants' fraud, reaching a high of $23.49 on December 2, 2014.

62.    <u>False and Misleading Statement</u>:  On December 4, 2014, Mentor filed its 3Q FY15 Form 10-Q for the period ending October 31, 2014 with the SEC wherein it repeated Defendants' prior misrepresentations by failing to disclose: (i) the known adverse impact of Cadence's impending emulation product; (ii) that Synopsys' acquisition of EVE's ZeBu 3 emulator had already in fact (without contingency) resulted in the loss of Mentor's largest emulation customer, Intel, for the foreseeable future and others; and (iii) that announced industry consolidations had occurred and negatively affected Mentor's financial performance:

> We or our competitors sometimes pre-announce or provide "road maps" of the expected availability of new hardware or software products or product features. ***Such pre-announcements, whether offered by the pre-announcing company or its competitors, can result in customers canceling or deferring orders for currently offered products anticipating that currently offered products may be uncompetitive or lacking in features or performance.***  In the case of hardware products, slowing sales may cause inventories to increase or become obsolete, resulting in the need to discount or reduce production of current products.

> \*        \*        \*

> ***Our competitors may acquire technology or companies offering competing or complementary product offerings which could adversely impact our ability to compete in the marketplace***. ***They may be able to*** deliver better or broader product offerings, ***offer better pricing, or otherwise make it more desirable for our customers to buy more of the tools in their design flow*** from the competitor after the acquisition. . . .

> \*        \*        \*

> ***Customers may acquire or merge with other customers or their business***.

> Like many industries, the semiconductor and electronics industries are subject to mergers, acquisitions, and divestitures and our customers or parts of their business may acquire or be acquired by other customers.  ***Such synergies could result in***

*fewer customers in the industries or the loss of some customers to competitors, or reduced customer spending on software and services due to redundancies or stronger customer negotiating power, which could have an adverse effect on our business and future revenues.*

63.    <u>False and Misleading Statement</u>:  Defendants also continued to falsely claim that the only competition the Company faced in the emulation market was Cadence.  At the January 14, 2015 Needham Growth Conference, Hinckley stated that "*[w]e [Mentor] have some advantages today. There are for all intents and purposes two competitors [in emulation], ourselves and Cadence*."

64.    As a result of Defendants' material misrepresentations and omissions, Mentor's stock continued to trade at artificially inflated prices, reaching a high of $23.20 on January 30, 2015.

65.    <u>Reasons Why Statements in ¶¶58-59, 62-63 Were Knowingly False and Misleading</u>: Each of the statements and omissions alleged in ¶¶58-59, 62-63 above were false and misleading when made, as Defendants knew or recklessly disregarded the following:

(a)    All the reasons set forth in ¶¶3, 45-55 above:

(b)    Defendants knew, but failed to disclose, that Mentor had lost its largest customer's emulation business to Synopsys as well as other business as a result (¶¶47-52);

(c)    Cadence and Mentor were not the only two material competitors in the emulation market.  Defendants knew, but failed to disclose, that Synopsys was a "competitive threat" and was already "challenging [Mentor] very significantly at virtually every account" with Mentor losing business as result (¶¶47-52);

(d)    Defendants knew, but failed to disclose, that evaluations by customers were taking longer, causing delays in orders, as a result of Synopsys newly acquired emulator (ZeBu 3) and the increasing threat of Cadence's anticipated new emulation product (Palladium Z1);

(e)    Defendants knew Synopsys was taking emulation business from Mentor and that Cadence's new emulation product would also take away from Mentor's sales because it was a

major new platform.  As a result, Defendants knew, but did not disclose, that Mentor could neither sustain nor grow its market position in emulation;

(f)  Semiconductor companies were experiencing a market downturn, resulting in increased consolidations and reduced expenditures.  Consolidations announced in 2014 totaled $23 billion, nearly double the $12 billion announced in 2013.  Defendants knew, but did not disclose, that semiconductor consolidations typically always had a "negative effect."  Defendant Rhines conceded this knowledge on a May 19, 2016 1Q FY17 earnings call, admitting that **"*in almost all cases of consolidation, it's a negative effect*.**  That is it either slows the growth rate or even causes a negative growth rate";

(g)  Defendants also knew, from their own experience, that semiconductor consolidations could negatively impact their contract renewals.  In a February 27, 2014 earnings call, Defendants reported that there was "a substantial drag from Japan . . . due to the restructuring of the Japanese electronics industry . . . ."  In addition, Defendant Rhines had acknowledged during a February 27, 2014 earnings call that the Company lost 20% on two of its largest contract renewals as "a direct result of the consolidations and reductions in people that had occurred in those companies";

(h)  Defendants knew that Mentor's customers IBM and GlobalFoundries had announced a $1.5 billion deal on October 20, 2014, which would result in decreased orders and price erosion.  In fact, Defendants blamed this very deal (in part) for their more than $104 million reduction in FY16 revenue guidance on November 19, 2015.  ¶101.  Rhines was quoted in an article on December 2, 2015, admitting his knowledge that the effect of the announced consolidations would be one that lasted for years, not months and impacted renewals.  ¶108.  Analysts would note

after Defendants' disclosure on December 4, 2015 that Mentor "does not get to count on both IBM and Global Foundries."  ¶114; and

       (i)    The outlook for FY15 emulation revenue growth of 20%-25% had not improved as Defendants represented, and could and would not be met, for all the facts known to Defendants in (a)-(h) above.

<u>Mentor Issues FY16 Financial Guidance that Lacks Any Reasonable Basis</u>

66.    On February 26, 2015, Mentor issued a press release announcing its financial results for 4Q FY15, ended January 31, 2015.  The press release provided in pertinent part:

> Mentor Graphics Corporation today announced financial results for the company's fiscal fourth quarter ended January 31, 2015.  The company reported revenues of $439.1 million, non-GAAP earnings per share of $1.09, and GAAP earnings per share of $0.96.  For the full fiscal year, revenues were $1.244 billion, non-GAAP earnings per share were $1.77, and GAAP earnings per share were $1.26.
>
>             *        *        *
>
> "In the fourth quarter we posted numerous all-time records including bookings, revenue, and both GAAP and non-GAAP earnings per share," said Gregory K. Hinckley, president of Mentor Graphics.  "Similarly, we had record revenue and non-GAAP earnings per share for the full year. . . .

67.    <u>False and Misleading Statement</u>:  Mentor's February 26, 2015 press release also included guidance for FY16 that Defendants knew lacked any reasonable basis when issued:

> **Outlook**
>
> For the first quarter of fiscal 2016, the company expects revenues of about $260 million, non-GAAP earnings per share of about $0.18 and GAAP earnings per share of approximately $0.08.  ***For the full year fiscal 2016, the company expects revenues of about $1.282 billion***, non-GAAP earnings per share of about $1.85, and ***GAAP earnings per share of approximately $1.45***.  The fiscal 2016 non-GAAP guidance, first quarter and full year, anticipates a normalized non-GAAP tax rate of 19% which is an increase from the fiscal 2015 rate of 17%.

68.    <u>False and Misleading Statement</u>: On the same day as the press release, Defendants held an earnings call with analysts and investors to discuss the Company's 4Q FY15 and FY15 reported earnings and results.  Defendants Rhines, Hinckley and Reinhart hosted the call.  During the

earnings call, Defendants repeated the earlier *false Company revenue guidance of $1.282 billion and EPS guidance of $1.45*. Defendants also made numerous false statements, including that Mentor's emulation business would grow:

> [ANALYST:] And then, emulation, I think you talked about perhaps growing that business on the order of 25% in FY15. Wondering if you can kind of talk about where you ended up, maybe relative to that number?
>
> And then, what are your thoughts, and what's baked in to your FY16 forecast, with respect to emulation growth? It sounds like you expect no products from your – no sales from your largest customer. Just wondering how it affects the overall growth there?
>
> [RHINES:] Well, we were able . . . to grow our emulation revenue this past year. But as noted, we had a contribution from a large customer, which we don't expect to have in the coming year. *But we do expect that we can probably grow emulation revenue in the year ahead – or the year we are currently engaged in, in FY16.*
>
> *         *         *
>
> [ANALYST:] Okay. And could you comment on the renewals calendar for FY16? And to what extent is FY13, a predictor of this year's results? In FY13, bookings were down year over year in each quarter and for the year
>
> [HINCKLEY:] I haven't looked back at FY13 in preparation for this call, so I can't address that, and we don't really comment on what the levels are of our renewal portfolio from year to year. What I do point out is that our expected revenue is less than it has historically traded.
>
> But, that has to do with the expected absence of business from our single-largest emulation account, and emulation is not a product that is characterized by renewals, at least for Mentor. Most of the business is perpetual license.

69.    <u>False and Misleading Statement</u>: Defendants also falsely assured analysts and investors on the February 26, 2015 earnings call that the "decline in the level of activity" from the Company's largest emulation customer, Intel, was an "isolated" issue that would not affect future growth in emulation. Defendants also misled investors regarding the impact of the anticipated release of Cadence's competing emulation product and Synopsys' sales of its newly acquired ZeBu 3 emulator on Mentor's growth prospects by simultaneously issuing revenue guidance for FY16 of $1.282 billion and downplaying any impact of the Company's competition:

> [ANALYST:] Okay. And then, I was just wondering, with one of your competitors in emulation with a new product, I'm wondering what your thoughts are on the

competitive dynamics there?  And whether or not the long-term – or let's say, the five-year growth rate for emulation should reaccelerate after this year for you?

[RHINES:] . . .  I believe you're referring to Cadence.  Is that what the question is?

[ANALYST:]  Yes.

[RHINES:] ***Yes, we haven't seen much direct competition from Cadence***, but we're always wary.  Customers develop new capabilities, and ***so we work hard to be sure that we are ahead of the game***.

*        *        *

[HINCKLEY:] [R]ight now, our emulation business is ***affected by a big decline in the level of activity with our single-largest customer.  It's quite isolated.  This has nothing to do with what is going on in the overall emulation market***.  It is our business with what has been our historically largest emulation customer.

70.    As a result of Defendants' misrepresentations, on February 27, 2015, the Company's stock continued to trade at artificially inflated prices above $22.00 per share, closing at $24.18 on March 2, 2015.

71.    Analysts bought Defendants' reassurances and promises regarding the strength of Mentor's emulation business reporting that FY16 guidance was "conservative," there was a "lower risk profile for FY16" and that "emulation business remains strong":

(a)    Canaccord Genuity, on February 27, 2015, reported that "We are reiterating a BUY rating on MENT following upside results and what we view as conservative guidance for fiscal 2016. While this year sees overall top line growth slowing on slowing demand from MENT's largest emulation customer, we expect revenue and earnings growth to be above trend in fiscal 2017";

(b)    J.P. Morgan, on February 27, 2015, reported that "Looking to FY16 management is factoring in stable growth in core EDA, but taking out a large customer in the emulation business as timing/certainty of deal closure is up in the air.  This lowers the risk profile of FY16 estimates, but likely causes shares to go into a holding pattern on whether that business materializes"; and

(c)    Summit Research, on March 2, 2015, reported that "Reiterating BUY and $30 PT Due to the Following: 1) Emulation business at Intel has not been lost, and Intel is probably

taking a pause; 2) Non-Intel Emulation business remains strong (6 customer wins); 3) Automotive

and PCB business are strong . . . ."

72.    <u>False and Misleading Statement</u>: As Defendants had done in prior quarters,

Defendants repeated in Mentor's FY15 Form 10-K their false statements omitting the true impact of

Cadence's new emulator, Synopsys competitive emulator and semiconductor consolidations:

> We or our competitors sometimes pre-announce or provide "road maps" of
> the expected availability of new hardware or software products or product features.
> ***Such pre-announcements***, whether offered by the pre-announcing company or its
> competitors, ***can result in customers canceling or deferring orders for currently
> offered products anticipating that currently offered products may be uncompetitive
> or lacking in features or performance***.  In the case of hardware products, slowing
> sales may cause inventories to increase or become obsolete, resulting in the need to
> discount or reduce production of current products.
>
> *        *        *
>
> ***Our competitors may acquire technology or companies offering competing
> or complementary product offerings which could adversely impact our ability to
> compete in the marketplace***.  ***They may be able to*** deliver better or broader product
> offerings, ***offer better pricing, or otherwise make it more desirable for our
> customers to buy more of the tools in their design flow*** from the competitor after the
> acquisition. . . .
>
> ***Customers may acquire or merge with other customers or their business***.
>
> Like many industries, the semiconductor and electronics industries are subject
> to mergers, acquisitions, and divestitures and our customers or parts of their business
> may acquire or be acquired by other customers.  ***Such synergies could result in
> fewer customers in the industries or the loss of some customers to competitors, or
> reduced customer spending on software and services due to redundancies or
> stronger customer negotiating power, which could have an adverse effect on our
> business and future revenues***.

73.    <u>False and Misleading Statement</u>: Defendants also falsely maintained in Mentor's

FY15 Form 10-K that the Company was not overly dependent on any customer or product, and had

developed strong leadership positions with its products that it expected to be able to maintain:

- "***[N]o material portion of our business is dependent on a single or a few
customers***."

- "We do not believe that ***the competitive loss of one or more individual
products at one or more of our customers would have a material adverse
effect on our revenues***."

74.   <u>False and Misleading Statement</u>: Mentor's FY15 Form 10-K filed with the SEC on March 16, 2015 also reaffirmed the false FY16 revenue and EPS guidance issued by Defendants on February 26, 2015:

**OUTLOOK FOR FISCAL 2016**

We expect revenues for the first quarter of fiscal 2016 to be approximately $260 million, with earnings per share for the same period of approximately $0.08. For the *full year fiscal 2016, we expect revenues to be approximately $1.282 billion, with earnings per share of approximately $1.45*.

75.   As a result of Defendants' false statements on March 16, 2015, Mentor's stock continued to trade at artificially inflated prices, closing at $24.09 on March 16, 2015.

76.   <u>Reasons Why Statements in ¶¶67-69, 72-74 Were Knowingly False and Misleading</u>: Each of the statements and omissions alleged in ¶¶67-69, 72-74, including that the Company expected to achieve FY16 revenue guidance of ~ $1.282 billion and EPS of $1.45 accompanied by statements that Mentor's emulation business was: (i) expected to "grow"; (ii) there was no "direct competition" from Cadence; (iii) the decline in activity from its largest customer emulation customer (Intel) was "isolated"; (iv) pre-announcements of competitive products "***can result*** in in customers canceling or deferring orders"; (v) acquired products from its competitors "***could adversely*** impact our ability to compete"; (vi) that consolidations "***could result***" in reduced spending, "which ***could*** have an adverse effect"; and (vii) "no material portion of our business is dependent on a single or few customers," were false and misleading when made, because Defendants knew or recklessly disregarded the following:

(a)   All the reasons set forth in ¶¶3, 45-55, 65 above;

(b)   Defendants' statement that there was "a big decline in the level of activity with our single-largest customer" was a material understatement. Defendants knew but failed to disclose, that Mentor had lost its largest customer's emulation business to Synopsys. ¶¶47-52.  Nor did Defendants disclose the impact of that loss including given that they knew that no orders would be placed for Mentor's emulators in the foreseeable future and that other business had been lost to

Synopsys as a result of losing the "800-pound gorilla" that was "really important" for sales to "other folks" (¶47);

(c)    Nor was the purported decline in Intel's business "isolated" as Defendants claimed.  Rather, once Mentor lost Intel's business to Synopsys, Defendants knew that Synopsys was a "competitive threat" for virtually all of Mentor's emulation accounts representing a "dramatic change" in competition;

(d)    Defendants also knew, but did not disclose, that evaluations by emulation customers were taking longer, causing delays in orders, as a result of: (i) Synopsys' acquisition of the ZeBu 3 emulator and its imminent release of a new version of that emulator in March 2015; and (ii) the increasing threat of Cadence's anticipated new emulation product;

(e)    Defendants' claim that they had not "seen much competition from Cadence" was materially misleading.  Defendants knew that customers were deferring orders in anticipation of evaluating Cadence's new emulator and thus Cadence's "direct competition" to Mentor's revenues and market share in emulation;

(f)    Defendants also had no reasonable basis for telling investors that emulation revenue would "grow" given the adverse facts known to Defendants, including its competitors' new emulation products, the loss of its largest customer's emulation business and the negative effect of the semiconductor consolidations;

(g)    In addition to the $1.5 billion deal between IBM and GlobalFoundries that Defendants would specifically blame for contributing to the reduction in FY16 guidance (¶101), by January 15, 2015 there had been another $3 billion deal announced between Mentor semiconductor customer Infineon Technologies AG and International Rectifier.[8]  This deal along with the other deals was having an existing negative impact on Mentor's future revenues.  Defendants would post-Class Period admit that the effects of the announced consolidations would be felt for "years" (¶108);

---

[8]    *See* Exhibit A for a listing of semiconductor deals.

(h)    Because of the lengthy evaluation cycle and the lead times for the manufacturing and delivery of Mentor's emulators, Defendants had to have finished the direct evaluation cycle and negotiations that according to Mentor VP Cantow could take 18 months (¶55) when they issued FY16 guidance.  Defendants also told investors in the Company's FY15 Form 10-K that its $142 million backlog of orders booked by January 31, 2015 were expected to be delivered by the end of FY16.  Defendants had also previously presented on May 23, 2013 that for manufacturing "it takes us about six months to respond to a big jump in orders, which, what we're booking in the first and second quarter, we will largely be shipping in the fourth."  It was not reasonable under the circumstances for Defendants to anticipate that tens of millions of dollars more in additional emulation bookings would close and that those bookings could be manufactured and delivered in FY16 in time to book revenues;

(i)    Defendants knew that early renewals simply pulled in revenues to earlier quarters and that additional bookings were necessary to meet guidance;

(j)    Defendants knew that the Company's targeted renewals for contracts were 70% semiconductor companies, when traditionally Mentor prided itself on the diversity of its customer base, split ~ 50/50 between semiconductor and systems companies.  ¶116.  Defendants concealed this fact from investors despite the increasing consolidations and weakness in the semiconductor industry; and

(k)    In light of the above and specifically (a)-(j), Defendants also knew that FY16 fiscal guidance of ~ $1.282 billion in revenues and EPS of $1.45 lacked a reasonable basis.  In fact, Defendants would dramatically lower FY16 revenue guidance to $1.18 billion and EPS guidance to $0.63 on November 19, 2015 blaming the delays in booking emulation orders and the negative impact of semiconductor consolidations.

Mentor Falsely Affirms FY16 Revenue and EPS Guidance Touting Emulation Growth

77.    On May 22, 2015, Mentor issued a press release announcing its financial results for the 1Q FY16, the period ended April 30, 2015:

**Mentor Graphics Reports Fiscal First Quarter Results and Announces Quarterly Dividend**

Mentor Graphics Corporation today announced financial results for the company's fiscal first quarter ended April 30, 2015. The company reported revenues of $272.1 million, non-GAAP earnings per share of $0.28, and a GAAP loss per share of $0.08.

"The first quarter was strong for Mentor Graphics, substantially exceeding financial guidance," said Walden C. Rhines, chairman and CEO. "In addition to more than 50% bookings growth in three of our four product categories, our automotive business was very strong, driven by a major win with a leading automotive OEM."

*        *        *

"First quarter revenue was 5% greater than guidance, while continued attention to expenses drove non-GAAP earnings per share to exceed guidance by 55%," said Gregory K. Hinckley, president of Mentor Graphics.

78.   <u>False and Misleading Statement</u>: In the May 22, 2015 press release Defendants falsely affirmed previous ***revenue guidance for FY16 of ~ $1.282 billion*** and issued ***GAAP EPS guidance to $1.18***, attributing the decrease in EPS guidance to "primarily the result of workforce restructuring expenses":

**Outlook**

For the second quarter of fiscal 2016, the company expects revenue of about $250 million, non-GAAP earnings per share of about $0.14 and GAAP earnings per share of approximately $0.03.  ***For the full year fiscal 2016, the company affirms the previous revenue guidance of about $1.282 billion***; increases non-GAAP earnings per share guidance from $1.85 to about $1.88; and ***currently expects GAAP earnings per share of approximately $1.18***.  The decrease in fiscal 2016 GAAP earnings per share from previous guidance is primarily the result of workforce restructuring expenses announced during the first quarter.

79.   <u>False and Misleading Statement</u>: On the same day, May 22, 2015, Defendants held an earnings call with analysts and investors to discuss the Company's 1Q FY16 reported earnings and operations and FY16 guidance.  Defendants Rhines, Hinckley and Reinhart hosted the earnings call. During the earnings call, Defendants reiterated the Company's ***false FY16 guidance of ~ $1.282 billion in revenue and EPS guidance of $1.18***.  Defendants also stated that the Company was booked to capacity in evaluations  and had more demand than it could handle, such that even if

revenue was otherwise down, the Company had more than enough business in the pipeline to meet or

exceed fiscal year guidance:

> [HINCKLEY:] [B]ookings were up 70%, through *the second highest Q1 ever*. That strength was dispersed, spread across all regions in most product categories.

*     *     *

> [ANALYST:] Okay. And then, finally, maybe just a quick update on the emulation business, on both the competitive front, but also just the linearity you're expecting through this year. It looks like revenue's been higher than bookings for the last few quarters, and I wonder if that's changing at all.

> [RHINES:] *We are expecting that, during the year, our revenue will grow for emulation*. And I have to say, at this point, that the *activity for evaluations is so strong, that we are booked to capacity in the number of customers we can evaluate*.

80.    <u>False and Misleading Statement</u>: Defendants, when specifically asked about Mentor's

FY16 guidance, falsely assured investors that business, especially in emulation, was robust:

> [ANALYST:] The first question is on the guidance. Why would revenue – I mean maybe if you could kind of touch base, why the revenue will be down Q over Q? Is it some pull-in, in the Q1 quarter?

> [HINCKLEY:] That's what Wally explained, []. So we had some contracts that were expiring naturally outside of the first quarter that those customers asked us to renew in the first quarter. That happened. And so, it's business that we expected to do later in the year, happened in the first quarter.

> [ANALYST:] Got it. Okay. And then, the scalable verification revenue is down year over year. So is it mainly kind of the one big emulation customer, which you talked about last quarter, may not be renewing this year or buying more tools? Is it because of that?

> [HINCKLEY:] I think what we described is – and we think the most compelling indicator of the strength of the business is actually what out bookings are. So, our revenue maybe down, and that has to do with, for example, in scalable verification is emulation, *we have to actually build emulators, so we ship to a build forecast. Bookings for the quarter were, in fact, up 65%. So, the business is robust*.

81.    Asked directly, again, during the earnings call about declining revenue in emulation

and the loss of emulation business, Defendants reassured analysts that bookings were up and would

materialize in revenue in the remainder of the fiscal year, with Hinckley stating that he thought

negative leading indicators were "all noise." Based on these reassurances, analysts continued to

believe that Mentor was at least on track to deliver on its guidance. Canaccord Genuity, for

example, in a May 22, 2015 report declared that "[w]e reiterate our BUY rating and see potential for upside to consensus estimates based on increasing momentum for automotive (additional wins at other manufacturers) and emulation (management expectations conservative)."

82.    <u>False and Misleading Statement</u>: Defendants repeated in Mentor's 1Q Form 10-Q for FY16 filed on June 2015 with the SEC verbatim the misrepresentations it had earlier made regarding the impact of Cadence's new emulation product, the impact of Synopsys' acquisition of a new emulator and giving investors an impression that materially differed from the truth about consolidations:

> We or our competitors sometimes pre-announce or provide "road maps" of the expected availability of new hardware or software products or product features. ***Such pre-announcements, whether offered by the pre-announcing company or its competitors, can result in customers canceling or deferring orders for currently offered products anticipating that currently offered products may be uncompetitive or lacking in features or performance***.  In the case of hardware products, slowing sales may cause inventories to increase or become obsolete, resulting in the need to discount or reduce production of current products.

> \*       \*       \*

> ***Our competitors may acquire technology or companies offering competing or complementary product offerings which could adversely impact our ability to compete in the marketplace***.  ***They may be able to*** deliver better or broader product offerings, ***offer better pricing, or otherwise make it more desirable for our customers to buy more of the tools in their design flow*** from the competitor after the acquisition. . . .

> \*       \*       \*

> Like many industries, the semiconductor and electronics industries are subject to mergers, acquisitions, and divestitures and our customers or parts of their business may acquire or be acquired by other customers. ***Such changes could result in fewer customers in the industries or the loss of some customers to competitors, or reduced customer spending on software and services due to redundancies or stronger customer negotiating power, which could have an adverse effect on our business and future revenues***.

83.    <u>False and Misleading Statement</u>: Defendants also reiterated the false FY16 revenue and EPS guidance they had given on May 22, 2015 in Mentor's 1Q Form 10-Q filed with SEC as follows:

**Outlook**

For the second quarter of fiscal 2016, the company expects revenue of about $250 million, non-GAAP earnings per share of about $0.14 and GAAP earnings per share of approximately $0.03. *For the full year fiscal 2016, the company affirms the previous revenue guidance of about $1.282 billion*; increases non-GAAP earnings per share guidance from $1.85 to about $1.88; and *currently expects GAAP earnings per share of approximately $1.18*. The decrease in fiscal 2016 GAAP earnings per share from previous guidance is primarily the result of workforce restructuring expenses announced during the first quarter.

84.     Following its 1Q FY16 results and Defendants' misrepresentations, the Company's stock continued to trade at artificially inflated prices above $25.00 per share, reaching as high as $26.79 on June 2, 2015.

85.     <u>Reasons Why Statements in ¶¶78-80, 82-83 Were Knowingly False and Misleading</u>: Each of the statements and omissions alleged in ¶¶78-80, 82-83 above were false and misleading when made because Defendants knew of or recklessly disregarded the following:

(a)     All of the reasons set forth in ¶¶45-55, 65, 76 above;

(b)     Defendants knew, but did not disclose, that Mentor had lost its largest customer's emulation business for the foreseeable future. ¶¶47-52. Defendants also failed to disclose the magnitude or impact of the business it had lost. No orders would be placed for Mentor's emulators in 2015 or for its next-generation emulator by Intel (¶49);

(c)     Intel's emulation business was not the only business Mentor lost to Synopsys. Synopsys had become a "competitive threat" for virtually all of Mentor's emulation accounts and Mentor was losing business as result (¶¶51-52);

(d)     Defendants also knew, but did not disclose, that evaluations by emulation customers were taking longer, causing delays in orders, as a result of: (i) Synopsys' acquisition of the ZeBu 3 emulator and its imminent release of a new version of that emulator in March 2015; and (ii) the increasing threat of Cadence's anticipated new emulation product;

(e)     The imminence of Cadence's new product was clear.  During the May 22, 2015 earnings call one analyst noted, "we know that Cadence is coming to market soon with their new platform."  Defendants, however, did not disclose the delays in bookings as a result of the anticipation of Cadence's new emulator that were impacting bookings;

(f)     Semiconductor companies were experiencing a market downturn, resulting in increased consolidations and reduced expenditures.  Consolidations announced in the ***first half of 2015 totaled $83 billion***, significantly up from the $23 billion in announced deals for all of 2014.  The number and magnitude of the semiconductor deals was staggering.  In addition to the IBM/GlobalFoundries $1.5 billion deal that Defendants would belatedly blame as contributing to the $104 million reduction of 4Q FY16 guidance on November 19, 2015 (¶101), Defendants also knew of a $11.8 billion deal announced between Mentor customer NXP Semiconductors NV and Freescale Semiconductor Ltd., and a $37 billion deal between Avago Technologies Inc. and Broadcom Corp.  *See* Exhibit A.  Defendants deliberately disregarded the adverse impact that they knew these consolidations would have on Mentor's financial performance;

(g)     Despite the unusual number of semiconductor consolidations that had already been announced in 2015, Defendants misled investors about the known impact that those announcements was already having.  Not until December 3, 2015, after reducing guidance would Defendants materially change their purported risk disclosures noting: "***Merger and acquisition*** activity in the semiconductor industry has been ***unusually strong during 2015***.  This activity ***appears to be the result of semiconductor companies, experiencing slower sales in their existing market segments***, desiring to broaden the scope of their businesses and to ***spread the rising costs of product development*** and use of advanced technologies across a larger organization."  Defendants

thus knew not only of the consolidations but the slower sales in the semiconductor industry and the reductions in expenditures;

(h)    Defendants had no reasonable basis for telling investors that "revenue will grow for emulation" given the adverse facts known to Defendants including its competitors' new emulation products that were causing delays in bookings, lost sales and price erosion, as well as the consolidations in the semiconductor industry;

(i)    Defendants knew, but failed to disclose, that though emulation bookings were reportedly increased, demand was not strong or "robust." In truth, there was no increased demand. Defendants' representations regarding the number of evaluations was also misleading because Defendants knew that they "were not only game in town" and that competitive evaluations were causing delays in orders and lost sales (¶117);

(j)    Because of the lengthy evaluation cycle and the lead times for the manufacturing and delivery of Mentor's emulators, Defendants had to have finished the lengthy evaluation cycle and negotiations that according to Mentor VP Cantow could take 18 months (¶55) when they issued FY16 guidance. Defendants also told investors in the Company's FY15 Form 10-K that its $142 million backlog of orders booked by January 31, 2015 were expected to be delivered by the end of FY16. It was not reasonable under the circumstances for Defendants to anticipate that tens of millions of dollars more in additional emulation bookings would close and that those bookings could be manufactured and delivered in FY16 in time to book revenues;

(k)    Defendants knew that early renewals simply pulled in revenues to earlier quarters and that additional bookings were necessary to meet guidance;

(l)      Defendants also knew that the Company's targeted renewals for contracts were 70% semiconductor companies, when traditionally Mentor prided itself on the diversity of its customer base, split ~ 50/50 between semiconductor and systems companies.  ¶116.  Defendants concealed this fact from investors despite the increasing consolidations and weakness in the semiconductor industry; and

(m)      In light of the above (a)-(l), Defendants also knew that the FY16 guidance of ~ $1.282 billion in revenues and EPS of $1.45 they had affirmed lacked any reasonable basis.   In fact, Defendants would dramatically lower FY16 revenue guidance to $1.18 billion and EPS guidance to $0.63 on November 19, 2015 blaming the delays in booking emulation orders and the negative impact of semiconductor consolidations.

<u>Mentor Falsely Raises FY16 Financial Guidance Emphasizing Demand in Growth and Denies Negative Impact of Semiconductor Consolidations</u>

86.      On August 20, 2015, Mentor issued a press release announcing its financial results for the 2Q FY16, the period ended July 31, 2015 as follows:

**Mentor Graphics Reports Fiscal Second Quarter Results and Announces Quarterly Dividend**

Mentor Graphics Corporation today announced financial results for the company's fiscal second quarter ended July 31, 2015.  The company reported revenues of $281.1 million, non-GAAP earnings per share of $0.36, and GAAP earnings per share of $0.26.

"Revenue was an all-time second quarter record and Mentor exceeded non-GAAP earnings per share guidance for the 26th consecutive quarter . . . .  Customer need for increased amounts of software drove early renewal activity and the upside in the quarter."

"[W]e [also] added five new emulation customers, including both a Top Ten chip company and a start-up."

*        *        *

"Second quarter revenue exceeded guidance by 12% while non-GAAP EPS was up over 150% versus guidance."

87.   <u>False and Misleading Statement</u>: In the August 20, 2015 press release Defendants also falsely raised revenue guidance for FY16 from $1.282 billion to $1.285 billion and issued FY16 EPS Guidance of $1.25:

**Outlook**

For the third quarter of fiscal 2016, the company expects revenue of about $290 million, non-GAAP earnings per share of about $0.27 and GAAP earnings per share of approximately $0.17. ***For the full year fiscal 2016, the company is raising revenue guidance to about $1.285 billion***; is increasing non-GAAP earnings per share guidance from $1.88 to about $1.90; and ***currently expects GAAP earnings per share of approximately $1.25***.

88.   <u>False and Misleading Statement</u>: Following the issuance of the August 20, 2015 press release, Defendants held an earnings call the same day with analysts and investors to discuss the Company's reported earnings and financial guidance. Defendants Reinhart, Rhines and Hinckley hosted the earnings call, and repeated the Company's ***false guidance of $1.285 billion in revenue and EPS of $1.25***. Defendants also materially misled investors regarding purported growth in demand as follows:

[RHINES:] Second quarter of FY16 was one of records for a Q2. We substantially exceeded our own expectations with revenue of $281.1 million and non-GAAP earnings per share of $0.36.

This was largely the result of booking FY16 expiring contracts earlier than planned. The majority of this upside was the result of users requiring more software than anticipated in their prior contracts. . . .

***We were impressed by the breadth of demand growth in*** our two largest and fastest-growing product categories, ***Design to Silicon and Scalable Verification***, which grew 105% and 20% respectively. With Calibre's golden status in the semiconductor industry and over 1,000 customer companies, we've come to expect steady growth.

89.   <u>False and Misleading Statement</u>: When asked specifically about industry consolidation among Mentor's customers, Defendants misled investors into believing there would be little to no impact:

[ANALYST:] Hi, thanks for taking my question. If you look in the semi industry, a couple of companies have preannounced negatively, a lot of them have guided down next quarter. Given your business model, we don't see immediate impact to the financials, but maybe could you provide commentary if you have seen any weakness either in bookings or the comments, what new customers are telling you.

[RHINES:]  Yes, the semiconductor revenue tends to be very volatile compared to semiconductor R&D.  Semiconductor companies can't adjust their R&D spending very rapidly, and an ongoing business because it means hiring and firing designers which they rarely do fire them.  So any of the – *even a one-year change in outlook*, unless it's really severe, *doesn't have that much ripple-through*.  If you want to look at how EDA traditionally modulates with the semiconductor industry, *just look at semiconductor R&D and I think you will find that most of the forecasts in the industry are somewhere in the 4% to 6% range for next year for revenue and for R&D*.

\*      \*      \*

One other topic that comes up in many of my meetings is concern about the increased amount of M&A activity in the semiconductor industry.  While the actual number of mergers and acquisitions is up only modesty in 2015 compared to prior history, the magnitude of announced deals is up dramatically.  Historically, *these changes simply add to the strength of the de facto standard leader in EDA in each tool category*, so there are some wins and some losses for every supplier.

*But the other concern is that the total R&D spending of the semiconductor industry could be reduced.  That is, of course, possible but for more than 30 years semiconductor R&D has averaged a constant 14% of revenue despite lots of structural changes.  It's likely that most of the R&D investment that's reduced in one company will show up later in other companies* who want to capture the customer demand that's no longer being adequately served.

90.    <u>False and Misleading Statement</u>: During the August 20, 2015 earnings call,

Defendants also falsely guided investors regarding Mentor's 4Q FY15 revenue:

[HINCKLEY:]  *Fourth-quarter revenue is expected to be slightly over $440 million*, similar to the $439 million achieved in the fourth quarter of FY15.

91.    <u>False and Misleading Statement</u>: Defendants assured investors during the earnings

call that they were very comfortable with raising the Company's FY16 guidance revenue to $1.285

billion:

[ANALYST:]  And then Wally, you talked a bit about how some of the customers came in, they wanted to get more software so they renewed a little earlier in the cycle.  I'm curious though why that didn't impact the full-year view a little bit more.  If they're coming in and ordering more software than you thought or having to order sooner, shouldn't that have impacted your full-year view a little more?

[RHINES:]  Well certainly it makes us feel better about the year, but as Greg reflected, the growth rate in contracts is not abnormally high.  So we felt it was *prudent to continue on the path we previously forecasted*.

\*      \*      \*

[ANALYST:] I just wanted to understand more so what drove the higher EPS for the year, and with that, how you would view your visibility to achieving the full-year guidance now versus a quarter ago?

*          *          *

[HINCKLEY:] ***As we see our business right now, what we are prepared to – albeit it is modest, a \$3 million increase in revenues for the year, but it's something that we feel we're quite comfortable with.*** And we are now at a point, much like last quarter and this quarter, where most of incremental revenue goes down to operating income. So in our business, if costs are relatively fixed, somewhere around \$1.5 million of revenue, pretax, creates \$0.01 per share. So \$3 million more revenue in our forecast, \$0.02 per share.

92.    Analysts were impressed with specific areas of the business based on Defendants' statements. Canaccord Genuity, for example, in an August 20, 2015 report titled "We see room for additional upside" cited "strong demand in Scalable Verification driven by strength in Emulation" as a basis for concluding that "we see potential for additional positive revisions to estimates given solid momentum for emulation and transportation as well as a healthy outlook for core EDA."

93.    On August 21, 2015, the first day of trading following the after-market-hours press release and conference call of August 20, 2015, the Company's stock price continued to trade at artificially inflated prices above \$24.00 per share.

94.    <u>False and Misleading Statement</u>: Ten days later on August 31, 2015, Mentor filed its 2Q FY16 Form 10-Q with the SEC for the period ending July 31, 2015 in which Defendants repeated verbatim its prior misleading representations concealing the impact of its competitors' products, including Cadence's new emulation product and Synopsys' emulation product, and the negative effect of consolidations that the Company had already experienced:

> ***We or our competitors sometimes pre-announce or provide "road maps" of the expected availability of new hardware or software products or product features. Such pre-announcements***, whether offered by the pre-announcing company or its competitors, can result in customers canceling or deferring orders for currently offered products anticipating that currently offered products may be uncompetitive or lacking in features or performance. In the case of hardware products, slowing sales may cause inventories to increase or become obsolete, resulting in the need to discount or reduce production of current products.

*          *          *

*Our competitors may acquire technology or companies offering competing or complementary product offerings which could adversely impact our ability to compete in the marketplace.  They may be able to* deliver better or broader product offerings, *offer better pricing, or otherwise make it more desirable for our customers to buy more of the tools in their design flow* from the competitor after the acquisition. . . .

*        *        *

Like many industries, the semiconductor and electronics industries are subject to mergers, acquisitions, and divestitures and our customers or parts of their business may acquire or be acquired by other customers. *Such changes could result in fewer customers in the industries or the loss of some customers to competitors, or reduced customer spending on software and services due to redundancies or stronger customer negotiating power, which could have an adverse effect on our business and future revenues*.

95.     <u>False and Misleading Statement</u>: Defendants also falsely reiterated the increase in guidance for the Company's FY16 in Mentor's 2Q FY16 Form 10-Q as follows:

## OUTLOOK FOR FISCAL 2016

We expect revenues for the third quarter of fiscal 2016 to be approximately $290 with earnings for the same period of approximately $0.17 per diluted share. *For the full fiscal year 2016, we expect revenues of approximately $1,285 with earnings of $1.25 per diluted share*.

96.     As a result of Defendants' misrepresentations and omissions, Mentor's stock price traded at artificially inflated prices reaching a high of $26.03 on August 31, 2015.

97.     After raising Mentor's revenue guidance, expressing that the Company had demand in growth in two of its largest products and denying any negative impact on Mentor's financials for FY16 as a result of semiconductor consolations, between October 9, 2015 and October 12, 2015, just two weeks before the end of 3Q FY16, *Defendant Rhines sold 170,000 shares of Mentor Graphics stock at prices above $25.00 per share for proceeds of more than $4.3 million with knowledge of non-public adverse material information*.  The timing of his trades was highly suspicious.  Likewise, Defendant Hinckley's trades in Mentor stock on September 2, 2015, two days after Defendants raised FY16 fiscal guidance for proceeds of nearly $1.2 million were also highly suspicious.

98.     On October 26, 2015, *Seeking Alpha* published a report, entitled "Mentor Growing Through The Roof," which explained that Mentor's growth showed no signs of abating.  In particular, the analyst was impressed with "[m]anagement['s] claim[]" that the Company was able to increase bookings in the 2Q FY16 "due to customers renewing contracts to get more software ahead of schedule," which suggested that demand for Mentor's products continued to grow.

99.     <u>Reasons Why Statements in ¶¶87-91, 94-95 Were Knowingly False and Misleading</u>: Each of the statements and omissions alleged in ¶¶87-91, 94-95 above were false and misleading when made because Defendants knew of or recklessly disregarded the following:

(a)     All of the reasons set forth in ¶¶3, 45-55, 65, 76, 85 above;

(b)     Defendants knew, but did not disclose, that not only had Mentor had lost Intel's business to Synopsys, the magnitude of the loss was material (¶¶47-52);

(c)     Synopsys was a "competitive threat" for virtually all of Mentor's emulation accounts and Mentor was losing business as result (¶¶51-52);

(d)     Rather than breadth in "demand growth" for Scalable Verification (including emulation), Defendants knew they were not "the only game in town" and that evaluations were taking longer and not translating into bookings (¶117);

(e)     Nor were the bookings in 2Q FY16 indicative of demands or growth for Design to Silicon.  Defendants knew that early renewals simply pulled in revenues to earlier quarters and that additional bookings were necessary to meet guidance;

(f)     Mentor had attended the June 2015 Design Automation Conference ("DAC").  Online industry blog *DeepChip.com*'s representative attended this conference and would later describe on November 5, 2015 Cadence and Mentor as being at "war" with respect to emulation platforms.  Defendants, however, continued to omit the delays in bookings they were seeing as a result of this war;

(g)     Cadence's anticipated new emulation product (Palladium Z1) began shipping in 3Q (July-September) according to Cadence's comments at a January 14, 2016 Needham Growth

Conference.  Defendants belatedly admitted that even prior to shipment, that with the anticipation of Cadence's new product "there was a *general fear* in the market that there might be competition that could approach [Veloce2's] capability" causing the deferral of orders (¶23);

(h)     The delays that Defendants would blame on November 19, 2015 for reduced FY16 guidance ("planned bookings for emulation were delayed") had to have occurred by August 20, 2015 because of the six-month plus lead times for emulation hardware to be manufactured and delivered so that revenue could be booked (¶76);

(i)     Semiconductor companies were experiencing a market downturn, resulting in increased consolidations and reduced expenditures.  Consolidations announced in the first half of 2015 totaled $83 billion.  The consolidations were not, as Defendants claimed on August 20, 2015, "simply add[ing] to the strength of the *de facto* standard leader in EDA in each tool category." Defendants knew that with respect to the impact of the $1.5 billion IBM/GlobalFoundries deal (announced on November 19, 2015 as a reason for reducing 4Q FY16 guidance by $104 million) that IBM had renewed its contract with Mentor "just before completion of the [July 1, 2015] merger [with GlobalFoundries], with a *decrease in annual run rate*." ¶118.  Thus, Defendants definitively knew of the adverse impact of this consolidation before July 1, 2015;

(j)     Defendants also knew that the $37 billion Avago/Broadcom deal announced in May 2015 included engineering expense cuts of $500 million.  The Intel and Altera $16.7 billion deal announced on June 15, 2015, also included cost cutting.  Defendant Hinckley admitted on January 13, 2016, that Defendants had known that the reduction in expenditures as a result of these consolidations would negatively impact Mentor:  "So just . . . *taking out $500 million worth of engineering expense [by Broadcom] has – will reduce the EDA spend for the entire industry."*  He further admitted that *"this is just one example, like somewhere between 1.5% and 2% of TAM* [the total available market] and on an industry that is somewhere between about $5.5 billion and $6 billion in revenue. *So we are getting hit by that"*; and

(k)      Defendants knew, but failed to disclose, that FY16 fiscal guidance lacked a reasonable basis because the Company's targeted renewals for contracts were 70% semiconductor companies, when traditionally Mentor's revenues were split ~ 50/50 between semiconductor and systems companies (¶116).

(l)      In light of the above and specifically (a)-(k), Defendants had no reasonable basis to *raise FY16 revenue guidance to $1.285 billion*, issue FY16 EPS guidance of $1.25 or 4Q FY16 revenue guidance of $440 million.  In fact, Defendants would dramatically lower FY16 revenue guidance to $1.18 billion and EPS guidance to $0.63 and reduce 4Q FY16 guidance by a staggering $104 million on November 19, 2015 blaming the delays in booking emulation orders and the negative impact of semiconductor consolidations.

### THE RELEVANT TRUTH BEGINS TO BE DISCLOSED

100.    On November 19, 2015, Mentor issued a press release for its 3Q FY16 reporting disappointing bookings and substantially reducing its 4Q FY16 financial outlook – instead of $440 million in revenue for 4Q FY16, the Company announced that its 4Q FY16 revenue forecast would be reduced by *a whopping $104 million* to $336 million.  The Company also reduced FY16 revenue guidance from $1.285 billion to $1.18 billion  and FY16 EPS guidance from $1.25 to $0.63.  The press release provided:

**Mentor Graphic Reports Fiscal Third Quarter Results**

Mentor Graphics Corporation today announced financial results for the company's fiscal third quarter ended October 31, 2015.  The company reported revenues of $291 million, non-GAAP earnings per share of $0.28, and GAAP earnings per share of $0.12.

"Mentor achieved third-quarter guided results . . . .  Active evaluations of Mentor's Veloce emulator increased in the third quarter, but *the time required for completion of evaluations also increased.  This, along with semiconductor industry consolidations, is having a negative impact on our business.*  However, demand for EDA software for system design, particularly in the transportation industry, remains robust."

\*      \*      \*

"*Semiconductor consolidation and delays in emulator decisions are now having an adverse impact on our ability to close business*," said Gregory K. Hinckley, president of Mentor Graphics. "Because we recognize revenue upfront on product sales, changes in market outlook and demand are reflected in real time in Mentor's results. Nevertheless, with appropriate scaling of the business and continued attention to expenses, we expect to deliver FY16 non-GAAP operating margins consistent with our strategic objective."

### Outlook

For the fourth quarter of fiscal 2016, *the company expects revenues of about $336 million*, non-GAAP earnings per share of about $0.47 and *GAAP earnings per share of approximately $0.32.  For the full year fiscal 2016, the company expects revenues of about $1.18 billion*, non-GAAP earnings per share of about $1.40, and *GAAP earnings per share of approximately $0.63*.

101.    Following the issuance of the press release, Defendants held an earnings call with analysts and investors to discuss the Company's reported financial performance and prospects and its sharply reduced financial guidance.  During the earnings call, Defendants explained that: (i) bookings were flat to down for all of Mentor's products; (ii) at least one semiconductor industry consolidation had already impacted the Company's Design to Silicon business; (iii) Mentor experienced a delay in decisions on adoption and expansion of emulation; (iv) the anticipated release of competitive products had already frozen demand for the Company's emulation products; and (iv) these poor business conditions were expected to continue and were also responsible for the Company's dramatically reduced financial guidance:

[RHINES:]  There are two changes that will negatively impact our outlook for the fourth quarter of FY16 and cause us to reduce our guidance.  *First, we experienced a delay in decisions on adoption and expansion of emulation.  And second, we were negatively affected by at least one of the semiconductor industry consolidations*.

. . .  *[T]he time required for completion of evaluations has been increasing, I believe due to anticipation of competitive product announcements during the quarter.*

                    *        *        *

With regard to semiconductor industry restructuring, *our third quarter growth in contract renewal value was affected by one major contract* where a portion of the company was spun off from the parent.  *While the parent company executed an early renewal contract for the portion of the business they retained*, we expect the *renewal of the contract for the portion of the business that was spun off will not be concluded until the fourth quarter*.

*     *     *

[HINCKLEY:] *[T]otal bookings were down 20% year-over-year and were flat to down across all product categories. After two consecutive quarters of record growth, Design to Silicon, which includes our Calibre product family, was down 35% . . . .*

*Scalable Verification was down 25%. It's probable that a competitor's recent announcement of the release of their next generation emulation product has temporarily frozen activity in that market.*

*     *     *

Guidance. *Appropriate longer than our typical guidance, our fourth quarter and FY16 guidance reflects three challenges. First, there has been an unprecedented level of semiconductor M&A activity recently, approaching $100 billion of announced transactions in the past 12 months, well over 10% of the global IC industry's market capitalization. This is on top of a challenging demand environment for ICs.*

*     *     *

Second, *immediate demand for emulation has stalled as the result of the expected introduction of competitive products.*

*     *     *

Taking into account these challenges, we are reducing fourth quarter and FY16 guidance. *For the fourth quarter of FY16, we are now forecasting revenue to be approximately $336 million* and non-GAAP and *GAAP earnings per share of about* $0.47 and *$0.32*, respectively. *For the full year, we are projecting revenue* of approximately *$1.18 billion*, with non-GAAP and *GAAP earnings per share of* $1.40 and *$0.63, respectively.*

102.     Defendants made a number of further statements during the November 19, 2015 earnings call which disclosed that the "normal" result from consolidations was, at best, a delay in booking new business and renewing contracts:

- "Normally, the result of [consolidations is that it] takes a *longer period of time* [to book business]."

- "*[T]here is a delay period* . . . ."

- "*Industry consolidation is causing companies to look for synergies in the combined [entities], including the spend on R&D. This is not just for those companies involved in M&A, but also those independent companies that must execute in this new competitive environment*."

AMENDED CONSOLIDATED CLASS ACTION ALLEGATION          Page 49
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

103.    On November 20, 2015, Mentor's stock price plunged 36%, closing at $17.85 per share, down from the previous day's close of $27.78 per share, on over 19.9 million shares traded, compared to only 602,000 on November 19, 2015.

## POST-CLASS PERIOD EVENTS

104.    Following the publication of the Company's November 19, 2015 financial results, *The Wall Street Journal* reported on November 19, 2015, in an article entitled "Mentor Graphics Shares Plunge Amid Lower Forecast, Quarterly Profit," that the Company's stock price was declining because of the poor 3Q FY16 financial results, lowered guidance and what that revealed about the Company's performance and prospects:

> *Shares of Mentor Graphics plunged as the company slashed its profit and revenue outlooks*, said it was having *problems closing business* and *reported that profit in its latest quarter declined*.
>
> *The stock fell 23% after market hours to $21.42, which would be its lowest level since January.*
>
> For the fourth quarter, *Mentor projected adjusted earnings per share of about 47 cents and revenue of about $336 million, far lower than analysts' expectations of 97 cents and $439 million*.

105.    That same day, on November 19, 2015, Pacific Crest Securities issued an analyst report entitled "Mentor Graphics Corp.: Impact of Semiconductor Consolidation Could Linger; Downgrading to Sector Weight." In the report, Pacific Crest described Mentor's explanation for the drastically lowered guidance as "puzzling," explaining that the numbers did not add up:

> *Mentor's FQ4 shortfall of $105 million is a significant miss. Taking out currency impact, Mentor still had $92 million shortfall, per our estimates*.
>
> *              *              *
>
> *Mentor lowered its FQ4 guidance significantly by $105 million. The company cited delayed adoption of emulation, impact from consolidation and currency as the reasons for the lower guidance. Cadence released its new emulation tool during the quarter.* Mentor said this led customers to *delay decisions around emulation in anticipation of Cadence's release*.
>
> The company said revenue was down $25 million y/y due to FX. Assuming 50% less currency impact in FQ4 (a $13 million negative impact) *still leaves a $92 million shortfall due to emulation and lower core EDA sales*.

Then assuming about $42 million adverse impact from emulation means core EDA sales could be down $50 million. (Our previous emulation revenue estimate for Mentor was about $145 million. Assuming a $42 million negative impact to emulation means emulation sales could be now down 29% compared with our previous estimate.) *Since Mentor recognizes 60% revenue upfront, this would mean core EDA license sales could be down close to $83 million, which is a significant license shortfall, in our view*. Mentor sounded confident when it said the company has not lost any customers, so *the magnitude of negative impact from consolidation is puzzling*.

106.    In the same report, Pacific Crest also explained that, contrary to Defendants' previous denials, consolidation among the Company's customers was not a short-term and minor risk:

**Preliminary F2017 Guidance Was Meaningfully Lower Than Our Estimates**

Mentor guided growth for F2017 to low single digits. Mentor's guidance implies that revenue could grow only $45 million y/y in F2017. *Revenue growth could be even lower than the negative impact in FQ4. We are concerned that consolidation in the semiconductor industry could continue* for some time; more semiconductor M&A deals were announced recently. This means *consolidation could have more impact on Mentor in the coming years*.

107.    Like Pacific Crest, who found Defendants' explanations "puzzling," analysts were skeptical of Defendants' stated explanations for Mentor's dramatically reduced guidance. RBC Capital Markets, for example, in a November 19, 2015 report on Cadence titled "EDA – *Mentor miss likely company specific*, no implication for SNPS/CDNS" concluded that "[w]e find the logic behind the miss a little confusing. We believe that the big miss is the feature of upfront revenue recognition which lends itself to pull in/push out of recognition."

108.    On December 2, 2015 in a publication by Semiconductor Engineering called "Consolidations Aftermath," Defendant Rhines was quoted admitting his knowledge that the "normal delay in booking new business as a result of consolidations could be "measured in years" and that announced consolidations renewals impacted:

*Short-term, there is a lot of uncertainty*. If you don't know the size or strength of the company, you're generally less aggressive about renewal commitments. Historically, M&A has had only a temporary effect on the semiconductor industry. That could be *measured in years, not months* . . . .

109. The next day, on December 3, 2015, Defendants filed the Company's 3Q FY16 Form 10-Q. The 10-Q confirmed what investors and analysts had already surmised from Defendants' November 19, 2015 reports and statements – Mentor's problems were systemic with bookings down 20% year over year, while the number of new customers was down 15% for the fiscal year, not just the most recent quarter:

Bookings during the first nine months of fiscal 2016 increased by approximately 5% compared to the first nine months of fiscal 2015 primarily due to the timing of term license contract renewals. ***Bookings for the three months ended October 31, 2015 decreased by approximately 20% compared to the three months ended October 31, 2014 primarily due to a decrease in term license contract renewals.*** Bookings are the value of executed orders during a period for which revenue has been or will be recognized within six months for software products and within twelve months for emulation hardware systems, professional services, and training. Ten customers accounted for approximately 40% of total bookings for the first nine months of fiscal 2016 and 2015. ***The number of new customers during the first nine months of fiscal 2016 decreased approximately 15% from the levels experienced during the first nine months of fiscal 2015.***

\*        \*        \*

System and software revenues decreased $(9.4) for the three months ended October 31, 2015 compared to the three months ended October 31, 2014, ***primarily due to a decrease in sales of emulation hardware systems.***

110. Mentor also admitted in its 3Q Form 10-Q filed on December 3, 2015 that "[w]e believe the expected release of a competitor's emulation product ***earlier this year*** may have resulted in the deferral of orders for our emulation products."

111. Defendants also disclosed for the first time in Mentor's December 3, 2015 3Q Form 10-Q that:

***Merger and acquisition activity in the semiconductor industry has been unusually strong during 2015.*** This activity appears to be the result of semiconductor companies, experiencing slower sales in their existing market segments, desiring to broaden the scope of their businesses and to spread the rising costs of product development and use of advanced technologies across a larger organization. ***Increasing consolidation could result in fewer customers in these industries or the loss of some customers to competitors, or reduced customer spending on software and services due to redundancies or stronger customer negotiating power, which could have an adverse effect on our business and future revenues.***

112.    These additional disclosures evidence facts Defendants had known but did not disclose.  Namely, deferral of emulation orders, loss of customers, reduction in spending and stronger customer negotiating power with respect to pricing.

113.    Analysts following the EDA market quickly concluded that Mentor's problems were specific to Mentor.  Griffin Securities, for example, in reporting on December 3, 2015, the Company's competitor, explained that, far from seeing delays in emulation orders due to the release of Cadence's new product, Synopsys had certainly taken market share from Mentor, and indeed probably from Cadence as well:

> ***Synopsys' emulation revenues*** have typically been considerably smaller than for **Cadence Design Systems** (CDNS, $22.22, Buy) and **Mentor Graphics'** (MENT, $17.96, Neutral).  However, if our inferred revenues for Synopsys are about right, then ***their emulation revenues may have exceeded Cadence's and certainly exceeded Mentor's*** in the quarter (though not for the trailing-twelve months in either case).

114.    Summit Research also issued a report on Synopsys, in a December 4, 2015 article, titled "SNPS F4Q15 Results=Good. MENT's Issues with Semi-M&A Specific to MENT," concluding that any effect from consolidations was muted for the Company's competitor:

> **MENT Problems Seem Company Specific**: While this note is about SNPS, the most relevant topic in EDA is now MENT's shortfall.  ***It would seem that Mentor's lower guide was a unique, company-specific issue.***  Alternatively put, Synopsys said they aren't observing any problems with respected to the emulation market.  We think that Mentor had previously overestimated growth in all its markets, especially in its emulation market.  In addition, Global Foundries, which got IBM's foundry biz, is on the sales block with Mubadala corp. trying to sell it.  In that scenario, ***MENT does not get to count on both IBM and Global Foundries, both of which were paying customers of MENT.***  Synopsys' results and guide confirm that MENT's issues are unique to the company.

115.    On January 13, 2016, Defendant Hinckley appeared at a Needham Growth Conference where, in addition to conceding that Broadcom had announced "***a year ago, a year and a half ago***" that "***they were exiting the cell phone market***," and taking "***like $300 million***" out of

EDA industry in doing so,[9] he also admitted that "*approximately 25% of the entire digital IC market by market cap* has either completed an important big transaction, or is in negotiation."

116.    Defendant Hinckley further admitted on January 13, 2016 that Mentor knew its renewals for the current fiscal year were going to be heavily concentrated in semiconductor customers, making guidance particularly difficult to meet given the downturn and unprecedented wave of consolidations in the semiconductor industry:

> [HINCKLEY:] And while we've had a many, many year track record of having our renewals grow at the expiration of our three-year leases by 25%, *what we've seen this year is we expect the growth of our renewals will be flat and it will all be concentrated within our IC sector*.
>
> Making it – *compounding the challenges we've had this year is while we are typically 50% systems companies and 50% IC companies, this year we have 70% of our portfolio of renewals are IC targeted* [*i.e.*, semiconductor], IC companies, and only 30%, 25%, 30% are systems companies.

117.    On March 3, 2016, Mentor held an earnings call which offered further clarification regarding the impact of competitive product introductions during the Class Period, with Defendants telling investors:

- "Last quarter, we attributed *this slowdown largely to an increase in evaluation time, as some customers were able to wait for competitive product introductions*."

- "*[T]he evaluations are taking longer and longer to close. Pricing is also more challenging and has reduced the values of many of our opportunities*."

- "[W]e've had, generally *the evaluation periods for emulation have stretched out from approximately a quarter to now it seems like it's closer to nine months*. So that's part of what's going on. So it's taking more time to close business."

- Rhines admitted when asked about what was driving the six-month extra stretch in emulation evaluation: "So we don't know exactly. But our *judgment says that a year or two ago, we were pretty much the only game in town. Now with announcements this past year, there are now competitors to evaluate*. Those people really didn't have much that could compete with the Veloce in the past. So I think customers are both squeezed and they feel

---

[9]    In fact, Broadcom announcement occurred on June 2, 2014, wherein Broadcom said it expected to save $600 million in research and development and administrative costs.

they need to evaluate, and evaluations are not easy to do.  So it seems to have stretched out."

- Rhines when asked, "***maybe three years or so ago, maybe around 2013***, give or take, is when you guys started gaining traction against Cadence on emulation.  During that timeframe, how long did it take for customers to switch from your competitor to you guys?" Rhines responded, "***We typically planned for nine months from initial contact to actually completing the sale. But of that, about six months was the evaluation cycle.  And clearly, this has gotten longer***."

118.    Defendant Rhines further explained during the March 3, 2016 4Q FY16 earnings call that "[i]n the largest of [the post-consolidation contract renewals Mentor Graphics had negotiated], the acquiree [IBM] renewed in the third quarter, ***just before completion of the merger***, with a ***decrease*** in annual run rate. . . ."  Because the IBM-GlobalFoundries acquisition was completed on July 1, 2015, that means that Mentor had secured a contract renewal from IBM "just before" July (calendar 3Q), and knew by then that the renewal came with a decrease in annual run rate.

119.    On March 22, 2016, Griffin Securities issued a report titled "Review of FY16 10-K new data."  Although Defendants had cited foreign currency as one reason for the drastic cut in their 4Q FY16 guidance, Griffin's review of the Company's data showed that foreign currency's unfavorable impact on sales revenues was more than made up for by the favorable effect it had on operating expenses: "Foreign currency had an unfavorable impact of ($21.1) million for the year . . . .  On the other hand, there was a favorable effect on operating expenses of $36.5 million in FY16 . . . ."

120.    On May 19, 2016, Defendants further clarified of the impact of emulation competition and consolidations in the semiconductor market:

- "[T]he ***total industry emulation revenue has stalled in the $300 million to $315 million range per year***, likely due to ***price erosion*** after rapidly doubling from the previous long-term run rate in just two years, from 2010 to 2012."

- "Continued weakness in semiconductor related design software, including emulation . . . ."

- "Weakness in bookings from semiconductor companies in Q4 of FY16 accurately reflect what has become *general weakness in semiconductor revenue and R&D spending*."

- "[O]ur *Japan bookings in FY15 reflected weakness in EDA demand* by Japan's semiconductor companies."

- "[T]here is more competition [for all small and medium-sized customers] because *all three vendors have viable products*."

121.    On May 19, 2016, J.P. Morgan issued a report stating: "[W]eakness in the semiconductor market and the competitive emulation market continues to be challenging. . . . We remain Underweight on MENT until we see signs of improvement in the core semiconductor EDA business that is needed to deliver consistent growth."

122.    Three days later, on May 23, 2016 Griffin Securities issued a report stating that Defendants had confirmed that for emulation "*the evaluation/procurement cycle had lengthened substantially*," due not just to the release of "Cadence's new Z1," *but also because "Synopsys [is] now [] a clearly more material competitor in this space*."

## ADDITIONAL ALLEGATIONS OF SCIENTER

123.    As alleged herein, each of the Defendants acted with scienter in that each Defendant knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading or omitted to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.    Each Defendant knew that such statements or documents would be issued or disseminated to the investing public and knowingly and substantially participated or acquiesced in the making, issuance or dissemination of such statements or documents as a primary violation of the federal securities laws.    By virtue of their receipt or reckless disregard of information reflecting the true facts regarding Mentor, their control over and/or receipt and/or modification of Mentor's materially misleading statements, and/or their other associations with the Company, each defendant was privy to confidential information concerning Mentor and knowingly or recklessly participated in the fraudulent scheme and conduct alleged herein.

124.   <u>Substantial visibility as to its customers purchases</u>:   In addition to Defendants' statements on the very topics that misled investors and knowledge of the material adverse facts alleged herein, Defendants had substantial visibility into the Company's bookings and backlog.   In turn, Defendants had substantial visibility into Mentor's potential revenues and the timing of those revenues based on: (i) the timing of software contract renewals, typically every three years (¶10); and (ii) delivery lead times for its emulation hardware.[10]   The Company's onsite employees at existing customers also provided realtime feedback on competitors as Mentor's executive testified at trial.   ¶53.

125.   Defendants also personally met with customers and tracked new customers giving them further visibility into whether customers were engaged in competitive evaluations and the impact of economic changes of those customers expenditures:

- "I have met with more than 20 present and perspective [sic] emulation customers [th]is quarter . . . ." (Rhines – Aug. 21, 2014 Mentor Earnings Call 2Q FY15).

- Rhines referred to his "meetings with leading customers in Korea, China and the US . . . ." (Rhines – Feb. 26, 2015 Mentor Earnings Call 4Q FY15).

- "***We track new customers*** . . . ." (Hinckley – May 22, 2014 Mentor Earnings Call 1Q FY15).

- "We . . . ***track new customers***, both in terms of number of transactions, and the value of those transactions." (Hinckley – Feb. 26, 2015 Mentor Earnings Call 4Q FY15).

- "We . . . ***track new customers***, both in count and average transaction because we've seen through the years that small customers react more quickly to economic changes than the larger companies do." (Hinckley – May 19, 2016 Mentor Earnings Call 1Q FY17).

126.   <u>Defendants capitalized on Mentor's artificially inflated stock price selling stock for proceeds of over $10.5 million</u>:   Defendant Rhines sold Mentor stock at artificially inflated prices for proceeds of more than $6.8 million on the heels of Defendants' materially false and misleading

---

[10]   For example, Defendants claimed on May 23, 2013 that those emulation hardware orders booked in 1Q FY14 would not be shipped and revenue recorded until the 4Q FY14.

statements.  He sold his stock with knowledge of the material adverse information alleged herein.

His sales were as follows:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 4/13/2015 | 55,437 | $24.90 | $1,380,381 |
| 4/14/2015 | 44,563 | $24.46 | $1,090,011 |
| 10/9/2015 | 150,000 | $25.63 | $3,844,500 |
| 10/12/2015 | 20,000 | $25.82 | $516,400 |
| | 270,000 | | **$6,831,292** |

127.    Rhines sold a significant amount of his stock, both in absolute value of shares sold and as a percentage of total shares owned, 18.17%.[11]  Because Rhines, according to the Company's proxy materials, was to maintain a 3x multiple of his base salary in stock at all times, his percentage of total shares available for sale was much higher than 18.17%.

128.    Defendant Rhines unloaded 170,000 of his shares between October 9, 2015 and October 12, 2015 for proceeds of $4.3 million, just two weeks before the end of 3Q FY16.  On November 19, 2015 when Defendants reduced 4Q FY16 revenue guidance by $104 million Defendants would admit that for the third quarter (ending October 31, 2015): (i) bookings declined 20% across the Company's products year-over-year; (ii) Scalable Verification (including emulation) ( suffered a 25% decrease in bookings; and (iii) that Mentor's business had been negatively impacted by, *inter alia*, the "expected introduction of competitive products," delays in booking business as a result of consolidations and that contract renewals in the 3Q had been negatively impacted by the IBM/GlobalFoundries deal (*see also* ¶¶22-23, 100-102, 118).  His trades were suspicious and dramatically out of line with prior trading history.

---

[11]    This percentage is calculated by dividing shares sold by the total number of shares held by each insider.

129.   In addition to Defendant Rhines, Defendant Hinckley's stock sales were highly suspicious in terms of amount and timing.  Defendant Hinckley sold 157,000 shares of Mentor stock for proceeds of more than $3.7 million:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 5/9/2015 | 110,000 | $23.11 | $2,542,100 |
| 9/2/2015 | 47,000 | $24.99 | $1,174,530 |
| | 157,000 | | **$3,716,630** |

130.   Hinckley's sales were significant, both in absolute value of shares sold and as a percentage of total shares owned, selling 11.87% of his shares.[12]  As with Defendant Rhines, the Company required him to maintain a 3x multiple of his base salary in stock at all times, thus the percentage of total shares available to Defendant Hinckley was higher than 11.87%.

131.   Like Defendant Rhines, Defendant Hinckley sold shares after the price of Mentor's stock had been artificially inflated as a result of Defendants raising FY16 revenue guidance on August 20, 2015, and confirming that raised guidance on August 31, 2015 while denying the impact of semiconductor consolidations on the Company.  Defendant Hinckley sold his shares of Mentor stock with knowledge of the material adverse information alleged herein.

**ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS**

132.   As detailed herein, Defendants engaged in a fraudulent and wrongful course of business, which was designed to and did deceive Class Period purchasers of Mentor's common stock as Defendants misrepresented and/or omitted material information about Mentor's growth, sales, market share and financial performance.  When the market learned that Mentor was negatively impacted by its competitors' products and the anticipated release of another competitor's new product as well as by semiconductor customer consolidations, Mentor's stock fell precipitously as the prior artificial inflation came out of the price.  As a result of their purchases of Mentor's common

---

[12]   This percentage is calculated by dividing shares sold by the total number of shares held by each insider.

stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.* damages, under the federal securities laws.

133.    Defendants' false statements and omissions, identified herein in at ¶¶37-39, 42-43, 58-59, 62-63, 67-69,72-74, 78-80, 82-83, 87-91, 94-95, had the intended effect and caused Mentor stock to trade at artificially inflated levels during the Class Period.

134.    As a direct result of Mentor's disclosures on November 19, 2015, including a 20% decline in bookings across the Company's products year-over-year, a 25% decrease in Scalable Verification bookings and a $104 million reduction in projected 4Q FY16 year revenues, as well as that Mentor's business had been negatively impacted by, *inter alia*, the "expected introduction of competitive products," delays in booking business as a result of consolidations and that contract renewals in the third quarter had been negatively impacted by the IBM/Global Foundries deal (*see also* ¶¶22-23, 100-102, 118), the Company's stock price plunged 35.7%, from a close of $27.78 on November 19, 2015 to $17.85 on November 20, 2015. As demonstrated in the chart in ¶24 above, this drop removed the inflation from Mentor's stock price, causing real economic loss to investors who had purchased Mentor's common stock during the Class Period.

135.    The decline in the Company's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' prior false statements and omissions being revealed to investors and the market. The timing and magnitude of Mentor's stock price declines negate any inference that the loss suffered by Lead Plaintiffs and other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other members of the Class, was a direct result of Defendants' concealing from investors the negative impact of the announced and actual release of competitive emulation products, its reliance on a few customers, the weakening semiconductor business and the impact of the consolidations in the semiconductor industry on Mentor's sales. Indeed, financial analysts explicitly arrived at that same conclusion. Summit Research, for example, concluded that Mentor's issues "were specific to"

Mentor. ¶¶113-114.  Defendants' false and misleading statements and omissions artificially inflated Mentor's stock price and maintained the price at artificially inflated levels until the subsequent significant decline in the value of the Company's stock occurred when Defendants' prior misrepresentations and omissions were revealed.

136.    Investment analysts indeed attributed the stock price decline on November 19, 2015, to Defendants' revelations. *The Wall Street Journal*, for example, reported on November 19, 2015, that the Company's stock price was declining because of the poor 3Q FY16 financial results, lowered 4Q FY16 guidance and what that revealed about the Company's performance and prospects:

> ***Shares of Mentor Graphics plunged as the company slashed its profit and revenue outlooks***, said it was having problems closing business and reported that profit in its latest quarter declined.
>
> ***The stock fell 23% after market hours to $21.42, which would be its lowest level since January.***
>
> For the fourth quarter, ***Mentor projected adjusted earnings per share of about 47 cents and revenue of about $336 million, far lower than analysts' expectations of 97 cents and $439 million***.

## CLASS ACTION ALLEGATIONS

137.    Court appointed Lead Plaintiff Western Pennsylvania brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Mentor common stock during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their family members, directors and officers of Mentor and their families and affiliates.

138.    This action meets the requirements of Federal Rules of Civil Procedure Rule 23(a) because the members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Mentor has more than 106,000,000 million shares of stock outstanding, owned by hundreds or thousands of persons.

139.    This action meets the requirements of Federal Rules of Civil Procedure Rule 23(a) because there is a well-defined community of interest among class members in the questions of law and fact involved in this case, common questions of law and fact predominate, Lead Plaintiff's claims are typical of the members of the class and Lead Plaintiff can fairly and adequately request the interests of the Class.

140.    This action satisfies the requirements of Federal Rules of Civil Procedure Rule 23(b)(3) because it involves questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members, including but not limited to:

(a)    Whether the 1934 Act was violated by Defendants;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of Mentor common stock was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

141.    Western Pennsylvania's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

142.    Western Pennsylvania is an institutional investor that was appointed by the Court as Lead Plaintiff.  It suffered significant financial losses as a result of Defendants' misconduct, and Western Pennsylvania's interests are therefore aligned with those of other class members. Accordingly, Western Pennsylvania will be an adequate representative and will adequately protect the interests of the Class.

143.    Lead Plaintiff has also retained counsel who are experienced in class action securities litigation, and Western Pennsylvania has no interests which conflict with those of the Class.

144.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action under Rule 23(b)(3).

## THE STATUTORY SAFE HARBOR DOES NOT APPLY

145.    The statements alleged herein to be false and misleading are not subject to the protections of the Private Securities Litigation Reform Act's ("PSLRA")'s statutory safe harbor for forward-looking statements because they are either: (i) not forward-looking; (ii) subject to exclusion; or (iii) not identified as forward looking or accompanied by meaningful cautionary language.

146.    Under the PSLRA's statutory safe harbor for written statements, a forward-looking statement is protected if it is: (i) identified as such; *and* (ii) accompanied by *meaningful* cautionary language.  15 U.S.C. §78u-5(c)(1)(A)(i).

147.    For oral statements, an oral forward-looking statement must be: (i) accompanied by a cautionary statement that it is forward-looking, that actual results may differ materially and that additional information concerning risk factors is contained in a readily available written document; (ii) the oral statement must identify the written document, or portion thereof that contains such factor; and (iii) the referenced written documents must contain *meaningful* cautionary language.  15 U.S.C. §78u-5(c)(2)(B).

148.    The safe harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K.  15 U.S.C. §78u-5(b)(2)(A).

149.    Statements of historical fact, current condition, or a mixture thereof are not "forward-looking" and thus not protected by the safe harbor.  Among the false statements alleged herein, the

following false oral and written statements are actionable and the safe harbor does not apply because they are statements of current or historical fact:

- "We already know that we had more than 50% of the revenue in first quarter, so that almost guarantees that we are number one. *It does guarantee we are number one*[.]" (¶38);

- "*we haven't seen much direct competition from Cadence* . . . ." (¶69);

- "our emulation business is affected by a big decline in the level of activity with our single-largest customer. *It's quite isolated. This has nothing to do with what is going on in the overall emulation market.*" (¶69);

- "*no material portion of our business is dependent on a single or a few customers*. We do not believe that *the competitive loss of one or more individual products at one or more of our customers would have a material adverse effect on our revenues.*" (¶¶43, 73);

- "at this point, that the *activity for evaluations is so strong, that we are booked to capacity in the number of customers we can evaluate.*" (¶79);

- "we think the most compelling indicator of the strength of the business is actually what out bookings are . . . . *Bookings for the quarter were, in fact, up 65%. So, the business is robust.*" (¶80);

- "*We were impressed by the breadth of demand growth in* our two largest and fastest-growing product categories. . . ." (¶88); and

- "While *the actual number of mergers and acquisitions is up only modesty in 2015* compared to prior history, the magnitude of announced deals is up dramatically. Historically, *these changes simply add to the strength of the de facto standard leader in EDA in each tool category* . . . ." (¶89).

150.    None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made. The safe harbor simply does not apply to Defendants' statements of current or historical fact.

151.    To the extent that the false and misleading statements are forward looking, defendants are still liable. Defendants knew at the time they spoke or failed to speak fully that each of their

forward-looking false and misleading statements were false and misleading. Defendants' false and misleading forward-looking statements were authorized or approved by an executive officer or director of Mentor , who knew that the forward-looking statements were false when made. The forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statement would not be misleading. And the safe harbor warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks. *See* 15 U.S.C. §78u-5(c)(1)(A)(i).

152. For example, no safe harbor applies to Defendants' statements contained in the Company's 2Q FY15 Form 10-Q, 3Q FY15 Form 10-Q, FY15 Form 10-K, 1Q FY16 Form 10-Q and 2Q FY16 Form 10-Q September 5, 2014 Form S-8 regarding: (i) the pre-announcements of competitors' products; (ii) the competitive loss of one or more individual products; and (iii) semiconductor consolidations identified in ¶¶42-43, 62, 72-73, 82 and 94 because those statements were knowingly false when issued.

153. Close examination of other purportedly cautionary language contained in the Company's Class Period quarterly and annual filings (summarized below) shows that this language was likewise inadequate because Defendants knew that these risks had already materialized:

- "***Our pipeline estimates may prove to be unreliable either in a particular quarter or over a longer period of time, in part because the "conversion rate" of the pipeline into contracts can be very difficult to estimate and requires management judgment.*** A variation in the conversion rate could cause us to plan or budget incorrectly and materially adversely impact our business or our planned results of operations. In particular, ***a slowdown in customer spending or weak economic conditions generally can reduce the conversion rate in a particular quarter as purchasing decisions are delayed, reduced in amount, or canceled***."

- "We derive a substantial portion of our revenues from sales of relatively few product groups and related support services. As a result, ***any factor adversely affecting sales of these products, including product release cycles, market acceptance, product competition, performance and reliability, reputation, price competition, and economic and market conditions, could harm our operating results***."

- "*Price competition in the EDA industry is intense, which can lead to, among other things, price reductions, longer selling cycles, lower product margins, loss of market share, and additional working capital requirements.*"

- "*Sales of our products and services are sometimes discretionary and may be delayed if customers delay approval or commencement of projects due to budgetary constraints, internal acceptance review procedures, timing of budget cycles, or timing of competitive evaluation processes*."

- "*Any loss of our leadership position in certain categories of the EDA market could harm our business.*"

- "*Our competitors may acquire technology or companies offering competing or complementary product offerings which could adversely impact our ability to compete in the marketplace*. They may be able to deliver better or broader product offerings, *offer better pricing, or otherwise make it more desirable for our customers to buy more of the tools in their design flow* from the competitor after the acquisition."

154.    Mentor's purported cautionary language was inadequate to insulate Defendants' false statements under the statutory safe harbor because each of the disclosures was boilerplate language that remained unchanged throughout the Class Period, and failed to warn investors of the known risks that materialized during the Class Period, including *inter alia*: (a) Mentor's competitors' new emulation products were causing delays in emulation orders and negatively impacting Mentor's bookings; (b) with Synopsys' acquisition of the ZeBu 3 it was a competitive threat for virtually all of Mentor's emulation accounts and Mentor's business had changed dramatically; (c) Mentor's loss of its largest emulation customer, Intel, to Synopsys had an adverse effect on Mentor's revenue and sales; and (d) due to the overall downturn in the semiconductor industry and consolidations among semiconductor companies, Mentor's sales were negatively impacted as semiconductor customers were declining to renew contracts, delaying contracts, decreasing contracts and/or price erosion.

## PRESUMPTION OF RELIANCE

155.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Lead Plaintiff and other members of the Class purchased Mentor common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

156.    At all relevant times, the market for Mentor common stock was efficient for the following reasons, among others:

(a)    As a regulated issuer, Mentor filed periodic public reports with the SEC; and

(b)    Mentor regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

157.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiff and Class is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

158.    Lead Plaintiff incorporates ¶¶1-157 by reference.

159.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

160.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Mentor common stock during the Class Period.

161.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Mentor common stock.  Lead Plaintiff and the Class would not have purchased Mentor common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements or material omissions.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

162.    Lead Plaintiff incorporates ¶¶1-161 by reference.

163.    The Individual Defendants acted as controlling persons of Mentor within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of Mentor

stock, the Individual Defendants had the power and authority to cause Mentor to engage in the wrongful conduct complained of herein. Mentor controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment and relief as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.    Awarding Lead Plaintiff and the members of the Class damages and interest;

C.    Awarding Lead Plaintiff and the members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.


DATED:  August 10, 2016                                s/ Willow E. Radcliffe
                                   _____
                                   ROBBINS GELLER RUDMAN & DOWD LLP
                                   **Shawn A. Williams**, *pro hac vice*
                                   shawnw@rgrdlaw.com
                                   **Willow E. Radcliffe**, *pro hac vice*
                                   willowr@rgrdlaw.com
                                   **Amanda M. Frame**, *pro hac vice*
                                   aframe@rgrdlaw.com
                                   **Kenneth J. Black**, *pro hac vice*
                                   kennyb@rgrdlaw.com
                                   Post Montgomery Center
                                   One Montgomery Street, Suite 1800
                                   San Francisco, CA  94104
                                   Telephone:    (415) 288-4545
                                   Facsimile:    (415) 288-4534

                                   Lead Counsel for Plaintiff

STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.
**Gary M. Berne**, OSB No. 774077
gberne@stollberne.com
**Jennifer S. Wagner**, OSB No. 024470
jwagner@stollberne.com
209 S.W. Oak Street, 5th Floor
Portland, OR  97204
Telephone:     (503) 227-1600
Facsimile:     (503) 227-6840

Local Counsel

AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

WESTERN PENNSYLVANIA ELECTRICAL EMPLOYEES PENSION FUND ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re Silver Wheaton Corp. Sec. Litig.*, No. 2:15-cv-5146 (C.D. Cal.)

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30 day of March , 2016.

WESTERN PENNSYLVANIA
ELECTRICAL EMPLOYEES PENSION
FUND

By: _____

Its: Designated Representative

- 2 -

MENTOR

## SCHEDULE A

### SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Total Amount of Securities Acquired | Price |
|---|---|---|
| 08/07/2015 | 5,200 | $25.90 |
| 08/10/2015 | 100 | $26.09 |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 10, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 10, 2016.

s/ Willow E. Radcliffe
WILLOW E. RADCLIFFE

ROBBINS GELLER RUDMAN
  & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: willowr@rgrdlaw.com

AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# Mailing Information for a Case 3:16-cv-00470-PK Haroutunian et al v. Mentor Graphics Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Gary M. Berne**
  gberne@stollberne.com,gseaman@stollberne.com

- **Kenneth J. Black**
  kennyb@rgrdlaw.com,e_file_sd@rgrdlaw.com,inavarrete@rgrdlaw.com

- **Amanda M. Frame**
  aframe@rgrdlaw.com

- **Barry M. Kaplan**
  bkaplan@wsgr.com,rcarter@wsgr.com,npierce@wsgr.com

- **Robert J. McGaughey**
  bob@law7555.com,office@law7555.com

- **Elizabeth A. Tedesco Milesnick**
  elizabeth.milesnick@millernash.com,sandy.hanson@millernash.com

- **Brian O. O'Mara**
  bomara@rgrdlaw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com

- **Jennifer S. Wagner**
  jwagner@stollberne.com,gseaman@stollberne.com

- **Gregory L. Watts**
  gwatts@wsgr.com,rcarter@wsgr.com,npierce@wsgr.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,AFrame@rgrdlaw.com,Willowr@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`