**Gary M. Berne**, OSB No. 774077
gberne@stollberne.com
**Jennifer S. Wagner**, OSB No. 024470
jwagner@stollberne.com
STOLL STOLL BERNE LOKTING
 & SHLACHTER P.C.
209 S.W. Oak Street, 5th Floor
Portland, OR 97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840

Local Counsel

**Shawn A. Williams**, *pro hac vice*
shawnw@rgrdlaw.com
**Willow E. Radcliffe**, *pro hac vice*
willowr@rgrdlaw.com
**Kenneth J. Black**, *pro hac vice*
kennyb@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone:    (415) 288-4545
Facsimile:    (415) 288-4534

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| WESTERN PENNSYLVANIA ELECTRICAL EMPLOYEES PENSION FUND, Individually and on Behalf of All Others Similarly Situated, and GEORGE HAROUTUNIAN,<br><br>Plaintiffs,<br><br>vs.<br><br>MENTOR GRAPHICS CORPORATION, WALDEN C. RHINES, GREGORY K. HINCKLEY and JOSEPH REINHART,<br><br>Defendants. | No. 3:16-cv-00470-PK<br><br><u>CLASS ACTION</u><br><br>FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE .................................................................................10

PARTIES ..................................................................................................................11

CONTROL PERSONS ..............................................................................................12

DEFENDANTS' KNOWLEDGE OF MATERIAL ADVERSE FACTS REGARDING
MENTOR'S EMULATOR BUSINESS ....................................................................14

    Competition from Synopsys ..........................................................................14

    Competition from Cadence ............................................................................23

DEFENDANTS' KNOWLEDGE OF ADVERSE FACTS REGARDING THE
SEMICONDUCTOR BUSINESS .............................................................................28

DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS
REGARDING THE RISK AND IMPACT OF MENTOR'S EMULATION
COMPETITION ........................................................................................................38

    Defendants' False Statements and Omissions ...............................................38

    Reasons Why Defendants' Statements and Omissions Were  Knowingly False and
    Misleading....................................................................................................47

DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS
REGARDING THE RISK AND IMPACT OF SEMICONDUCTOR
CONSOLIDATIONS.................................................................................................54

    Defendants' False Statements and Omissions ...............................................54

    Reasons Why Defendants' Statements and Omissions Were  Knowingly False and
    Misleading....................................................................................................57

WHEN DEFENDANTS ISSUED FY16 GUIDANCE THEY OMITTED
MATERIAL ADVERSE INFORMATION REGARDING MENTOR'S
COMPETITION AND SEMICONDUCTOR CONSOLIDATIONS ..........................61

    Defendants' False Statements and Omissions ...............................................61

    Reasons Why Defendants' Statements and Omissions Were  Knowingly False and
    Misleading....................................................................................................63

THE RELEVANT TRUTH BEGINS TO BE DISCLOSED .....................................67

ADDITIONAL POST-CLASS PERIOD EVENTS ...................................................70

**Page**

ADDITIONAL ALLEGATIONS OF SCIENTER ...................................................75

ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS ......................81

CLASS ACTION ALLEGATIONS ....................................................................84

THE STATUTORY SAFE HARBOR DOES NOT APPLY ........................................86

PRESUMPTION OF RELIANCE .....................................................................90

PRAYER FOR RELIEF ...............................................................................92

JURY DEMAND .......................................................................................93

## SUMMARY OF THE ACTION

1.      Lead Plaintiff Western Pennsylvania Electrical Employees Pension Fund ("Western Pennsylvania" or "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Mentor Graphics Corporation ("Mentor" or the "Company"), as well as court filings, earnings call transcripts and media and analyst reports about the Company.  The investigation of facts pertaining to this case is ongoing. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Mentor between August 21, 2014 and November 19, 2015, inclusive (the "Class Period"), for violations of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder, against Mentor, its Chief Executive Officer ("CEO") and Chairman Walden C. Rhines ("Rhines"), its President and Chief Financial Officer ("CFO") Gregory K. Hinckley ("Hinckley"), and its Vice President ("VP") of Corporate Development and Investor Relations Joseph Reinhart ("Reinhart").  Lead Plaintiff alleges that Defendants violated the securities laws by disseminating materially false and misleading statements and concealing material adverse facts regarding Mentor's current financial and business conditions, and growth prospects.[1]

3.      Mentor develops, manufactures and distributes electronic design automation ("EDA") products – computer software and emulation hardware systems.  The Company's EDA products

---

[1]     Attached hereto as Exhibit A is a chart of Defendants' false and misleading statements and Omissions, and a summary of the reasons why said statements are false.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    Page 1
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

allow customers to test both hardware and software components of technologically complex products before they are mass produced.  More than half of Mentor's revenues were derived from Mentor's Integrated Circuit ("IC") Design to Silicon (sold to semiconductor companies) and Scalable Verification (including emulation sold to semiconductor and systems companies) segments, with 65% of FY14 and FY15[2] revenues being derived from these two segments.

4.      The fraud alleged herein primarily relates to these two segments.  In particular, when Defendants spoke, Defendants portrayed Mentor to investors as insulated from emulation competition and unprecedented semiconductor consolidations, representing that Mentor would grow and that the Company had booked and renewed enough business to confidently forecast financial results.  Throughout the Class Period, Defendants knew but failed to disclose the negative impact of its competitors, Synopsys, Inc. ("Synopsys") and Cadence Design Systems, Inc. ("Cadence"), in the emulation business, and also the adverse impact of massive semiconductor consolidations on Mentor's business.

5.      The EDA market is, and was during the Class Period, dominated by three firms: Mentor, Synopsys and Cadence, often referred to as the "Big 3."  Mentor was the smallest of the three but over the years it had gained traction on competitor Cadence in the ~$250 million emulation market with Mentor's next-generation emulators.  During this time, Mentor, including its CEO Rhines, actively tried to prevent Mentor's other competitor – Synopsys – from acquiring a competitive emulator.  When Defendants' efforts failed and Synopsys acquired a competitive emulator from a small company called EVE-USA, Inc. ("EVE"), Mentor and Synopsys prepared for

---

[2]     Mentor reports on a fiscal year that runs from February 1 to January 31.  As used herein "FY" means Mentor's fiscal year.  Thus, FY15 means Mentor's fiscal year 2015, which ran from February 1, 2014 to January 31, 2015.  The Company's 1Q FY15 ran from February 1, 2014 to April 30, 2014, 2Q FY15 ran from May 1, 2014 to July 31, 2014, its 3Q FY15 ran from August 1, 2014 to October 31, 2014, and its 4Q FY15 ran from November 1, 2014 to January 31, 2015.  Likewise, FY16 ran from February 1, 2015 to January 31, 2016.

trial in proceedings held before the Honorable Michael W. Mosman in the United States District Court for the District of Oregon, Portland Division, Nos. 3:10-cv-00954-MO, 3:12-cv-01500-MO and 3:13-cv-0059-MO (hereinafter, "Synopsys Trial"), a case where fact discovery closed months before the start of the Class Period and where during a September 2014 trial, Mentor told the jury that Synopsys owed it damages tied to lost emulation sales to Mentor's former largest emulation customer, Intel.

6.    During the Synopsys Trial, Mentor described Intel as the "800-lb gorilla" and the "dominant customer" who Mentor previously sold upwards of 70% of its emulators to, but who would no longer be purchasing Mentor's emulators for the foreseeable future and rather, Intel would be purchasing Synopsys' newly acquired Zebu emulator.  Further, that Intel's loss impacted sales to other customers and forced Mentor to cut prices.  This trial was so important to Mentor that CFO Hinckley personally sat in the proceedings and Mentor paid upwards of $22 million in litigation costs alone for trial in FY15 and FY16.  Following the trial, Synopsys released a new non-infringing Zebu emulator, making the official announcement on March 12, 2015.

7.    In addition to competition from selling-giant Synopsys, Mentor's emulation business faced competitive pressures as a result of an anticipated next-generation emulator from long-time competitor Cadence.  Defendants knew from historical experience with the release of Mentor's own next-generation emulators and Cadence's release of its prior next-generation emulator to expect a market shift – with Cadence gaining traction with its new emulator.

8.    By the start of the Class Period, Cadence was in its fifth year of a three to five year life cycle for its emulator, and the market knew its next-generation emulator was imminent. Analysts even asked Defendants about the potential impact of Cadence's new product.  After much anticipation, Cadence would announce on February 4, 2015 that the product would ship in the

second half of calendar 2015 and confirmed that they were already engaged with customers who loved the new emulator.

9.      Defendants would admit post-Class Period that "two competitors" (*i.e.*, Synopsys and Cadence) released products that negatively impacted Mentor's emulation business.  The competitive emulators contributed to the $104 million FY16 miss and corresponding 36% drop of Mentor's stock price: "[t]he growth of our emulation business temporarily stalled as two competitors came into the market."

10.     Throughout the Class Period, Defendants misled investors about the competitive threats to Mentor's emulation business, which artificially inflated the value of Mentor's stock. According to testimony at the Synopsys Trial of a Mentor executive, Synopsys "became a large supplier" of emulators and started challenging Mentor "very significantly at virtually every account and things changed very dramatically" for Mentor as a result.  What investors were told by Defendants stood in marked contrast to this testimony.  For example, on the first day of the Class Period, despite emulation being mentioned 43 times on Mentor's earnings call and Defendants being directly asked what they were seeing in terms of the emulation business, Defendants did not inform investors that "things [had] changed very dramatically" as a result of Synopsys being a significant competitor in the emulation business.  Nor did Defendants disclose that the anticipation of Cadence's next-generation emulator was causing customers to defer orders and longer evaluation times. Likewise, on January 14, 2015 Hinckley flatly lied when he told investors: "[w]e [Mentor] have some advantages today.  There are for all intents and purposes two competitors [in emulation], ourselves and Cadence."  There was no mention of the selling-giant Synopsys.

11.     Further, throughout the Class Period, Defendants merely warned that competitors "***may*** acquire" competitive offerings "***which could*** adversely impact our ability to compete in the

marketplace," knowing that this warning had already come to pass with Synopsys' acquisition of the Zebu emulator.  Similarly, Defendants repeatedly told investors that anticipated new products from Mentor's competitors "*can* result in customers canceling or deferring orders for currently offered products" in anticipation of new ones, when Defendants knew bookings were already being delayed because of Cadence's and Synopsys' anticipated competitive products.  Defendants also claimed that "no material portion of our business is dependent on a single or a few customers," but Mentor said otherwise at the Synopsys Trial: "Intel sets the standard.  Believe me, Intel is really important, because if you can sell to Intel, you can sell to these other folks."

12.    In addition to increased emulation competition, Mentor was facing unprecedented semiconductor consolidations in calendar 2014 and 2015.  In 2013, the semiconductor industry saw $12 billion in mergers and acquisitions ("M&A").  That number nearly doubled in calendar 2014 to $23 billion.[3]  In 2015, the value of consolidations would reach $166 billion, with $83 billion in the first half alone.  Defendants knew about these consolidations and their negative impact on Mentor's business.  Defendants admitted on December 2, 2015, that the negative impact of the announcement of consolidations "*could be measured in years*, not months . . . ."  And on May 19, 2016 that: "*in almost all cases of consolidation, it's a negative effect*.  That is it either *slows the growth rate* or even *causes a negative growth rate*."  Defendants also knew they were particularly reliant in FY16 on the semiconductor industry at a time of unprecedented consolidations – 70% versus typically 50%.

13.    On December 4, 2014, Defendants misled investors by including false warnings in SEC filings that "[c]ustomers *may* acquire or merge with other customers" which "*could* result" in lost business and "*could* have an adverse effect on our business and future revenues."  In addition,

---

[3]    Attached hereto as Exhibit B is a chart of major semiconductor consolidations announced in 2014 and 2015.

on August 20, 2015, when specifically asked about "weakness either in booking or the comments [from customers]," as a result of semiconductor companies providing downward guidance, Defendants misled investors by responding that, "[s]emiconductor companies can't adjust their R&D spending very rapidly" and as a result changes in outlook do not "have that much ripple-through." While acknowledging that the magnitude of announced consolidations was up "dramatically," Defendants falsely assured investors there was nothing to worry about because "these changes simply add to the strength of the **de facto** standard leader" and resulting "reduc[tions] in one company will show up later in other[s] . . . ." Defendants omitted that "later" meant years and the then known negative effect of consolidations.

14.     At the end of the Class Period, on November 19, 2015, Defendants acknowledged that "there has been an unprecedented level of semiconductor M&A activity recently, approaching $100 billion of announced transactions in the past 12 months, well over 10% of the global IC industry's market capitalization." Defendants further disclosed that part of the reason for Mentor's $104 million FY16 miss was that "semiconductor industry consolidations [are] having a negative impact on our business." Defendants also revealed a 35% decline in business in Mentor's Design to Silicon segment. In particular, Defendants revealed that "[w]ith regard to semiconductor industry restructuring, our third quarter growth in contract renewal value was affected by one major contract where a portion of the company was spun off from the parent." Defendants knew, however, that this deal – the IBM/GlobalFoundries merger – had been announced on October 19, 2014 with significant cost-cutting, and that the deal announced would "slow[] the growth or even cause[] a negative growth rate." True to that knowledge, by July 2015 IBM had renewed its contract with Mentor with a "*decrease* in annual run rate."

15.     Even with the knowledge of: (i) the "negative effect" of semiconductor consolidations; (ii) that IBM had renewed its contract with Mentor as of July 1, 2015 with "a decrease in the annual run rate"; (iii) that Synopsys was a significant competitive threat to Mentor's emulation business; and (iv) that both Synopsys and Cadence had new emulators negatively impacting bookings, Defendants issued FY16 revenue guidance of ~$1.282 billion and EPS guidance of ~$1.45 on February 26 and March 16, 2015.  Defendants confirmed FY16 revenue guidance of ~$1.282 billion on May 22 and June 3, 2015.  Despite increasingly adverse circumstances, Defendants raised FY16 revenue guidance to ~$1.285 billion on August 31, 2015, claiming it was "prudent" to do so based on how Defendants "see our business right now."  This guidance was linked to the false impression Defendants gave investors regarding the state of Mentor's emulation business and the impact of unprecedented semiconductor consolidations.

16.     When Defendants spoke throughout the Class Period regarding Mentor's business, current financial condition and future prospects, they misled investors by concealing material adverse facts when they spoke, including that: (i) Mentor had lost its largest emulation customer's business (Intel) to its competitor Synopsys as a result of its acquisition of small company EVE's emulator; (ii) the loss to Mentor was significant given that Intel accounted for 60-70% of Mentor's emulator sales and approximately one-third of the emulator market; (iii) because Intel was the dominant customer in the industry its loss had a negative spillover effect on sales and pricing with respect to other customers; (iv) Synopsys with its well-established sales organization, was challenging Mentor for virtually all of its emulation business with its Zebu emulator and, as a result, the evaluations were taking longer and Mentor was losing business and/or having to lower prices; (v) Synopsys' non-infringing emulator was anticipated and officially announced on March 12, 2015; (vi) Mentor's competitor Cadence's new emulation product was imminent and was also causing

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

customers to delay orders; and (vii) weakness in the semiconductor industry as well as the related extraordinary increase in the magnitude of semiconductor company consolidations and resulting reductions in expenditures were negatively impacting Mentor's business.

17.     By concealing material adverse facts, Defendants created an impression Mentor had only one real competitor for its emulation business – Cadence – and that the Company was and would not be adversely impacted by any other competitor, or by Cadence's next-generation emulator.  Likewise, Defendants created the false impression that the massive semiconductor consolidations announced in calendar 2014 and 2015 were not negatively impacting Mentor, and that neither emulation competition nor semiconductor consolidations negatively impacted Mentor's FY16 financial guidance or future growth prospects.  The truth stood in marked contrast to Defendants' representations.

18.     Each of Defendants' materially false statements and omissions caused the Company's stock price to trade at artificially inflated levels above $25.00 per share during the Class Period. Rhines and Hinckley took advantage of Mentor's inflated stock price, selling stock for proceeds of more than $6.8 million and $3.8 million, respectively.  Defendants sold on the heels of their false statements, including raising FY16 financial guidance and continuing to misrepresent the current state of Mentor's business.  Their sales were also suspicious as many of them were weeks before Mentor's November 19, 2015 disclosure that the Company was not growing as Defendants previously represented because of the very issues Defendants concealed from investors.

19.     To that end, on November 19, 2015, Mentor issued a press release informing the market that instead of $440 million in revenue for 4Q FY16, its fourth quarter revenue forecast would be reduced by a whopping $104 million to $336 million, and that total bookings for the three months ended October 31, 2015 had decreased by ~20% compared to the three months ended

October 31, 2014.  The Company also took down its guidance for FY16 by $104 million, from $1.285 billion, and halved its FY16 EPS guidance from $1.25 to $0.63.

20.     More specifically, Defendants admitted in the November 19, 2015 press release and earnings call, and Mentor's 3Q FY16 Form 10-Q filed on December 3, 2015, that the Company's emulation business was not growing and that its financial prospects were not what Defendants had previously conveyed to investors because of the facts concealed from investors, including, the following:

- **"[A] decrease in term license contract renewals."**

- **"Total bookings were down 20%** year-over-year and were flat to down across all product categories. . . .  **Design to Silicon**, which includes our Calibre product family, was **down 35%** . . . .";

- "**Scalable Verification was down 25%**.  It's probable that a competitor's recent announcement of the release of their next generation emulation product has **temporarily frozen activity in that market**";

- "*I think there was a **general fear in the market*** that there might be competition that could approach that kind of capability";

- **"'Semiconductor consolidation and delays in emulator decisions are now having an adverse impact on our ability to close business . . . .'"**; and

- **"[I]immediate demand for emulation has stalled as the result of the expected introduction of competitive products."**

21.     As a result of Defendants' fraud, on November 20, 2015, Mentor's stock price plunged 36%, closing at $17.85 per share, down from the previous day's close of $27.78 per share, on high trading volume as reflected in the following chart:



## JURISDICTION AND VENUE

22.    Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act.  The claims

asserted herein arise under §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and

Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

23.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because Mentor has

headquarters in this District and many of the acts and practices complained of herein occurred in

substantial part in this District.

## PARTIES

24.     Court-appointed Lead Plaintiff Western Pennsylvania purchased or otherwise acquired Mentor common stock during the Class Period as described in the attached certification, and was damaged by the conduct alleged herein.

25.     Defendant Mentor was incorporated in Oregon and traded on the NASDAQ Exchange ("NASDAQ") during the Class Period under the ticker symbol "MENT." The Company maintains a corporate headquarters at 8005 S.W. Boeckman Road, Wilsonville, Oregon 97070.

26.     Defendant Rhines is, and was at all relevant times during the Class Period, the Chairman, CEO and a director of the Company. As CEO, Rhines spoke on Mentor's behalf in press releases and earnings conference calls. Rhines signed and/or certified the SEC filings alleged herein to contain false and misleading statements, including the Company's FY14 Form 10-K filed March 17, 2014 and FY15 Form 10-K filed March 16, 2015. He also certified that the "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company" in these same Forms 10-K, as well as the Company's 2Q FY15 Form 10-Q filed September 5, 2014; 3Q FY15 Form 10-Q filed December 4, 2014; 1Q FY16 Form 10-Q filed June 3, 2015; and 2Q FY16 Form 10-Q filed August 31, 2015. Rhines also participated in the following earnings conference calls wherein Defendants, including Rhines, made false and misleading statements on August 21, 2014; November 20, 2014; February 26, 2015; May 22, 2015; and August 20, 2015.

27.     Defendant Hinckley is, and was at all relevant times during the Class Period, President and CFO of the Company. He signed Mentor's SEC filings and spoke on the Company's behalf in press releases and earnings conference calls. Hinckley signed Mentor's SEC filings alleged herein to contain false and misleading statements, including the Company's FY14 Form 10-K filed March 17, 2014; FY15 Form 10-K filed March 16, 2015; 2Q FY15 Form 10-Q filed September 5,

2014; 3Q FY15 Form 10-Q filed December 4, 2014; 1Q FY16 Form 10-Q filed June 3, 2015; and 2Q FY16 Form 10-Q filed August 31, 2015.  Hinckley also made certifications in the same documents that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  Hinckley also participated in the following earnings conference calls wherein Defendants, including Hinckley, made false and misleading statements on August 21, 2014; November 20, 2014; January 14, 2015; February 26, 2015; May 22, 2015; and August 20, 2015.

28.    Defendant Reinhart is, and was at all relevant times during the Class Period, VP of Corporate Development and Investor Relations of the Company.  As a VP, Reinhart spoke on Mentor's behalf in earnings conference calls.  Reinhart participated in the following earnings conference calls wherein Defendants, including Reinhart, made false and misleading statements on August 21, 2014; November 20, 2014; February 26, 2015; May 22, 2015; and August 20, 2015.

29.    The Defendants named in ¶¶26-28 are referred to herein as the "Individual Defendants."

## CONTROL PERSONS

30.    As officers and controlling persons of a publicly held company whose common stock was traded on the NASDAQ and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

31.     The Individual Defendants participated in the drafting, preparation and/or approval of the various public statements, investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions, and were aware of their materially false and misleading nature.  Because of their board of director membership and/or executive and managerial positions with Mentor, each of the Individual Defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Mentor and its business or adopted by the Company materially false and misleading.

32.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made were then materially false and misleading.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## DEFENDANTS' KNOWLEDGE OF MATERIAL ADVERSE FACTS REGARDING MENTOR'S EMULATOR BUSINESS

33.    One of Mentor's key products was its emulation hardware system, Veloce.  The product was a primary component of Mentor's Scalable Verification segment which made up 25% of Mentor's FY15 revenues.  Unlike software sales, Mentor's emulation hardware sales were characterized by a backlog of booked orders with long lead times for evaluation by potential customers, and then manufacture and delivery before revenue was recognized.

34.    Cadence was the leader in emulation and once the largest supplier of emulators by a large margin.  Mentor had tried to develop and sell technology in an effort to grow market share and surpass Cadence.  To that end, Mentor's and Cadence's competition for new and existing customers was fierce.  For example, on May 25, 2012, speaking at the Company's earnings call for the quarter ended April 30, 2012 (1Q FY13), Rhines told investors that with the announcement of the Company's new Veloce2 emulation product in April 2012, Mentor was poised to become the market leader in emulation, stating, "Based upon publically reported numbers, that run rate puts us on track to achieve the #1 market share position this year in the rapidly growing emulation market."

35.    Industry analysts were impressed with Rhines' prediction because it meant that Mentor was going to be taking that position from the current market leader, Cadence.  As John Cooley explained in a *DeepChip.com* blog (which Defendants followed) on December 5, 2014, "MENT bigwigs says Veloce 2 will pass CDNS [Cadence] Palladium by end-of-year . . . Did you get that?  That's Wall Street speak by Wally [Rhines] publically saying that his new Veloce 2 sales will overtake CDNS [Cadence] Palladium sales by Dec 31, 2012!  Wow!" (emphasis in original).

### Competition from Synopsys

36.    Following Rhines' announcement at the May 25, 2012 earnings call, Mentor's path to "#1" in emulation was faced with a game changer.  Synopsys, one of the "Big 3" in the EDA

business along with Cadence and Mentor, acquired a small company called EVE.  By doing so, Synopsys with its large customer base, connections and large sales team acquired a competitive emulator, the Zebu.  Prior to the acquisition, Synopsys lacked such a product.  As a result, Mentor faced a significant competitive threat for emulation business that it previously had not faced.

37.    Defendants were aware of the competitive threat that Mentor faced as a result of Synopsys' acquisition of EVE's emulator based on Mentor's history with EVE and Synopsys.  In fact, Mentor had directly tried to block such an acquisition by entering into a licensing agreement with EVE.  As summarized by Synopsys' counsel I. Neel Chatterjee, Rhines personally threatened Synopsys' CEO with that agreement on August 20, 2012 referencing Synopsys' acquisition of EVE.  Thereafter, protracted litigation with Mentor ensued regarding Synopsys' sales of the Zebu and alleged infringement of Mentor's patents.

38.    The Synopsys Trial wherein Mentor sought tens of millions of dollars in lost profits from Synopsys, details the significance of the loss of Mentor's emulation business to Synopsys, including the loss of Mentor's largest customer, Intel, as well as the magnitude, duration and impact of that loss.[4]  Defendants omitted these facts from investors when they spoke during the Class Period regarding the state of Mentor's emulation business and competition.  Defendants knew these facts as evidenced by: (i) the importance of Mentor's emulation business to the Company; (ii) the importance of the loss of business to Synopsys as reflected by Hinckley's physical presence during the trial proceedings and statements made during trial; (iii) Rhines' personal involvement in interactions with

---

[4]    The case had a discovery cutoff of April 25, 2014, multiple summary judgment motions filed in the first half (including a filing by Mentor on June 23, 2014), and a trial commencing on September 29, 2014; which meant that Mentor and the Individual Defendants had knowledge of all of the facts that were presented at trial before the start of the Class Period.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    Page 15
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

EVE and Synopsys; and (iv) the $4.1 million in FY16 and $18.4 million FY15[5] spent by Mentor in litigation costs alone for the Synopsys Trial.

39.    ***Importance of Mentor's Emulation Business***.    The importance of Mentor's emulation business is highlighted by the fact that during investor earnings calls both before and during the Class Period, analysts repeatedly asked about the state of Mentor's emulation business, including its competition and prospects for growth.  Despite facts known to Defendants, they assured investors that they had nothing to worry about from Synopsys as a competitor.  For example, on December 4, 2013 at a NASDAQ OMX Investor Program, when asked about "the competitive landscape [] in emulation," Hinckley responded "there is two.  It's Cadence and ourselves."  Later on May 22, 2014, during an earnings call an analyst questioned: "Synopsys, a couple months back, released a new emulation platform.  Do you think that heats up the competition in the market?"  Rhines dismissed the suggestion: "[] I think things are not going to change appreciably in the foreseeable future."  And in the days leading up to the Class Period and six weeks before the Synopsys Trial, on August 12, 2014 at a Pacific Crest Global Leadership Forum when asked about Synopsys' release of ZeBu 3 and its impact on market share, Reinhart stated: "We tend to not hear a lot about ZeBu. . . .  I don't think that[] [its 10% market share position will] really [have] a material change []."

40.    ***Importance of the Loss of Intel's Emulation Business to Synopsys***.  Mentor's opening statement at the Synopsys Trial by its trial counsel, George Riley, on September 29, 2014 described Intel as a dominant and important customer, who set the standard for the EDA industry:

> [RILEY:] [T]here is one ***800-pound gorilla here in the room***.  The largest and the most advanced chip maker in the world is Intel.

---

[5]    These figures were reported by analysts at Griffin Securities in a November 23, 2016 analyst report.

*Intel is the dominant customer*.  Not only do they buy more EDA tools because they're making more chips, but Intel is making the most advanced chips. . . .  And because Intel makes the most powerful, the fastest and the most chips, they demand the most from the tools.  *They're the ones that set the standards for the EDA industry*.  They want more powerful tools, better tools, more rigorous tools.  Intel sets the standard.  *Believe me, Intel is really important, because if you can sell to Intel, you can sell to these other folks*.

41.     George Riley also explained in his opening statement for Mentor, the significance and importance of having Intel's business:

[RILEY:] *Intel [] purchase[d] 60 to 70 percent of the ZeBu and Veloce emulators in the U.S.* . . . .  So you've got one customer that makes up 60 to 70 percent of all the sales of ZeBu and Veloce.

42.     Mentor's then VP of Enterprise Solutions Organization Donald Cantow ("Cantow")[6] revealed during his trial testimony that while Intel purchased $80 million in emulation products in 2013, it had cut purchases to a mere $500,000 in 2014 and told Mentor that it was no longer going to be purchasing emulation products from the Company for the foreseeable future:

[CANTOW:]  *Sandra Connor of Intel, who is in charge of the procurement of emulation . . . .*

\*       \*       \*

[CANTOW:]  *[] Sandra Connor shared with me that going forward for all next generation purchases . . . their intent or their plan is to purchase all of that from EVE/Synopsys* [not Mentor].

\*       \*       \*

[CANTOW:]  After May of 2013, we [Mentor] haven't sold anything to Intel.  I shouldn't say anything.  We sold [$]500K."

43.     By the start time of the Class Period on August 21, 2014, Defendants therefore knew that Mentor had lost Intel's emulation business to its significant competitor Synopsys.  The loss was

---

6     VP Cantow was an executive with Mentor since 1995.  For example, he was VP of Global Accounts, and a member of Mentor's executive team according to the Company's website.  Cantow testified that one of his primary responsibilities was working with Intel as a customer and that there were ~70 people in his organization with people onsite at various customers.

critical, as former VP of Marketing for EVE and then Mentor Consultant, Lauro Rizzatti, testified Intel spent $100 million a year on emulation.  Mentor's economic damages expert Suzanne Stuckwisch further testified that "Intel accounts for 25 percent of the overall emulation market, including Cadence" and "30 percent for [the] U.S."

44.      ***Overall Importance of Synopsys as a Competitor in Emulation***.  VP Cantow testified to the competitive threat that Synopsys posed to Mentor's emulation business, noting that once Synopsys took Intel's business, it "became a large supplier" of emulators and started challenging Mentor "***very significantly at virtually every account*** [*i.e.*, customer] and ***things changed very dramatically***" for Mentor as a result.  He further affirmatively answered "Yes" when asked if Synopsys, as a seller of the ZeBu emulators was a "***[d]irect competitor***."  This testimony was substantiated by Mentor's own economic damages expert Stuckwisch's trial testimony that Mentor's Veloce and Synopsys' ZeBu were "substitutable."  Mentor's expert Stuckwisch also explained as to emulators that "on a function-by-function level, one may be a little better, one may be a little less, but they both meet [Intel's] needs."

45.      VP Cantow further testified that "due to the pressures place[d] on us by EVE at Intel, ***our pricing, we lowered a lot.  We lowered our cost and lowered our pricing***."  Further elaborating that he believed that absent Synopsys/EVE, Mentor would have gotten "***higher prices at other customers***."

46.      Mentor's VP and General Counsel, Dean Freed ("Freed"), also testified that like Cadence, Synopsys had a "much larger" sales organization and customer support than Mentor, and as a result, ***"[Mentor was] concern[ed] [] if Mentor technology were to be run through those sales forces in those companies, that it could be a significant competitive threat to Mentor and its emulation business***."

47.     And to be sure, Rhines knew that Synopsys' acquisition of EVE and its emulation product was an adverse event.  He had, in fact, tried to prevent it.  As Dr. Luc Burgun, founder and CEO of EVE, testified during the Synopsys Trial he personally had a conversation with Rhines in July 2010 regarding EVE's license agreement with Mentor which was in his words a "confirmation that in the end *Wally Rhines* – he didn't care about EVE in term of what product, what we could do together.  I mean, *the only focus was to make sure we would not be acquired by Synopsys*, and that was it."

48.     Later on August 20, 2012, as Mentor's General Counsel Freed testified during the Synopsys Trial, Rhines emailed Synopsys' CEO regarding its acquisition of EVE writing: "I understand from John Cooley's recent blog that Synopsys may be engaged in discussions to acquire EVE" referencing a settlement with EVE.  This was an effort to "scare" Synopsys according to Synopsys' trial counsel Mr. Chatterjee's closing arguments.

49.     Despite Rhines' efforts, Synopsys did acquire EVE in October 2012, and the increased competition from Synopsys following its acquisition was no surprise to Mentor.  VP Cantow testified Mentor employees from the support organization were onsite at customers, like Intel, on a daily basis and that because EDA is a "small world," Mentor was always aware of its competition:

> [QUESTION:]  Do you follow what your competitors are doing at the customers where you're located?
>
> [CANTOW:]  Yes.  There's basically two other large [E]DA companies, so *it's a very small world*.  Our competitors will be at the very same location.  So *there's a very realtime feedback on what's occurring in the competition*."

50.     Two large semiconductor companies – AMD and Freescale – endorsed Synopsys' Zebu when the company announced its availability on February 25, 2014, with Synopsys touting that Zebu had the "[h]ighest capacity" and "fastest emulation system."

51.     ***Mentor's Unique Visibility Into Emulation Revenues***.  Mentor's emulation sales cycle was a lengthy process requiring: (i) technical review (three months to a year); (ii) financial negotiations (another three to nine months); and (iii) the actual manufacture and shipment of the product (another six months to a year or more later).  This meant that Defendants knew up to nearly three years in advance of anticipated emulation revenue and the loss thereof.

52.     VP Cantow testified at the Synopsys Trial as to the visibility that Mentor's backlog gave the Company into revenue recognition:

> [CANTOW:]  [B]asically a schedule of our shipments for the future. . . . [I]t's basically a process where we will give visibility to our manufacturing organization of here's how many components I need to make, here's when I need to deliver them by.

*       *       *

> [CANTOW:]  [Backlog at Mentor means] we have a contract that obligates the customer to take delivery and pay us for those units.

53.     VP Cantow further explained the lengthy evaluation and negotiation process between Mentor and a potential customer:

> [QUESTION:]  Could you briefly describe how that process works, from interest to negotiation to actually inking the deal, signing on it.

> [CANTOW:]  Yes.  Typically it starts off with more of a technical focus, where the customers will go through a ***technical qualification review***.  And that can be ***anywhere from three months to sometimes it's a year***.  Sometimes you'll go through and actually implement an entire design with a customer on the tools and go into them.

> And then you move into a ***financial portion of the negotiations***, and those will last anywhere from ***three months to maybe as long as nine months***, depending on the size of the purchase.  Some of the smaller purchases kind of happen more quickly once a contract is developed.

> And it's a very rigorous process.

54.     In addition to the negotiation process as testified by VP Cantow, Defendants represented on May 23, 2013 during an earnings call that for manufacturing "it takes us about six months to respond to a big jump in orders, which, what we're booking in the first and second

quarter, we will largely be shipping in the fourth."   Later, Defendants told investors in the Company's FY15 Form 10-K filed on March 16, 2015 that its $142 million backlog of orders booked by January 31, 2015 were expected to be delivered by the end of FY16 (ending January 31, 2016), or in other words a year later after the booking.

55.      Defendants also knew precisely what Mentor sold to its customers as VP Cantow testified to Mentor's tracking of sales:

> [QUESTION:] Mr. Cantow, what systems do you use at Mentor Graphics to keep track of sales to customers?
>
> [CANTOW:] We use a system, it's called **SAP**.  That's the name of the company. It's basically a central depository **software system that keeps track of all our financials, our sales data**, revenue data, things like that.

56.      VP Cantow further testified that sales data regarding Intel was kept in the SAP system, that "**[i]t's used throughout the company on a regular basis**," and among other things, "[w]e'll access it in coming up with strategic plans for customers."  Defendants thus knew precisely what Mentor had and had not booked from its customers – bookings that would not be recorded as revenue until six months to more than a year later.

57.      ***Defendants Belatedly Admit to the Negative Impact of Competition from Synopsys***. At the end of the Class Period on November 19, 2015 Defendants admitted, *inter alia*, that: (i) Mentor would reduce FY16 revenue guidance by a $104 million; (ii) Scalable Verification (including emulation) suffered a 25% decrease in bookings; (iii) "immediate demand for emulation has stalled as the result of the expected introduction of competitive products"; (iv) "the time required for completion of evaluations [had] been increasing"; (v) "delays in emulator decisions are now having an adverse impact on our ability to close business"; and (vi) the "time required for completion of evaluations has been increasing, I believe due to anticipation of competitive product announcements during the quarter."

58.     Immediately following this disclosure, analysts at Griffin Securities in a December 3, 2015 analyst report noted that Synopsys had certainly taken market share from Mentor:

> Synopsys' emulation revenues have typically been considerably smaller than for Cadence Design Systems (CDNS, $22.22, Buy) and Mentor Graphics' (MENT, $17.96, Neutral).  However, if our inferred *revenues for Synopsys are about right, then their emulation revenues may have exceeded Cadence's and certainly exceeded Mentor's in the quarter* (though not for the trailing-twelve months in either case).

59.     Defendants further admitted on March 3, 2016, that "with *announcements this past year*, *there are now competitors to evaluate*."  Further, evaluation times and prices had increased significantly due to "competitive product introductions" which had been announced "this past year." Defendants admitted that "the *evaluations are taking longer and longer to close*.  Pricing is also more challenging and has reduced the values of many of our opportunities."

60.     Synopsys was one of the competitors with its Zebu emulator.  The Company announced the availability of its Zebu 3 in a February 25, 2014 press release.  Later, in a March 12, 2015 press release Synopsys affirmed that it "continue[s] to sell, ship and support" the Zebu 3 and that Synopsys had released a new version of the Zebu that did not include infringing features. Synopsys added that the new version "includes technology for up to 3x faster compile performance and Unified Debug with the market-leading Verdi solution."

61.     Later on May 19, 2016, Defendants confirmed: "[T]here is more competition [for all small and medium-sized customers] because *all three vendors* [*i.e.*, Cadence, Synopsys and Mentor] *have viable products*."  This was not the case before Synopsys acquired EVE's Zebu emulator.

62.     Analysts at Griffin Securities reported on May 23, 2016 that they had confirmed with Defendants that for emulation, "*the evaluation/procurement cycle had lengthened substantially*," in part because "*Synopsys [is] now [] a clearly more material competitor in this space []*."

63.    Consistent with Defendants' earlier revelations, on November 10, 2016, Rhines admitted in an Oregon Business article that Mentor's stock price plummeted in the fourth quarter of calendar 2015 (*i.e.*, Mentor's 4Q FY16) in-part because: "The ***growth of our emulation business*** temporarily ***stalled as two competitors*** came into the market."

64.    On June 7, 2016 Rhines participated in an in-depth interview by IEEE Design & Test wherein Rhines not only admitted that Synopsys had a significant offering in emulation but that as result, the sales cycle had lengthened negatively impacting Mentor's emulation business:

> [QUESTION:] ***Talking about increasing your revenue, I know currently the big three EDA companies are competing in that emulation space.*** How do you view that – is there a winner?
>
> [RHINES:] Mentor really enjoyed a wonderful period over the last few years, because we had emulation capability that was not available from competitors. We were the first to move to virtual stimulus, to high-level test benches, to hardware/software coverification. So it was quite an enjoyable period; we had the market to ourselves and enjoyed the benefit of that growth. ***Today, all three major EDA companies have significant offerings in emulation***, ***so it's a much more competitive market***. The good thing is that each of us has distinctions that make us better in specific applications or capabilities, but ***the sales cycle has spread out and become more complex, because users are evaluating more than one supplier***. So, like most of EDA, it's more work now, but I think all three major companies will continue to survive and generate revenue from emulation because it's a necessary piece of the whole verification solution.

65.    Defendants knew that customers were evaluating Synopsys' "significant offering" before the start of the Class Period. Mentor's executives and representative testified to this fact, emphasizing things had "changed dramatically."

**Competition from Cadence**

66.    ***Defendants' Historical Experience Informed Them that an Anticipated New Emulator from Mentor's Competition Would Negatively Impact the Company's Emulation Business.*** Defendants knew based on Mentor's experience that each release of a next-generation emulator caused market share shifts as customers were looking for improved features with each

release.  For example, according to comments by Reinhart at an August 14, 2013 Canaccord Genuity Growth Conference regarding the Company's Veloce1 emulation product, Mentor saw "strong gain[s]" in market share once it was released in 2008 and in the following year 2009, but for "2010 and 2011, there was a little bit of a pause because we were timing the introduction of a new tool."  In other words, the anticipation caused delays.

67.    Mentor experienced similar market shifts with its new Veloce2 emulator and Defendants knew that bookings were impacted by the very anticipation of its release.  Hinckley speaking on a May 25, 2012 earnings call of Mentor's backlog at the end of FY12 (ending January 31, 2012) answered affirmatively to an analyst question regarding whether "customers [were] aware of Veloce2's imminence and so the backlog [was] comprised of Veloce2," indicating that Mentor was booking Veloce2 primarily in the fourth quarter (November 1, 2011 to January 31, 2012).  *"We made the announcement after we were already taking orders."*  Rhines echoed the boost in Mentor's emulation business on the same call stating that "*[b]ookings* for this newly announced Veloce2 generation have *already exceed half of the total lifetime sales of the Veloce1 generation*."  Mentor had announced the availability of its new emulator Veloce2 only a month earlier in a press release on April 25, 2012.  It had, however, according to Hinckley and Rhines' statements been going through the lengthy technical review and negotiation process, and booking orders for months prior to its announcement.

68.    During the same May 25, 2012 earnings call, in which Rhines, Hinckley and Reinhart all participated in, Hinckley reported on the success of Mentor's pre-announcement bookings of Mentor's new emulator: "when we exit this year, [] our revenues will be such that we can claim a #1 market share in emulation.  So there is no slowing in the pace of bookings in the business or shipments."

69.     Even though Mentor gained market share on the leader in emulation, Cadence, with its new emulator Veloce2, industry expert Gary Smith warned on September 20, 2012 in a *DeepChip.com* blog that "Somewhere in 2013, the tables will turn because then Wally [Rhines] will have the old processor in Veloce 2, while Palladium 5 will have the new processor."[7] This happened with Cadence's prior release of a new emulator. In fact, analysts from Pacific Crest Securities commented on a February 4, 2015 Cadence earnings call that the "last time, when [Cadence] had a new emulation tool, we saw a significant growth at that time, 100% year over year."

70.     Consistent with Gary Smith's observation, analyst inquiries to Reinhart at an August 12, 2014 Pacific Crest Global Technology Leadership Forum and to Rhines on a November 21, 2013 earnings call, reflect that the lifecycle of an emulation product was typically three to five years. Thus, at the start of the Class Period, Mentor's product Veloce2 was nearly two years old, well into its life cycle, and Cadence's emulator was at the very end of its life cycle, being in the fifth year of its cycle.

71.     ***Defendants Knew that Cadence Was a Significant Competitor in Emulation and Its Next-Generation Emulator Was Imminent***. Defendants were acutely aware of Cadence as a competitor and the anticipated release of its new product (Palladium Z1) based on statements on Mentor's earnings calls both before and during the Class Period, as well as trial testimony, including:

(i)     On August 14, 2013 at a Canaccord Genuity Growth Conference, when asked about "what is driving the share shift in emulation?," Reinhart responded: "there is discussion of a new Cadence product";

---

[7]     Defendants told investors that Gary Smith (who passed away in 2015) was "the leading industry analyst for EDA" and the person they relied on to measure market share in one EDA industry was Gary Smith. *See, e.g.*, Feb. 28, 2013 earnings call (Rhines: "So we're anxiously awaiting the publication of results from Gary Smith EDA. That's the only source in our industry that gives total market as well as competitive results."); *see also* Aug. 12, 2013 Pacific Crest Global Tech. Leadership Forum (Reinhart noting with respect to emulation market share, "the real data doesn't come out from Gary Smith EDA for another week or two.").

(ii)     On December 4, 2013 at a NASDAQ OMX Investor Program, when asked about "the *competitive landscape* [] in emulation," Hinckley responded: "there is two.  It's *Cadence* and ourselves";

(iii)    On the August 21, 2014 Mentor earnings call, analysts noted that "*[i]t is expected sometime over the next six to nine months* it is likely Cadence has a *new platform*," asking Rhines if "it could then negatively impact the growth of emulation on Mentor's platform";

(iv)     At the January 14, 2015 Needham Growth Conference, Hinckley stated that: "We [Mentor] have some advantages today.  There are for all intents and purposes *two competitors* [in emulation], *ourselves and Cadence*."  Further, that Cadence, not Mentor, remained the leader in emulation: "So we are the market-share leader in four of the top 10 categories.  Synopsys is the leader in three and Cadence is in two, and one of those are in emulation . . . .";

(v)      On February 26, 2015, in response to an analyst question regarding "one of your competitors in emulation with a *new product*," Rhines stated: "we haven't seen much direct competition from Cadence, but we're always wary.  Customers develop new capabilities, and so we work hard to be sure that we are ahead of the game";

(vi)     During the May 22, 2015 earnings call one analyst noted: "we know that *Cadence is coming to market soon* with their new platform . . . ."; and

(vii)    Synopsys Trial testimony also evidences Defendants' knowledge of Cadence as emulation competition.  Cadence was a leader in emulation and once the largest supplier by a "large margin" according to the trial testimony of VP Cantow.  VP Cantow further acknowledged that "*Cadence* is still a very viable, a very *meaningful competitor* of Mentor in the emulation area."  He also testified that Mentor had "*realtime feedback*" on what was happening with Mentor's emulation competitors, they were "at the same location."

72.     As its direct emulation competitor that Mentor was focused on competing against, Defendants were aware of Cadence's warning on an August 12, 2014 Pacific Crest Global Technology Leadership Forum that "[w]e believe when our next generation [emulator] comes out we'll take a step ahead of our competition at that stage."  Defendants were also aware of Cadence's representations regarding the anticipation of its new emulator and customer interest before its official release:

(i)      During a February 4, 2015 Cadence earnings call, Cadence guided the street to an increase in revenue growth indicating it would begin shipping its next-generation emulator in the second half of 2015.  Further, Cadence's CEO Lip-Bu Tan stated that

it was already *"engaging with some of the key customers"* with respect to its next generation emulator indicating *"[t]hey love it"*; and

(ii)    During a July 27, 2015 Cadence earnings call, Cadence's CEO Lip-Bu Tan's stated that Cadence "*remain[ed] on track to start shipping* [Cadence's next generation emulator] later this year," and that customers were already very interested in the next generation emulator: "from my [CEO Tan's] customer interface, *customer interest in emulations remains high* . . . and *demand is strong* . . . ."

73.    In June 2015, Mentor participated in a Design Automation Conference ("DAC"). Online industry blog *DeepChip.com*'s representative attended this conference and would later describe on November 5, 2015 Cadence and Mentor as being at "war" with respect to emulation platforms at the time of the June conference. Defendants knew shortly thereafter, that Cadence's new emulation product had commenced shipping in 3Q (July-September 2015) according to Cadence's comments at a January 14, 2016 Needham Growth Conference.

74.    ***Defendants Subsequently Admit to the Negative Impact of Anticipated Competition, and Cadence Reports a Boost in Sales as a Result of Its New Emulator.*** At the end of the Class Period on November 19, 2015, Defendants admitted that "there was a general fear in the market that there might be competition that could approach [Veloce2's] capability," causing the deferral of orders. Defendants later explained on March 3, 2016 that once they were not "the only game in town" like a year or two ago (*i.e.*, March 2014), evaluations, and thus bookings were deferred by customers as "there [were] now competitors to evaluate." These admissions were consistent with the fact that: (i) Cadence's old emulator was in the fifth year of a five year lifecycle in 2014; (ii) analysts were discussing Cadence's imminent release of a new emulator in 2014, including with Defendants on the first day of the Class Period; (iii) Mentor had realtime feedback on its emulation competitors; (iv) Cadence was meeting with customers and said customers were loving the product before its official release; (v) Mentor's experience of previously booking sales of its new Veloce2 before its

availability; and (vi) Cadence was able to book and report nearly record emulation revenues in 2015 despite an official unveiling on November 15, 2015 as described below.

75.    Cadence would report: (i) for 4Q15 (ending December 31, 2015) "one of the best hardware quarters in the company's history" with revenue "benefiting from Palladium refresh"; (ii) that "initial shipments of the new Z1" contributed to a $108-109 million in revenues for its segment including emulation hardware; and (iii) a "record quarter for emulation . . . with 1Q16 [] the highest hardware revenue quarter in the company's history, with both the legacy and Palladium XP and the current Z1 contributing to results" as reflected by J.P.Morgan, Summit Research and Griffin Securities Cadence analyst reports on February 3, February 4 and April 25, 2016.

76.    Cadence's growth in its emulation business was not a surprise to Defendants. Defendants knew based on historical experience and feedback from customers that, prior to the Class Period, Cadence's anticipated next-generation emulator caused lost bookings and delays.  On November 19, 2015, Defendants admitted that "there was a general fear in the market that there might be competition that could approach [Veloce2's] capability," causing the deferral of orders. Defendants later explained on March 3, 2016 that once they were not "the only game in town" like a year or two ago (*i.e.*, March 2014), evaluations, and thus bookings were deferred by customers as "there [were] now competitors to evaluate."  Given the sales cycle for emulators, to ship Cadence's new emulator by December 31, 2015, Cadence was in technical and financial negotiations well in advance of their record bookings for 4Q15 and 1Q16.

### DEFENDANTS' KNOWLEDGE OF ADVERSE FACTS REGARDING THE SEMICONDUCTOR BUSINESS

77.    ***Defendants knew that Mentor's Business Depended on the Semiconductor Industry and in Particular on a Few Large Semiconductor Customers.***  The "three-member [EDA] oligopoly" of Mentor, Cadence and Synopsys, as Summit Research described the three competitors

in a March 25, 2014 report, marketed and sold their products primarily to semiconductor companies. As Hinckley explained at the January 13, 2016 Needham Growth Conference, "about 85% of EDA goes to the semiconductor industry . . . ." These semiconductor customers were also referred to as "semis," or "chip," "silicon," or "IC" companies.

78.    Mentor derived a majority of revenue from its two largest product offerings, both of which were primarily marketed to semiconductor customers. According to the Company's 10-K for FY15, the Company's Scalable Verification products (in particular Mentor's emulators) accounted for roughly 25% of Mentor's revenue. The IC Design to Silicon products accounted for roughly 40% of Mentor's revenue (in particular the Calibre family of products). As Griffin Securities explained in a May 23, 2016 analyst report, Design to Silicon includes "one of Mentor's two most important franchises []the Calibre family of products[]" (the Veloce product line was the other).

79.    Within the semiconductor industry, Defendants knew what was happening with its customers because Mentor relied on top customers in the industry with only 50 customers that "really matter," as reflected by Defendants' own statements:

(i)    December 4, 2013 NASDAQ OMX Investor Program – Hinckley reported: "The *top 50 IC companies represent approximately 80% of total R&D spending*";

(ii)    May 22, 2014, 1Q FY15 earnings call – Hinckley reported: "Last year, *8 of our top 10 customers were semiconductor companies* . . . .";

(iii)    August 21, 2014, 2Q FY15 earnings call – Rhines reported that "*still more than half [of the emulation customers] are semiconductor companies*";

(iv)    November 20, 2014 3Q FY15 earnings call – Hinckley reported: "We have gone deep not broad, and *so the major customers that generate our revenue tend to be the Who's Who of the semiconductor industry*"; and

(v)    December 16, 2014 Sanford C. Bernstein Technology Innovation Summit – Reinhart reported, "the beauty of the semiconductor industry is, there is only 800 customers and arguably, *only 50 customers of them really matter*. So you can be very efficient in going after this homogeneous market."

80.    ***Defendants Knew that Semiconductor Consolidations Negatively Impacted Mentor's Business***.  Semiconductor consolidations negatively impacted Mentor's business in several ways.  Not only did they reduce the amount of R&D expenditures because of synergies of the combined companies but the announcements of consolidations resulted in delays and opened the door for competitor products as a result of existing customers merging with entities that used competitor products.

81.    Defendants knew the negative impact of restructuring and consolidations as a result of Mentor's own experience.  For example, in a February 27, 2014 earnings call, Defendants reported that there was "***a substantial drag*** from Japan . . . due to the ***restructuring*** of the Japanese electronics industry . . . ."  In addition, Defendant Rhines acknowledged during a February 27, 2014 earnings call that the Company ***lost 20% on two of its largest contract renewals as "a direct result of the consolidations*** and reductions in people that had occurred in those companies."

82.    Defendants also knew that announced consolidations caused delays.  Defendants admitted during a November 19, 2015 earnings call that: "***[T]here is a delay period***. . . .  Normally, ***the result of [consolidations is*** that it] ***takes a longer period of time*** [to book business]."

83.    Defendants knew that historically the negative impact of announced consolidations could be felt for years.  In a December 2, 2015 Semiconductor Engineering article entitled "Consolidation's Aftermath," Rhines admitted that "Short-term, there is a lot of uncertainty.  If you don't know the size or strength of the company, you're generally less aggressive about renewal commitments.  Historically, M&A has had only a temporary ***effect on the semiconductor industry. That could be measured in years***, not months . . . ."

84.    Defendants also knew that semiconductor consolidations almost always had a "negative effect."  Defendant Rhines conceded this knowledge on a May 19, 2016 1Q FY17 earnings

call, admitting that "*in almost all cases of consolidation, it's a negative effect*.  That is it either *slows the growth rate or even causes a negative growth rate*."

85.    Consistent with Rhines' earlier admissions, in his interview for a November 10, 2016 story by Linda Baker of Oregon Business, he admitted that consolidations resulted in a "reset," negatively impacting the growth with respect to contract renewals: "*When two big companies join together, the growth of the amount of software they have in annual renewals does a temporary reset*.  Normally our customers increase their usage of our software about 25% every three years. The companies that merged didn't show an increase."

86.    *Mentor Sold its Software Products to Large Semiconductor Customers Pursuant to Long-term Contracts that Gave Defendants Significant Visibility into Future Sales.*  Mentor's leases for its software products to the semiconductor industry in its Design to Silicon segment were three years, giving Defendants unique visibility into those customers up for renewal, customers who's prior sales Mentor tracked in its SAP system (¶¶55-56).[8]  As explained by Reinhart on January 16, 2013 at a Needham Growth Conference, Mentor's typical contract was "about three years."  And Hinckley during a December 4, 2013 NASDAQ OMX Investor Program explained: "all three of the big three EDA companies do business with their accounts on a three-year lease.  And so, we have the stability that is caused by a multi-year lease to sustain revenues."  Defendants knew precisely which customer contracts were up for renewal well in advance of booking sales and recording revenue.

87.    Consistent with the three year contract terms for its software products, Reinhart at a January 16, 2013 Needham Growth Conference explained in response to an analyst question regarding "*how much of your revenues are already identified when the quarter starts*?"

---

[8]    All "¶_" and "¶¶_" references are to the instant motion.

"*Anywhere from 50% to 80%*.  And when I say identified, I would include in the identified bucket contracts who are scheduled to expire during the quarter."  He further elaborated that "[w]e have a pretty good visibility in our funnel."  Adding to visibility, Reinhart elaborated that: "[y]ou may even have a good understanding if for some reason a customer needs to get product sooner so there may be an early renewal."

88.    As result of the nature of Mentor's software contracts, Hinckley explained during an August 21, 2014 Mentor earnings call that "many of our customers will enter into negotiation and close the contract a full quarter in advance."  On a November 20, 2014 earnings call, Rhines explained for the "foundry" customers like GlobalFoundries, Mentor became "involved very early in the [] process."

89.    The size of Mentor's semiconductor contracts also gave Defendants visibility into Mentor's understanding of its expected sales.  Reinhart explained at the January 16, 2013 Needham Growth Conference Mentor's visibility into semiconductor sales as a result of large contracts:

> [REINHART:] The good news is we have – these are *typically large contracts, so you have pretty good visibility* even if it is – it may be quote activity and things of that sort.  So you have improved, better visibility than what you would expect. . . .
>
> But as I said, there aren't a real lot of big, new semiconductor companies being invented.  So *when it comes to the semiconductor world, you have a pretty good understand of what is coming up*.

90.    Mentor's backlog also included "software products requested for delivery within six months and emulation hardware systems, professional services, and training requested for delivery within one year" according to the Company's FY15 10-K for the period ending January 31, 2015.  As a result, Mentor's backlog gave Defendants additional visibility into future sales and revenue from the Company's semiconductor customers.

91.    Defendants also knew which customers were being affected by the consolidations and how that would affect Mentor because Defendants were negotiating new contracts with all of their

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

affected customers concurrently with the consolidations.  As Credit Suisse reported in an October 19, 2016 report: "MENT has indicated that the company and all of its major customers that were part of the recent Semi consolidation have renegotiated their contracts."  Semiconductor companies began announcing the unprecedented wave of consolidations no later than 2014.

92.    ***Defendants Knew Mentor's Business Was Particularly Susceptible to Semiconductor Consolidations.***  Because of the multi-year nature of Mentor's software contracts that they tracked using SAP (¶¶55-56), Mentor's backlog and the large size of semiconductor contracts, Defendants knew but did not disclose to investors that Mentor faced a "challenge" because a disproportionately large number of the Company's expiring customer contracts for FY16 ending January 31, 2016 were for semiconductor companies that were facing unprecedented consolidations. Hinckley subsequently admitted this fact at a January 13, 2016 Needham Growth Conference: "[c]ompounding the challenges we've had ***this year*** [FY16] is while we are typically 50% systems companies and 50% IC companies, this year ***we have 70% of our portfolio of renewals are IC targeted*** . . . ."  But rather than disclose this disproportionate reliance on semiconductor customers, Defendants primed the market to believe Mentor was uniquely diversified.  Reinhart, for example, speaking at the December 16, 2014 Sanford C. Bernstein Technology Innovation Summit, told investors that unlike Cadence and Synopsys, Mentor was "unique in that [] we get about 50% of our revenues form semiconductor companies and about 50% of our revenues coming from what we define as systems companies . . . ."  Despite knowing of the increased reliance on semiconductor customers, Defendants continued in FY16 to tell investors they were uniquely diversified.

93.    ***Semiconductor Companies Were Announcing Unprecedented Consolidations in late 2014 and 2015.***  In 2013, the semiconductor industry saw $12 billion M&As.  As detailed in

Exhibit B attached hereto, that number nearly doubled in calendar 2014 to $23 billion.  In 2015, the value of consolidations would reach $166 billion, with $83 billion in the first half alone.

94.    Defendants knew of the significant M&A activity and announced cuts in the semiconductor industry.  As explained above, the semiconductor industry was very important to Mentor.  Additionally, Defendants spoke regarding the acquisitions.  For example, Rhines appeared at a June 7-11, 2015 DAC where he analyzed "15 acquisitions that have happened in our industry this year" according to a June 9, 2015 Semiconductor Engineering article.

95.    Many of the largest consolidations would necessarily negatively impact the EDA industry and Mentor's business.  For example, the IBM/GlobalFoundries $1.5 billion deal announced on October 19, 2014, the Freescale/NXP $11.8 billion deal announced on March 2, 2015, the Broadcom/Avago $37 billion deal announced on May 15, 2015 and the Infineon Technologies AG/International Rectifier $3 billion deal announced January 15, 2015.  Because of the importance of the semiconductor industry to Mentor's business with only a few customers that "really matter," and the fact that IBM, GlobalFoundries, Broadcom and Infineon were Mentor's customers and some of the customers that "really mattered," Defendants were aware of the announced deals.

96.    For example, Defendants knew of the IBM/GlobalFoundries $1.5 billion deal announced on October 19, 2014.  This deal, wherein GlobalFoundries would acquire Mentor customer IBM's semiconductor business had "been in the works for some time" and wasn't "surprising" according to an October 20, 2014 PcWorld article.  Defendants would later point to this very deal as one of the reasons for Mentor's massive $104 million FY16 miss.  Defendants admitted on November 19, 2015 that "we were *negatively affected* by at least one of the semiconductor industry consolidations" and "[w]ith regard to semiconductor industry restructuring, our third quarter growth in contract renewal value was affected by one major contract . . . ."  Defendant Rhines

further admitted during a March 3, 2016 earnings call that the negative effect of this deal was known before July 1, 2015: "[i]n the largest of these cases [post-consolidation contract renewals Mentor Graphics had negotiated], the acquiree [IBM] renewed in the third quarter, just before completion of the merger, with a decrease in annual run rate . . . ." Because the IBM/GlobalFoundries acquisition was completed on July 1, 2015, that means that Mentor had secured a contract renewal from IBM "just before" July (calendar 3Q), and knew by then that the renewal came with a decrease in annual run rate.[9]

97.    Defendants also knew of Broadcom's announcement on May 15, 2015, that ***it expected to save $600 million in R&D*** and administrative costs as a result of the $37 billion Broadcom/Avago merger.    Defendants, based on their historical experience and subsequent admissions, knew that the announced consolidation would have a negative effect.    Defendant Hinckley admitted this fact on January 13, 2016 at a Needham Growth Conference when he indicated Mentor was getting "hit" by the deal: "So just . . . ***taking out $500 million worth of engineering expense [by Broadcom] has – will reduce the EDA spend for the entire industry***." ***"[T]his is just one example, like somewhere between 1.5% and 2% of TAM*** [the total available market] and on an industry that is somewhere between about $5.5 billion and $6 billion in revenue. ***So we are getting hit by that.***"    Rhines also conceded in an August 31, 2017 interview with Semiconductor Engineering that "Avago was clearly very aggressive in ***their projections of synergies***," which were announced to be $750 million.

98.    Defendants also were aware of NXP's announced merger with Mentor customer Freescale and the associated cost-cutting.  Following NXP's March 2, 2015 announced $11.8 billion acquisition of Mentor customer Freescale, "NXP anticipate[d] achieving cost savings of $200

---

[9]    Cadence later announced on February 3, 2016, that it had entered into an agreement with GlobalFoundries "that supports the newly acquired ASIC team from IBM."

million in the first full year after closing the transaction, with a clear path to $500 million of annual

cost synergies." The deal closed on December 7, 2015.

99.       Further, Defendants were aware of Intel's announcement in April 2015 of its intention

to cut its research and administrative budget by $300 million in 2015, because it was one of the

customers that "really matter." Defendants were also aware that in June 2015, Intel announced

additional significant cuts to its workforce and spending following the company's $16.7 billion

acquisition of Altera.

100.      ***Defendants Subsequently Admit the Impact of "Unprecedented" Semiconductor***

***Consolidations.*** On November 19, 2015 Defendants issued a press release in which they disclosed

that "semiconductor industry consolidations [are] having a negative impact on our business."

During the earnings call the same day, Defendants elaborated, explaining that they had lost and

would continue to lose business as a result of unprecedented consolidations:

    (i)      "[W]e were ***negatively affected*** by at least one of the semiconductor industry consolidations";

    (ii)    "With regard to ***semiconductor*** industry restructuring, ***our third quarter growth in contract renewal value was affected by one major contract*** where a portion of the company was spun off from the parent";

    (iii)   ". . . ***Design to Silicon***, which includes our Calibre product family, was ***down 35% . . . .***"; and

    (iv)   "[T]here has been an ***unprecedented level of semiconductor M&A activity*** recently, approaching $100 billion of announced transactions in the past 12 months, well over 10% of the global IC industry's market capitalization. This is on top of a challenging demand environment for ICs."

101.      Defendants also conceded during the November 19, 2015 earnings call that: "Industry

consolidation is causing companies to look for synergies in the combined [entities], including the

spend on R&D. This is not just for those companies involved in M&A, but also those independent

companies ***that must execute in this new competitive environment***."

102.    Defendants also disclosed on November 19, 2015 that the normal result of consolidations were delays. ¶¶173-174. Explaining on December 2, 2015 that those delays "could be measured in years . . . ." ¶180. And on May 19, 2016 that in "almost all cases of consolidation, it's a negative effect. ¶187.

103.    On December 3, 2015, Mentor would report in its 3Q FY16 Form 10-Q that "[b]ookings for the three months ended October 31, 2015 decreased approximately 20% . . . *primarily due to a decrease in term license contract renewals*," indicating that a number of Mentor's customers either did not renew or renewed for lower amounts.

104.    On December 3, 2015, Mentor would also materially change its purported risk disclosures in Mentor's 3Q FY16 Form 10-Q noting: "*Merger and acquisition* activity in the semiconductor industry has been *unusually strong during 2015*. This activity *appears to be the result of semiconductor companies, experiencing slower sales in their existing market segments*, desiring to broaden the scope of their businesses and to *spread the rising costs of product development* and use of advanced technologies across a larger organization." Defendants knew of these consolidations, slower sales in the semiconductor industry and the reductions in expenditures well before Mentor revised its risk disclosure.

105.    Later, on January 13, 2016, Defendant Hinckley appeared at a Needham Growth Conference where he quantified the magnitude of the semiconductor consolidations, admitting that "approximately 25% of the entire digital IC market by market cap has either completed an important big transaction, or is in negotiation."

106.    Defendants also directly linked Mentor's stock drop following its November 19, 2015 disclosures to in part "major mergers in the semiconductor industry" as reported in a November 10, 2016 Oregon business article.

107.    Consolidations also resulted in reduced revenues and drove weakness in the emulation business.  As an analyst at Societe Generale explained in a November 15, 2016 report, "Consolidation increases the purchased volumes from a single customer, which means Mentor has to offer a **_larger discount_**, resulting in a reduced revenue run-rate for the company."  And "M&A is also one of the factors that has driven weakness in the emulation business for Mentor in particular."

## DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING THE RISK AND IMPACT OF MENTOR'S EMULATION COMPETITION

### Defendants' False Statements and Omissions

108.    <u>False and Misleading Statement</u>: On August 21, 2014, Defendants held an earnings call with analysts and investors in which analysts directly asked about Mentor's emulation business. Defendants Rhines, Hinckley and Reinhart hosted the call.  In response, Defendants omitted that they had lost Intel's business to Synopsys, that Synopsys was a significant competitive threat to other businesses and Cadence's anticipated new emulator was impacting bookings:

> [ANALYST:]  [J]ust wanted to get a feel for emulation. So scalable was down pretty significantly year-over-year off of an admittedly tough comp, but **_just wanted to get a sense for how you're seeing the year in terms of the emulation business, either on a bookings or a revenue perspective_**.  Do you see this as a meaningful growth year again for your emulation business?

> [RHINES:]  **_Yes, absolutely we do.  We expect we will grow substantially this year in the emulation business._**

> [ANALYST:]  And would you be willing to put a finer point on substantially or is that we are going to have to leave it at?

> [HINCKLEY:]  I think it is somewhere in the range of 20% to 25% this year, Rich.

109.    <u>False and Misleading Statement</u>: During the August 21, 2014 earnings call, Defendants continued to speak on the topic of emulation and the competitive landscape Mentor faced but materially misled investors by failing to disclose that the anticipation of Cadence's new product and significant competition from Synopsys was already negatively impacting Mentor.  When

specifically asked about the impact of Cadence's new product on Mentor's growth, Defendants falsely assured investors that the release of a new emulation platform by competitor Cadence would not negatively affect Mentor's business:

> [ANALYST:]  ***It is expected*** sometime over the next six to nine months ***it is likely Cadence has a new platform and it could then negatively impact the growth of emulation on Mentor's platform***.  Could you share your thoughts on that?

> [RHINES:]  Well, so I think I indicated earlier that there are really two kinds of emulation.  There is traditional in-circuit emulation and then there is the whole new generation of virtual emulation.  We have been in the virtual emulation business for quite some time, over a decade . . . .

> ***Now, I expect our competitors will ultimately offer many of the kinds of features that Mentor has with virtual stimulus*** and accelerated test benches and the ability to do software development.  At some time in the future when they do, I think we will see them more often with competitors.

> But today we are not number one in in-circuit emulation; we are clearly number one in virtual emulation. . . .  ***I think it will take a long time for people to develop the capability that we have honed over the last 12 years to bring us to where we are in the virtual emulation side.***

110.    The market understood Defendants' message that Mentor did not need to worry about competitors' products as reflected in an August 25, 2014 *Seeking Alpha* report stating: "As the list of products requiring EDA has grown and diversified, each of the industry's three largest players has been able to carve out its own empire, often with little worry of competitor intrusion."

111.    <u>False and Misleading Statement</u>: On September 5, 2014, Mentor filed with the SEC its 2Q FY15 Form 10-Q for the period ending July 31, 2014 wherein Defendants continued to materially mislead investors regarding the impact of Cadence's impending new emulation product and Synopsys' emulator:

> We or our competitors sometimes pre-announce or provide "road maps" of the expected availability of new hardware or software products or product features.  ***Such pre-announcements, whether offered by the pre-announcing company or vendors of competitive products, can result in customers canceling or deferring orders for currently offered products as customers anticipate that currently offered products may be uncompetitive or lacking in features or performance***.

112.    <u>False and Misleading Statement</u>: On September 5, 2014, Mentor in its 2Q FY15 Form 10-Q deliberately misled investors by failing to disclose that Synopsys' acquisition of a new emulator had already "adversely impact[ed] [Mentor's] ability to compete in the marketplace":

> *Our competitors may acquire technology or companies offering competing or complementary product offerings which could adversely impact our ability to compete in the marketplace*. *They may be able to* deliver better or broader product offerings, *offer better pricing, or otherwise make it more desirable for our customers to buy more of the tools in their design flow* from the competitor after the acquisition.

113.    <u>False and Misleading Statement</u>: Also on September 5, 2014, Mentor filed with the SEC a Form S-8 Registration Statement.  The registration statement incorporated by reference a number of documents, including the Company's FY14 Mentor's Form 10-K filed on March 17, 2014, which falsely stated:

> *[N]o material portion of our business is dependent on a single or a few customers*. We do not believe that *the competitive loss of one or more individual products at one or more of our customers would have a material adverse effect on our revenues*.

114.    <u>False and Misleading Statement</u>: On November 20, 2014, Defendants held an earnings call with analysts and investors to discuss the Company's reported earnings, business and operations on the same day.  Defendants Rhines, Hinckley and Reinhart hosted the call.  During the call, Defendants falsely stated that Mentor's emulation business had strengthened omitting that the Company faced significant competition from Synopsys and Cadence:

> [ANALYST:]  [J]ust wanted to get your sense of *how you see the emulation business* relative to a quarter ago.  Something a little bit like bookings but very optimistic on the pipeline and the revenue potential fourth quarter.
>
> I think the last quarter you talked about that business, and I believe this is in terms of revenue being maybe a 20% to 25% grower [*sic*] this year.  *Anything changed in the last quarter?*
>
> [RHINES:]   *Of course the year-to-date revenue is quite strong, and from a bookings point of view, I would say it's strengthened*. . . .
>
> *So if anything, I think I'd say that our outlook has improved . . . .*

115.    Analysts commenting on the earnings call found Defendants' statements about the growing emulation business particularly significant, including:

(i)    Canaccord Genuity, on November 20, 2014, reported that "***Management*** expects strength in transportation and IC Design to silicon to continue in Q4 of 2014 and ***highlighted the growing pipeline of emulation customers***";

(ii)    Summit Research, on November 21, 2014, reported that "***Emulation*** and Automotive ***continue to be the stars in Mentor's portfolio***.  Mentor continues to maintain its lead in Emulation (mid 40% market share) and expects it to grow at 20%+ next year . . . ."; and

(iii)    J.P.Morgan, on November 24, 2014, reported that "Momentum in automotive strength, the ***rapidly growing pipeline for emulation products***, and strong contract renewal outlook are expected to fuel the fourth quarter."

116.    <u>False and Misleading Statement</u>: On December 4, 2014, Mentor filed with the SEC its 3Q FY15 Form 10-Q for the period ending October 31, 2014 wherein it repeated Defendants' prior misrepresentations by failing to disclose the known adverse impact of Cadence's impending emulation product and Synopsys' emulator:

We or our competitors sometimes pre-announce or provide "road maps" of the expected availability of new hardware or software products or product features. ***Such pre-announcements, whether offered by the pre-announcing company or its competitors, can result in customers canceling or deferring orders for currently offered products anticipating that currently offered products may be uncompetitive or lacking in features or performance***.  In the case of hardware products, slowing sales may cause inventories to increase or become obsolete, resulting in the need to discount or reduce production of current products.

117.    <u>False and Misleading Statement</u>: Defendants further mislead investors in Mentor's 3Q FY15 Form 10-Q by omitting that Synopsys' acquisition of EVE's ZeBu 3 emulator had already in fact (without contingency) resulted in the loss of Mentor's largest emulation customer, Intel, for the foreseeable future and other business.

***Our competitors may acquire technology or companies offering competing or complementary product offerings which could adversely impact our ability to compete in the marketplace.  They may be able to*** deliver better or broader product offerings, ***offer better pricing, or otherwise make it more desirable for our***

*customers to buy more of the tools in their design flow* from the competitor after the acquisition.

118.   <u>False and Misleading Statement</u>: Defendants also continued to falsely claim that the only competition the Company faced in the emulation market was Cadence, omitting the significant competition from Synopsys.  At the January 14, 2015 Needham Growth Conference, Hinckley stated that "*[w]e [Mentor] have some advantages today.  There are for all intents and purposes two competitors [in emulation], ourselves and Cadence*."

119.   <u>False and Misleading Statement</u>: On February 26, 2015, Defendants held a Mentor earnings call.  Defendants Rhines, Hinckley and Reinhart hosted the call in which Defendants falsely claimed that Mentor's emulation business would grow, omitting material adverse information regarding its competitors, including the magnitude, duration and impact of the loss of Intel and Synopsys:

> [ANALYST:] And then, emulation, I think you talked about perhaps growing that business on the order of 25% in FY15.  Wondering if you can kind of talk about where you ended up, maybe relative to that number?
>
> And then, what are your thoughts, and what's baked in to your FY16 forecast, with respect to emulation growth? It sounds like you expect no products from your – *no sales from your largest customer. Just wondering how it affects the overall growth there?*
>
> [RHINES:]  Well, we were able [] to grow our emulation revenue this past year.  But as noted, *we had a contribution from a large customer, which we don't expect to have in the coming year.  But we do expect that we can probably grow emulation revenue in the year ahead – or the year we are currently engaged in, in FY16.*

120.   <u>False and Misleading Statement</u>: Defendants continued to falsely assure analysts and investors on the February 26, 2015 earnings call regarding the "competitive dynamics" in emulation claiming they "haven't seen much direct competition from Cadence" and the "decline in the level of activity" from the Company's largest emulation customer was an "isolated" issue having "nothing to do with what is going on in the overall emulation market."  In doing so, Defendants misled investors

by omitting the impact of the anticipated release of Cadence's next-generation emulator and Synopsys' non-infringing emulator, as well as the magnitude, duration and impact of the loss of Intel to Synopsys:

> [ANALYST:]  Okay.  And then, I was just wondering, with one of your competitors in emulation with a new product, I'm wondering **what your thoughts are on the competitive dynamics there**?  And whether or not the long-term – or let's say, the five-year growth rate for emulation should reaccelerate after this year for you?

> [RHINES:] . . .  I believe you're referring to Cadence, is that what the question is?

> [ANALYST:]  Yes.

> [RHINES:] **Yes, we haven't seen much direct competition from Cadence**, but we're always wary.  Customers develop new capabilities, and **so we work hard to be sure that we are ahead of the game**.

> *       *       *

> [HINCKLEY:] [R]ight now, our emulation business is **affected by a big decline in the level of activity with our single-largest customer.  It's quite isolated.  This has nothing to do with what is going on in the overall emulation market**.  It is our business with what has been our historically largest emulation customer.

121.    Analysts bought Defendants' reassurances and promises regarding the strength of Mentor's emulation business reporting that "[e]mulation business remains strong" and only "slowing demand from MENT's largest emulation customer":

> (i)     Canaccord Genuity, on February 27, 2015, reported that "While this year sees overall top line growth slowing on **slowing demand from MENT's largest emulation customer**, we expect revenue and earnings growth to be above trend in fiscal 2017"; and

> (ii)    Summit Research, on March 2, 2015, reported that "Reiterating BUY and $30 PT Due to the Following: 1) **Emulation business at Intel has not been lost**, and Intel is probably taking a pause; 2) Non-Intel Emulation business remains strong (6 customer wins); 3) Automotive and PCB business are strong . . . ."

122.    <u>False and Misleading Statement</u>: As Defendants had done in prior quarters, Defendants repeated in Mentor's FY15 Form 10-K filed with the SEC on March 16, 2015 their false

statements omitting the true impact of Cadence's new emulator and Synopsys' latest version of its

emulator:

> We or our competitors sometimes pre-announce or provide "road maps" of the expected availability of new hardware or software products or product features. *Such pre-announcements*, whether offered by the pre-announcing company or its competitors, *can result in customers canceling or deferring orders for currently offered products anticipating that currently offered products may be uncompetitive or lacking in features or performance*. In the case of hardware products, slowing sales may cause inventories to increase or become obsolete, resulting in the need to discount or reduce production of current products.

123.    <u>False and Misleading Statement</u>: Defendants also repeated in Mentor's Form 10-K

filed with the SEC on March 16, 2015 their false statement warning of a risk that companies "may

acquire technology" that "could adversely impact our ability to compete" while omitting to disclose

that this risk had already occurred with respect to Synopsys' acquisition of EVE's Zebu 3:

> *Our competitors may acquire technology or companies offering competing or complementary product offerings which could adversely impact our ability to compete in the marketplace*. *They may be able to* deliver better or broader product offerings, *offer better pricing, or otherwise make it more desirable for our customers to buy more of the tools in their design flow* from the competitor after the acquisition.

124.    <u>False and Misleading Statement</u>: Defendants also falsely maintained in Mentor's

FY15 Form 10-K that no portion of Mentor's business was dependent on a single or few customers

and a competitive loss would not have a material adverse effect, while omitting that the loss of

Intel's emulation business to Synopsys had already negatively impacted Mentor:

> *[N]o material portion of our business is dependent on a single or a few customers*. We do not believe that *the competitive loss of one or more individual products at one or more of our customers would have a material adverse effect on our revenues*.

125.    <u>False and Misleading Statement</u>: On May 22, 2015, Defendants held an earnings call

with analysts and investors to discuss the Company's 1Q FY16 reported earnings and operations and

FY16 guidance.  Defendants Rhines, Hinckley and Reinhart hosted the earnings call.  During the

earnings call, Defendants misled investors claiming that the Company was booked to capacity in

evaluations and had more demand than it could handle, and failed to disclose that Mentor's

emulation business was in fact suffering as a result of its competition:

> [HINCKLEY:] [B]ookings were up 70%, through the second highest Q1 ever. That strength was disbursed, spread across all regions and most product categories.

*       *       *

> [ANALYST:] Okay. And then, finally, maybe just a quick update on **the emulation business**, on both **the competitive front**, but also just the linearity you're expecting through this year. It looks like revenue's been higher than bookings for the last few quarters, and I wonder if that's changing at all.

> [RHINES:] . . . We are expecting that, during the year, our revenue will grow for emulation. And I have to say, at this point, that the **activity for evaluations is so strong, that we are booked to capacity in the number of customers we can evaluate**.

126.   <u>False and Misleading Statement</u>: During the May 22, 2015 call, Defendants also

falsely assured investors that business, especially in emulation, was robust:

> [ANALYST:] The first question is on the guidance. Why would revenue – I mean, maybe if you could kind of touch base, why the revenue will be down Q over Q? Is it some pull-in, in the Q1 quarter?

> [HINCKLEY:] That's what Wally explained, []. So we had some contracts that were expiring naturally outside of the first quarter that those customers asked us to renew in the first quarter. That happened. And so, it's business that we expected to do later in the year, happened in the first quarter.

> [ANALYST:] Got it. Okay. And then, the scalable verification revenue is down year over year. So is it mainly kind of the **one big emulation customer**, which you talked about last quarter, **may not be renewing this year** or buying more tools? Is it because of that?

> [HINCKLEY:] I think what we described is – and **we think the most compelling indicator of the strength of the business is actually what our bookings** are. So, our revenue may be down, and that has to do with, for example, in scalable verification is emulation, **we have to actually build emulators, so we ship to a build forecast. Bookings for the quarter were, in fact, up 65%. So, the business is robust**.

127.   Investors continued to believe that Mentor had increasing momentum for emulation

with "management expectations conservative." Canaccord Genuity, for example, in a May 22, 2015

report declared that "[w]e reiterate our BUY rating and see potential for upside to consensus estimates based on increasing momentum for automotive (additional wins at other manufacturers) and emulation (management expectations conservative)."

128.    <u>False and Misleading Statement</u>: Defendants repeated in Mentor's 1Q Form 10-Q for FY16 filed with the SEC on June 3, 2015 and in its 2Q FY16 Form 10-Q filed on August 31, 2015 their earlier misrepresentations, omitting the existing impact of Cadence's next-generation emulator and Synopsys' new version of the Zebu 3:

> We or our competitors sometimes pre-announce or provide "road maps" of the expected availability of new hardware or software products or product features. ***Such pre-announcements, whether offered by the pre-announcing company or its competitors, can result in customers canceling or deferring orders for currently offered products anticipating that currently offered products may be uncompetitive or lacking in features or performance***. In the case of hardware products, slowing sales may cause inventories to increase or become obsolete, resulting in the need to discount or reduce production of current products.

129.    <u>False and Misleading Statement</u>: Defendants also continued to mislead investors in Mentor's 1Q Form 10-Q for FY16 filed with the SEC on June 3, 2015 and in its 2Q FY16 Form 10-Q filed on August 31, 2015 by failing to disclose the adverse impact of Synopsys' acquisition of EVE's Zebu 3 emulator:

> ***Our competitors may acquire technology or companies offering competing or complementary product offerings which could adversely impact our ability to compete in the marketplace***. ***They may be able to*** deliver better or broader product offerings, ***offer better pricing, or otherwise make it more desirable for our customers to buy more of the tools in their design flow*** from the competitor after the acquisition.[10]

---

[10]    A slight variation in language appears between Mentor's 1Q Form 10-Q for FY16 filed on June 3, 2015 and Mentor's 2Q FY16 Form 10-Q filed on August 31, 2015.

**Reasons Why Defendants' Statements and Omissions Were
Knowingly False and Misleading**

130.    As explained below, each of Defendants' statements in ¶¶108-109, 111-114, 116-120,

122-126, and 128-129, were materially false and misleading because Defendants knew or

deliberately disregarded, and failed to disclose material adverse facts.

131.    On August 21, 2014, Defendants were asked how "you're seeing the year in terms of

the emulation business, either on a bookings or a revenue perspective." ¶108.  Defendants' response

to this analyst question was materially misleading because Defendants omitted adverse facts that a

reasonable investor would have considered as significantly altering the total mix of information

regarding the state of Mentor's emulation business.  Likewise, on August 21, 2014, when asked

"could [Cadence's anticipated new platform] then negatively impact the growth of emulation on

Mentor's platform" (¶109), Defendants continued to mislead investors claiming that "some time in

the future" "our competitors will ultimately offer many of the kinds of features that Mentor has with

virtual stimulus," and "I think it will take a long time for people to develop the capability that we

have honed over the last 12 years to bring us to where we are in the virtual emulation side."  ¶109.

132.    Despite the mention of Mentor's emulation business 43 times during the August 21,

2014 earnings call, Defendants failed to disclose material adverse facts regarding Mentor's

emulation business when they spoke including, *inter alia*: (i) the loss of its largest emulation

customer Intel to Synopsys for the foreseeable future, or the magnitude of that loss; (ii) the impact of

that loss on sales to other customers; (iii) that Synopsys with its large and well developed sales

organization was a competitive threat challenging Mentor at every customer with its new

"substitutable" emulator causing longer evaluation times; and (iv) that the anticipation of Cadence's

new emulator was already negatively impacting Mentor's emulation business.  Investors were

deceived.  For example, analysts at Griffin Securities wrote on August 22, 2014 "incremental bookings possibility depends on whether Intel comes back again for additional emulation capacity."

133.    The undisclosed adverse facts known or deliberately disregarded by Defendants that informed them that their representations and omissions to investors were misleading are described in ¶¶33-76, and include the following:

(i)     At the time of their August 21, 2014 statements with regard to how they were seeing the emulation business, Defendants had primed the market days earlier on August 12, 2014 into believing that "[w]e tend to not hear a lot about ZeBu." ¶39.  Reinforcing earlier messages on May 22, 2014 that Synopsys' new emulation platform would not "heat[] up the competition" and on December 4, 2013 that the "competitive landscape" in emulation consisted of "Cadence and ourselves."  ¶39;

(ii)    Mentor had already lost its largest emulation customer Intel's business to Synopsys for the foreseeable future, which negatively impacted the Company's business (¶¶40-43), and which Mentor spent more than $22 million to try to recoup tens of millions in damages (¶6);

(iii)   That because Intel was the "dominant customer" in the industry and the "800-lb gorilla," the loss of it had a spillover effect on other customers, negatively impacting emulation sales to other customers and prices. ¶40. As Mentor told a jury in seeking damages: "Believe me, Intel is really important, because if you can sell to Intel, you can sell to these other folks." ¶40. And, absent Synopsys's acquisition and selling of a new emulator Mentor would have gotten "higher prices at other customers." ¶45.  Defendants also knew that Synopsys would release a new version of the Zebu which would increase competition. ¶60;

(iv)    Defendants knew that because Synopsys had a "much larger" sales and customer support organization, its acquisition of the ZeBu (that Rhines had tried to prevent) rendered Synopsys a significant "competitive threat" and as a result Mentor's business had already been adversely impacted. ¶¶44-46. As Mentor's executive testified, once Synopsys took Intel's business, it "became a large supplier" of emulators and started challenging Mentor "very significantly at virtually every account [i.e., customer] and things changed very dramatically" for Mentor. ¶44. Investors were not informed of this dramatic change. ¶44-50;

(v)     The magnitude of the loss of Intel was material.  Intel ordered $80 million from the Company in 2013 (¶42), nearly one-third of the total $250 million emulator market emulation for the year (¶5), and 70% of Mentor's emulators were purchased by Intel (¶41).  For 2014, Intel had ordered a mere $500,000 of emulation products, and more importantly told Mentor it had no intent to order the Company's emulators in the foreseeable future. ¶42;

(vi)     Contrary to Defendants' representations regarding competition and Mentor's emulator's capability as compared to its competition, Mentor told a jury that Mentor's Veloce and Synopsys' Zebu were "substitutable." ¶44. Later, on June 7, 2016, Rhines would admit with "the big three EDA companies . . . competing in [the] emulation space" that Mentor was not even the only competitor in virtual stimulus, only the first. ¶64. Further conceding that with "all three major EDA companies hav[ing] significant offering in emulation . . . the sales cycle has spread out . . . ." ¶64;

(vii)    Defendants knew that the introduction of Cadence's new emulation product (Palladium Z1) was imminent having been asked about its release beginning no later than August 2013 (¶71(i)), and repeatedly thereafter, including on August 21, 2014 (¶71(ii)). Based on: (i) Defendants' experience with Cadence's prior next-generation emulator and rapid growth as well as corresponding shifts in market share (¶69); (ii) Defendants' historical experience with evaluations and massive bookings of Mentor's Veloce2 well before it was released (¶¶67-68); (iii) the monitoring of Mentor's competition which informed Defendants that Cadence's next-generation emulator was not only imminent but that customers "loved it" (¶¶49, 71-73); and (iv) warnings by a leading industry analyst Gary Smith in a September 20, 2012 online blog *DeepChip.com* (which Rhines followed) that the tables would turn with Cadence' next-generation emulator (¶69), Defendants knew that the anticipated release of a major competitor's next-generation emulator would negatively impact sales;

(viii)   Defendants admitted on November 19, 2015 that "there was a general fear in the market that there might be competition that could approach [Veloce2's] capability," causing the deferral of orders. ¶¶20, 74, 76. Defendants later explained on March 3, 2016 that evaluations were taking six months longer and, in turn, bookings were deferred by customers because unlike a year or two ago (*i.e.*, March 2014), Mentor was not "the only game in town," and "there [were] now competitors to evaluate." ¶185. In other words, Synopsys and Cadence. Yet, Defendants already knew before the start of the Class Period that evaluations were taking longer – Mentor's VP Cantow testified to this fact (¶¶74-76, 173-174, 180, 185, 187-188); and

(ix)     In addition to trial testimony that Synopsys was challenging Mentor at virtually every customer, the nature of Mentor's emulator sales cycle (upwards of nearly three years) informed Defendants well before August 21, 2014 that Mentor's emulation business was already suffering as a result of competition from Synopsys and Cadence. ¶¶38-48, 52-53.

134.    Defendants represented to investors on September 5, 2014 and on March 16, 2015, that "no material portion of our business is dependent on a single or a few customers" and that they did not believe that "the competitive loss of one or more individual products at one or more of our

customers would have a material adverse effect on our revenues." These statements omitted material adverse facts known or deliberately disregarded by Defendants. Namely, that a material portion of Mentor's business was dependent on Mentor's largest emulation customer Intel and that "the competitive loss" of Intel to Synopsys had already adversely impacted Mentor.

135.    Defendants' statements and omissions on September 5, 2014 and March 16, 2015 were materially false and misleading, as Defendants knew or deliberately disregarded, and failed to disclose the following facts:

(i)     Mentor had already lost its largest emulation customer Intel's emulation business for the foreseeable future to the selling-giant Synopsys which adversely impacted a "material portion" of the Company's emulation business, including lengthening evaluation times, lost sales and lower prices. ¶¶40-43;

(ii)    The magnitude of the loss of Intel was material. Intel ordered $80 million from the Company in 2013 (¶42), nearly one-third of the total $250 million emulator market emulation for the year (¶5), and 70% of Mentor's emulators were purchased by Intel (¶41). Mentor's VP Cantow testified once Synopsys took Intel's business, it "became a large supplier" of emulators and started challenging Mentor "very significantly at virtually every account [*i.e.*, customer] and things changed very dramatically" (¶44), including "[lower] prices at other customers" (¶45);

(iii)   The Company had, in fact, lost Intel for the foreseeable future. That, as testified by VP Cantow, Mentor was told "going forward for all next generation purchases . . . their intent or plan is to purchase all of that from EVE/Synopsys [not Mentor]." ¶42. Yet, investors understood (albeit wrongly) that Intel's emulation business was not lost. ¶121. For example, analysts at Griffin Securities wrote on August 22, 2014 "incremental bookings possibility depends on whether Intel comes back again for additional emulation capacity . . ." and analysts at Summit Research wrote on March 2, 2015 that: "Emulation business at Intel has not been lost, and Intel is probably taking a pause . . . ."; and

(iv)    Mentor sued Synopsys for tens of millions in damages largely measured by the loss of Intel to Synopsys. ¶6. Mentor told a jury "Intel is the dominant customer," that Intel is the "800-pound gorilla here in the room," and that "[b]elieve me, Intel is really important, because if you can sell to Intel, you can sell to these other folks." ¶40.

136.    Defendants' representations on September 5, 2014 (¶111), December 4, 2014 (¶116), March 16, 2015 (¶122), June 3, 2015 (¶128) and August 31, 2015 (¶128) that competitor "pre-

announcements *can* result in customers canceling or deferring orders" were misleading as Defendants knew that the anticipation of Cadence's next-generation emulator and Synopsys' new emulator had already peaked customer interest causing delays in evaluation times. Defendants' statements and omissions were materially false and misleading, as Defendants knew or deliberately disregarded, and failed to disclose the following facts:

(i)    that the introduction of Cadence's new emulation product (Palladium Z1) was imminent having been asked about its release beginning no later than August 2013 (¶71), and repeatedly thereafter, including on August 21, 2014 (¶71(ii));

(ii)    that Synopsys had announced the availability of the Zebu on February 25, 2014 and was developing a new version of its Zebu emulator. ¶60. Synopsys would announce its release on March 12, 2015. ¶60. Because Synopsys was a selling-giant and competing with Mentor at virtually every customer, Defendants knew customers were deferring orders so that they could evaluate Synopsys' product; and

(iii)    that the "risk" Defendants warned of was in-fact a reality – customers were already delaying bookings and evaluations were taking longer. At the end of the Class Period, Defendants admitted that "there was a general fear in the market that there might be competition that could approach [Veloce2's] capability," causing the deferral of orders. ¶¶20, 74. Defendants later explained on March 3, 2016 that evaluations were taking six months longer and, in turn, bookings were deferred by customers because unlike a year or two ago (*i.e.*, March 2014), Mentor was not "the only game in town," and "there [were] now competitors to evaluate." ¶185. In other words Synopsys and Cadence. Yet, Defendants already knew before the start of the Class Period that evaluations were taking longer – Mentor's VP Cantow testified to this fact (¶¶74-76, 173-174, 180, 185, 187-188).

137.    As with Defendants other "warnings," Defendants' unwavering representations and purported "warnings" on September 5, 2014 (¶112), December 4, 2014 (¶117), March 16, 2015(¶123), June 3, 2015 (¶129) and August 31, 2015 (¶129) that Mentor's "competitors *may* acquire technology or companies offering competing or complementary product offerings which *could* adversely impact our ability to compete in the marketplace" were materially misleading for the same reasons as their other statements regarding Mentor's emulation business, namely that Defendants knew but did not convey to investors when they spoke that this risk had already come to

fruition.  Synopsys, a chief competitor, had acquired a new emulator that had adversely impacted Mentor's ability to compete in the marketplace.

138.    Defendants' statements and omissions were materially false and misleading, as Defendants knew or deliberately disregarded and failed to disclose the following facts:

(i)      that Synopsys' acquisition in October 2012 of the Zebu and subsequent marketing of the emulator was already materially impacting the Company with the loss of Intel's emulation business (approximately one-third of total emulator market) and other business.  ¶¶40-43, 49.  For example, as Mentor executives testified at the Synopsys Trial, the Company knew that because Synopsys had a "much larger" sales and customer support organization that its acquisition of the ZeBu rendered Synopsys a "competitive threat," and Mentor had already been "adversely impact[ed]" in its "ability to compete" in the marketplace (¶¶44-46).  This included being challenged at "virtually every [customer]" and being forced to lower prices.  ¶¶44-50;

(ii)     Defendants belatedly admitted on November 19, 2015 that "there was a general fear in the market that there might be competition that could approach [Veloce2's] capability," causing the deferral of orders.  ¶¶74, 76.  Explaining that "the time required for completion of evaluations has been increasing . . . due to the anticipation of competitive product announcements . . . ."  And Defendants later elaborated on March 3, 2016 that evaluations were taking longer and, in turn, bookings were deferred by customers because unlike a year or two ago (*i.e.*, March 2014), Mentor was not "the only game in town," and "there [were] now competitors to evaluate" ¶¶74-76, 173-174, 180, 185, 187-188;

(iii)    Defendants further admitted on November 10, 2016 that the reason for Mentor's stock price plummet following its November 19, 2015 disclosures was because in-part "our emulation business temporarily stalled as two competitors came into the market [*i.e.*, Synopsys as well as Cadence]."  ¶63; and

(iv)    Defendants knew of the above facts based on Defendants visibility into Mentor's lengthy sales cycle, "realtime feedback" regarding competition, the Synopsys litigation and by virtue of their own statements indicating knowledge of its competitor's business.

139.    Defendants' statement on January 14, 2015 that "[t]here are for all intents and purposes two competitors [in emulation], ourselves and Cadence" was false.  As the Synopsys Trial testimony unequivocally establishes, Synopsys was a significant competitor in emulation.  ¶¶38-48, 52-53.  It was challenging Mentor "at virtually every customer" (¶44) and had taken 70% of

Mentor's emulator sales and 30% of the entire market for emulators from Mentor (¶¶41-42).  As VP Cantow testified, Synopsys was "a direct competitor."  ¶44.  Defendants would subsequently admit that Synopsys, along with Cadence, is what caused Mentor's $104 million FY16 miss (¶¶57-58), and that Synopsys was a significant competitor.  ¶¶59-65.

140.    Defendants' statements on February 26, 2015 that: (i) there was "a big decline in the level of activity with our single-largest customer.  Its quite isolated" and having "nothing to do with what is going on in the overall emulation market"; and (ii) "we had a contribution from a large customer, which we don't expect to have in the coming year" created an impression that stood in marked contrast to the adverse facts known to Defendants, including the magnitude, duration and impact of the loss of Intel to Synopsys as described in ¶¶40-43.  Defendants' close monitoring of Synopsys (given not only that it was a "direct competitor" but the ongoing litigation) also would have informed Defendants of the imminent release of Synopsys' new emulator.  The new version of Synopsys' Zebu emulator was anticipated and would be officially announced on March 12, 2015. Rhines' evasive response and Defendants' omissions misled investors as to the true state of the competitive dynamics in emulation.

141.    Defendants also misled investors on February 26, 2015 when asked about new competitive emulation products and "competitive dynamics" claiming that they "had not seen any direct competition from Cadence."  ¶120.  In fact, unbeknownst to investors, Mentor's emulation business was already being negatively impacted by the anticipation of Cadence's next-generation emulator as described in ¶¶66-76 above.

142.    Despite the change in competitive dynamics in the emulation business, Defendants continued to mislead investors.  On May 22, 2015, Defendants misled investors when asked about "the emulation business" and the "competitive front" stating "activity for evaluations is so strong,

that we are booked to capacity in the number of customers we can evaluate." ¶125. They also claimed that with respect to emulation that "business is robust." ¶126. Mentor's emulation business was not robust and the "competitive front" was a significant problem for Mentor, facts which Defendants omitted when they spoke.

143. The adverse facts known to Defendants on May 22, 2015 included all of the adverse facts set forth in ¶¶36-76, 133, 135-136, and 138 regarding the increased competition from both Synopsys (including its release of a new emulator in March 2015) and Cadence (who had already announced on February 4, 2015 that its new emulator would ship in the second half of 2015) causing longer evaluations and lost bookings.

144. In particular, by this time, as a result of Mentor's lengthy sales cycle for emulators, Defendants would have had to have already completed evaluations and booked orders in order to manufacture and ship emulators for FY16. ¶¶51-56. Defendants thus knew of the lengthening evaluation times and lost bookings as a result of competition from both Synopsys and Cadence which they would later blame for the $104 million FY16 miss. In contrast, both Synopsys and Cadence would report outstanding emulation results for nearly the same period. ¶¶58, 75. Cadence reported for 4Q15 (ending December 31, 2015) "one of the best hardware quarters in the company's history" with revenue "benefiting from Palladium refresh." ¶75. And Synopsys reported increased emulation business. ¶58.

### DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING THE RISK AND IMPACT OF SEMICONDUCTOR CONSOLIDATIONS

#### Defendants' False Statements and Omissions

145. <u>False and Misleading Statement</u>: On December 4, 2014, Mentor filed its 3Q FY15 Form 10-Q for the period ending October 31, 2014 misleading investors by failing to disclose material adverse facts regarding the negative impact of consolidations in the semiconductor industry:

***Customers may acquire or merge with other customers or their business***.

Like many industries, the semiconductor and electronics industries are subject to mergers, acquisitions, and divestitures and our customers or parts of their business may acquire or be acquired by other customers. ***Such synergies could result in fewer customers in the industries or the loss of some customers to competitors, or reduced customer spending on software and services due to redundancies or stronger customer negotiating power, which could have an adverse effect on our business and future revenues.***

146.    <u>False and Misleading Statements</u>: Defendants unwaveringly repeated the same statement as set forth in ¶145 above in Mentor's FY15 Form 10-K filed with the SEC on March 16, 2015 and Mentor's FY15 Form 10-K filed with the SEC on June 3, 2015.

147.    <u>False and Misleading Statement</u>: At the January 14, 2015 Needham Growth Conference, Hinckley told investors that Mentor's customers were diversified, omitting to disclose that, for 2015 (or FY16), in fact Mentor was heavily exposed to the semiconductor industry and that 70% or more of its contract renewals were for semiconductor or "chip" customers:

[HINCKLEY:] We have the most extensive portfolio within the EDA industry.  We are involved with chips, which represent about half of the companies we sell to. . . .

. . . about 50% of our business is – 50% is the semiconductor companies, the likes of Freescale or ARM or Infineon, IBM; ***50% are two systems companies***, the likes of Yazaki, which is the largest cable and wire harness manufacturer in the world with something like 100,000 employees, with General Electric or Honeywell or Fujitsu.

148.    <u>False and Misleading Statement</u>: On March 16, 2015 in Mentor's FY15 Form 10-K Defendants falsely claimed that its business was not dependent on "a single or a few customers" when, in fact, Mentor was dependent on IBM:

***[N]o material portion of our business is dependent on a single or a few customers***. We do not believe that ***the competitive loss of one or more individual products at one or more of our customers would have a material adverse effect on our revenues***.

149.    <u>False and Misleading Statement</u>: On August 20, 2015 Mentor held an earnings call. Defendants Reinhart, Rhines and Hinckley hosted the earnings call.  During the call when asked

specifically about industry consolidation among Mentor's customers, Defendants misled investors

into believing there would be little to no impact:

> [RHINES:] One other topic that comes up in many of my meetings is concern about the increased amount of M&A activity in the semiconductor industry. While the actual number of mergers and acquisitions is up only modesty in 2015 compared to prior history, the magnitude of announced deals is up dramatically. Historically, ***these changes simply add to the strength of the de facto standard leader in EDA in each tool category***, so there are some wins and some losses for every supplier.

> But the other concern is that the total R&D spending of the semiconductor industry could be reduced. That is, of course, possible but for more than 30 years semiconductor R&D has averaged a constant 14% of revenue despite lots of structural changes. It's likely that most of the R&D investment that's reduced in one company will show up later in other companies who want to capture the customer demand that's no longer being adequately served.

*     *     *

> [ANALYST:] Hi, thanks for taking my question. If you look in the semi industry, a couple of companies have preannounced negatively, a lot of them have guided down next quarter. Given your business model, we don't see immediate impact to the financials, but maybe could you ***provide commentary if you have seen any weakness either in bookings or the comments***, ***what new customers are telling*** you.

> [RHINES:] Yes, the semiconductor revenue tends to be very volatile compared to semiconductor R&D. Semiconductor companies can't adjust their R&D spending very rapidly, and an ongoing business because it means hiring and firing designers which they rarely do fire them. So any of the – ***even a one-year change in outlook***, unless it's really severe, ***doesn't have that much ripple-through***. If you want to look at how EDA traditionally modulates with the semiconductor industry, ***just look at semiconductor R&D and I think you will find that most of the forecasts in the industry are somewhere in the 4% to 6% range for next year for revenue and for R&D***.

> 150.  <u>False and Misleading Statement</u>: On August 31, 2015, Mentor filed with the SEC its

2Q FY16 Form 10-Q for the period ending July 31, 2015 in which they misled investors by failing to

disclose the negative impact of unprecedented semiconductor consolidations by repeating virtually

the same statements Defendants made on December 4, 2014, March 16, 2015 and June 3, 2015,

which omitted material facts regarding the negative impact of the semiconductor industry as follows:

Like many industries, the semiconductor and electronics industries are subject to mergers, acquisitions, and divestitures and our customers or parts of their business may acquire or be acquired by other customers. *Such changes could result in fewer customers in the industries or the loss of some customers to competitors, or reduced customer spending on software and services due to redundancies or stronger customer negotiating power, which could have an adverse effect on our business and future revenues*.

**Reasons Why Defendants' Statements and Omissions Were Knowingly False and Misleading**

151.    Defendants represented to investors on December 4, 2014, March 16, 2015 and June 3, 2015 (¶¶145-146) that Mentor's "[c]ustomers *may* acquire or merge with other customers or their business" and that "synergies [from such consolidations] *could* result in fewer customers in the industries or the loss of some customers to competitors, or reduced customer spending on software and services due to redundancies or stronger customer negotiating power, *which could have an adverse effect on our business and future revenues*." Defendants also represented on March 16, 2015, that Mentor did not depend on a single or a few customers. ¶148. These statements were misleading as they created an impression of a state of affairs that differed in a material way from the one that actually existed. Semiconductor companies were announcing unprecedented consolidations which Defendants knew negatively impacted Mentor.

152.    For all the reasons set forth in ¶¶77-107, including the importance of the semiconductor business to Mentor and Defendants' own statements in ¶¶77-79, as well as the following, Defendants' statements and omissions were materially false and misleading, as Defendants knew or deliberately disregarded the following facts:

(i)      Semiconductor companies were experiencing a market downturn, resulting in an "unprecedented" "wave" of accelerating M&A activity that "reshaped" the semiconductor industry, and in particular resulted in significant cost-cutting. ¶¶93-107. Consolidations announced in 2014 nearly doubled year-over-year, from $12 billion in 2013 to $23 billion in 2014, only to increase to $83 billion in the first half of 2015 alone (¶93; Exhibit B);

(ii)     Defendants knew, as Rhines admitted post-Class Period that "in almost all cases of consolidation, ***it's a negative effect***." ¶¶84, 187.  Consolidations "either slow[] the growth rate or even ***cause[] a negative growth rate***," or a "temporary reset." ¶¶84-85, 209.  A negative effect that Rhines admitted lasted years, not months. ¶¶83, 180.  And one that extended to "independent companies that must execute in this new competitive environment," and not just the companies directly involved in M&A deals, and impacted pricing.  ¶¶101, 107;

(iii)    Because the top 50 semiconductor companies represented 80% of R&D, and these were the only ones that "really mattered," Defendants were aware of the unprecedented consolidations and their negative effect.  ¶79.  This included consolidations announced by Mentor customers IBM, GlobalFoundries, Broadcom and Infineon.  ¶95;

(iv)    The announced consolidations Defendants were aware of included the $1.5 billion IBM/GlobalFoundries deal announced on October 20, 2014.  ¶96.  Thus, the very deal that Defendants subsequently blamed (in-part) for Mentor's FY16 $104 million revenue miss.  ¶96;

(v)     By the time of Defendants' March 16, 2015 statements, other announced consolidations that included spending cuts, for example: (i) the $100 million in expected cuts from the $3 billion Infineon/International Rectifier deal announced on January 13, 2015 (¶95); and (ii) the $200 million in the first year and $500 million on an annual basis thereafter expected cuts from the $11.8 billion NXP/Freescale deal announced on March 16, 2015 (¶98);

(vi)    Defendants were also aware when they spoke on June 3, 2015 of the $37 billion Avago/Broadcom deal announced in May 2015 that included engineering expense cuts of $500 million.  ¶97.  Hinckley later admitted Mentor was "getting hit by" these cuts from this consolidations and this was "just one example" of spending cuts impacting Mentor's business in FY16.  ¶97.  Another example was the announced $300 million in cuts by Intel along with other cuts in connection with its $16.7 billion acquisition of the Altera deal announced in June 2015.  ¶99;

(vii)   Defendants knew from experience in 2014 that semiconductor consolidations resulted in lost business.  ¶81; and

(viii)  Defendants had significant visibility into their semiconductor business and revenues because of nature of the terms of the contracts and the size of the deals (¶¶86-91) – sales data that was tracked on Mentor's SAP system (¶¶55-56).  As a result, Defendants knew, as they subsequently admitted, that during the height of the announced consolidations, Mentor's major semiconductor customers affected by consolidations negotiated renewed contracts.  ¶91.  None of "[t]he companies that merged" did so at an increase in run rate.  ¶85.

153.     On January 14, 2015, Defendants touted Mentor's diversified customer base, claiming that Mentor had "the most extensive portfolio within the EDA industry" and that 50% of customers were semiconductor customers and the other 50% were a diverse range of systems companies. Defendants' statement omitted material adverse information and was knowingly false when issued because:

(i)      Mentor was disproportionally reliant on the Company's semiconductor customers in FY16 – Defendants omitted post-Class Period that 70%, not 50%, of Mentor's contract renewals in FY16 were for semiconductor companies (¶92); and

(ii)     Defendants knew because of their visibility into contract renewals that Mentor had increased reliance on semiconductor companies in FY16 at the same time that those customers were engaged in an unprecedented wave of consolidations that reduced their purchases from Mentor (¶¶86-91, 93, 152).

154.     On August 20, 2015, Defendants were asked directly what effect the dramatic increases in consolidations that resulted in semiconductor companies preannouncing negative financial results and lowering guidance were having on Mentor's business. Defendants' statements that the consolidations and related cost-cutting: (i) do not "have that much ripple-through"; and (ii) "simply add to the strength of the de facto standard leader in EDA in each tool" created an impression that stood in marked contrast to the adverse facts Defendants knew but omitted to disclose. ¶149. For all the reasons set forth in ¶¶77-107, as well as the following, Defendants' statements and omissions on August 20, 2015 were materially false and misleading, as Defendants knew or deliberately disregarded, and failed to disclose the following facts:

(i)      Defendants were aware of the unprecedented semiconductor consolidations, including the over $100 billion announced between 2014 and June 2015, and another whopping $83 billion in deals between the end of June and August 25, 2015. ¶¶93-107; Exhibit B;

(ii)     Rather than adding to "the strength of the defacto standard leader in EDA," the Defendants knew the announced consolidations resulted in a "negative effect," slow[ing] the growth rate or even caus[ing] a negative growth rate." ¶¶12, 84. This "negative effect" lasted for years and directly impacted customer renewals. ¶¶83-84, 180-181, 187.   The consolidations, contrary to Defendants'

representations, in fact, had "a ripple-through" on bookings and Mentor's business;

(iii)    Defendants already knew, for example, the IBM/GlobalFoundries deal had negatively impacted their business. Defendants admitted to knowing "just before completion of the merger [with GlobalFoundries]" on July 1, 2015 that IBM had renewed its contract with Mentor at "a decrease in annual run rate . . . ." ¶96. Defendants admitted at the end of the Class Period – less than 3 months later – that this very deal contributed to Mentor's announced FY16 $104 million miss: "we were negatively affected by at least one of the semiconductor industry consolidations." ¶¶96, 100. Further, that "[w]ith regard to semiconductor industry restructuring, our third quarter growth in contract renewal value was affected by one major contract . . . ." ¶¶96, 100; and

(iv)    Defendants knew specifically that the May 15, 2015 announcement of $600 million in cost-cutting as a result of the $37 billion Avago/Broadcom deal had negatively impacted Mentor's business. Defendants, admitted post-Class Period, that this one deal was just an example of Mentor "getting hit by" cost reductions. ¶97.

155.    Defendants made nearly identical representations to investors on August 31, 2015 that they made on December 4, 2014, March 16, 2015 and June 3, 2015 that Mentor's "[c]ustomers *may* acquire or merge with other customers or their business" and that they did not believe that "changes [from such consolidations] *could* result in fewer customers in the industries or the loss of some customers to competitors, or reduced customer spending on software and services due to redundancies or stronger customer negotiating power, *which could have an adverse effect on our business and future revenues*." ¶150. These statements omitted the same material adverse facts as set forth in ¶152. Additionally, Defendants' August 31, 2015 statements and omissions were materially false and misleading, as Defendants knew or deliberately disregarded and failed to disclose the following facts:

(i)    Defendants knew that unprecedented consolidations had been announced totaling ~$183 billion since 2014. ¶93; Exhibit B. They also knew of the negative effect of those consolidations, including the IBM/GlobalFoundries which closed on July 1, 2015. ¶¶96, 187. IBM had renewed its contract with Mentor at "a decrease in annual run rate . . . ." adversely impacting Mentor. ¶96; and

(ii)     Defendants also knew by virtue of their visibility and nature of Mentor's business that orders for other customers not been timely booked or booked at reduced amounts because of the consolidations they only warned could happen (¶¶51-56, 86-91).

**WHEN DEFENDANTS ISSUED FY16 GUIDANCE THEY OMITTED MATERIAL ADVERSE INFORMATION REGARDING MENTOR'S COMPETITION AND SEMICONDUCTOR CONSOLIDATIONS**

**Defendants' False Statements and Omissions**

156.    <u>False and Misleading Statements</u>: Beginning with Mentor's February 26, 2015 press release, Defendants issued false revenue and earnings per share FY16 guidance as follows:

| Date | Source | FY 2016 Revenue Guidance | FY 2016 EPS Guidance |
|---|---|---|---|
| 2/26/15 | Press Release and Earnings Call | ~ $1.282 billion | ~ $1.45 |
| 3/16/15 | Mentor's Form 10-K | ~ $1.282 billion | ~ $1.45 |
| 5/22/15 | Press Release and Earnings Call | ~ $1.282 billion | ~ $1.18 |
| 6/03/15 | Mentor's 1Q FY16 Form 10-Q | ~ $1.282 billion | ~ $1.18 |

157.    <u>False and Misleading Statement</u>: In an August 20, 2015 press release, Defendants falsely raised revenue guidance for FY16 from ~$1.282 billion to ~$1.285 billion and raised FY16 EPS Guidance to ~$1.25.

158.    <u>False and Misleading Statement</u>: During an August 20, 2015 earnings call held the same day, Defendants also falsely guided investors regarding Mentor's 4Q FY15 revenue:

[HINCKLEY:]  ***Fourth-quarter revenue is expected to be slightly over $440 million***, similar to the $439 million achieved in the fourth quarter of FY15.

159.    <u>False and Misleading Statement</u>: Defendants falsely assured investors on August 20, 2015 during the earnings call that they were very comfortable with raising the Company's financial guidance:

[ANALYST:]  And then Wally, you talked a bit about how some of the customers came in, they wanted to get more software so they renewed a little earlier in the cycle.  I'm curious though why that didn't impact the full-year view a little bit more. If they're coming in and ordering more software than you thought or having to order sooner, shouldn't that have impacted your full-year view a little more?

[RHINES:]  Well certainly it makes us feel better about the year, but as Greg reflected, the *growth rate in contracts is not abnormally high*.  So we felt it was *prudent to continue on the path we previously forecasted*.

\*    \*    \*

[ANALYST:]  I just wanted to understand more so what drove the higher EPS for the year, and with that, how you would view your visibility to achieving the full-year guidance now versus a quarter ago?

\*    \*    \*

[HINCKLEY:]  *As we see our business right now, what we are prepared to – albeit it is modest, a $3 million increase in revenues for the year, but it's something that we feel we're quite comfortable with.*  And we are now at a point, much like last quarter and this quarter, where most of incremental revenue goes down to operating income.  So in our business, if costs are relatively fixed, somewhere around $1.5 million of revenue, pretax, creates $0.01 per share.  So $3 million more revenue in our forecast, $0.02 per share.

160.    <u>False and Misleading Statement</u>: On August 31, 2015, Defendants falsely reiterated the increase in guidance given on August 20, 2015 for the Company's FY16 in Mentor's 2Q FY16 Form 10-Q: "*For the full fiscal year 2016, we expect revenues of approximately $1,285 with earnings of $1.25 per diluted share*."

161.    Analysts were impressed with specific areas of the business based on Defendants' statements.  Canaccord Genuity, for example, in an August 20, 2015 report, entitled "We see room for additional upside," cited "strong demand in Scalable Verification driven by strength in Emulation" as a basis for concluding that "we see potential for additional positive revisions to estimates given solid momentum for emulation and transportation as well as a healthy outlook for core EDA."

162.    On October 26, 2015, *Seeking Alpha* published a report, entitled "Mentor Growing Through The Roof," which explained that Mentor's growth showed no signs of abating.  In particular, the analyst was impressed with "[m]anagement['s] claim[]" that the Company was able to

increase bookings in the 2Q FY16 "due to customers renewing contracts to get more software ahead of schedule," which suggested that demand for Mentor's products continued to grow.

**Reasons Why Defendants' Statements and Omissions Were
Knowingly False and Misleading**

163.    Defendants' statements in ¶156 were materially false when issued.  Defendants knew but omitted material adverse facts regarding Mentor's forecasts when they spoke.  When Defendants issued revenue and earnings guidance of ~$1.282 billion and ~$1.45 (lowered May 22, 2015 to ~$1.18) for FY16 on February 26, 2015, March 16, 2015, May 22, 2015, and June 3, 2015 they omitted materially adverse facts negatively impacting that guidance.

164.    Defendants' FY16 guidance was based in particular on forecasted growth from emulation sales (*i.e.*, out of the Scalable Verification business segment) and semiconductor customers.  Defendants linked their guidance to both emulation and semiconductor sales.  For example, when Defendants first issued FY16 guidance on February 26, 2015, when asked by an analyst "***what's baked into your FY16 forecast,*** with respect to emulation growth?  It sounds like you expect . . . no sales from your largest customer.  Just wondering how it affects the overall [emulation] growth there?"  Defendants responded: "[W]e had a contribution from a large customer, which we don't expect to have in the coming year.  But we do expect that we can probably grow emulation revenue in the year ahead – or the year we are currently engaged in, in FY16."  And falsely claimed that "we haven't seen much direct competition from Cadence" and the loss of activity from its largest emulation customer was "quite isolated."  Likewise, Defendant Rhines indicated that the semiconductor industry was projected to grow in calendar 2015.

165.    Analysts bought Defendants' reassurances and promises regarding the strength of Mentor's emulation business reporting that FY16 guidance was "conservative," there was a "lower risk profile for FY16" and that "emulation business remains strong":

(i)    Canaccord Genuity, on February 27, 2015, reported that: "We are reiterating a BUY rating on MENT following upside results and what we view as *conservative guidance for fiscal 2016*. While this year sees overall top line growth slowing on slowing demand from MENT's largest emulation customer, we expect revenue and earnings growth to be above trend in fiscal 2017.";

(ii)   J.P. Morgan, on February 27, 2015, reported that: "***Looking to FY16 management is factoring in stable growth in core EDA***, but taking out a large customer in the emulation business as timing/certainty of deal closure is up in the air. *This lowers the risk profile of FY16 estimates*, but likely causes shares to go into a holding pattern on whether that business materializes."; and

(iii)  Summit Research, on March 2, 2015, reported that: "Reiterating BUY and $30 PT Due to the Following: 1) Emulation business at Intel has not been lost, and Intel is probably taking a pause; 2) Non-Intel Emulation business remains strong (6 customer wins); 3) Automotive and PCB business are strong . . . ."

166.    Similarly, when reiterating guidance on May 22, 2015, Rhines told investors that Mentor's first quarter saw "over 50% [bookings growth] in three of our four product categories" conveniently omitting the lack of bookings in emulation.  And when analysts asked about an "***update on the emulation business***, on both ***the competitive front***, but also just the linearity you're expecting through this year.  It looks like revenue's been higher than bookings for the last few quarters, and I wonder if that's changing at all."  Defendants falsely responded: "We are expecting that, ***during the year, our revenue will grow for emulation***.  And I have to say, at this point, that the activity for evaluations is so strong, that we are booked to capacity in the number of customers we can evaluate."  Based on these reassurances, analysts continued to believe that Mentor was at least on track to deliver on its guidance.  Canaccord Genuity, for example, in a May 22, 2015 report, declared that "[w]e reiterate our BUY rating and see potential for upside to consensus estimates based on increasing momentum for automotive (additional wins at other manufacturers) and emulation (management expectations conservative)."

167.    Despite Defendants' reassurances to investors, Defendants' FY16 guidance (¶156) was undermined by undisclosed facts known to Defendants at that time including: (i) competition in

emulation from both Synopsys and Cadence was causing longer evaluation times and lost bookings; and (ii) the negative effect of semiconductor consolidations.  The adverse facts Defendants knew and failed to disclose, included the following:

(i)     By the time they issued their guidance for FY16 on February 26, 2015, repeatedly reaffirmed until raised on August 20, 2015, Defendants knew the bookings they needed to have in their "funnel" in order to manufacture and ship and recognize revenue on the products they sold, especially the complex hardware emulators. ¶¶51-56;

(ii)    Defendants knew that Synopsys had newly become a material competitor in the emulation market having acquired Intel as a customer and releasing a new version of its Zebu (¶¶36-50, 57-65), forcing Mentor to compete with two companies instead of one, both with more sales resources than Mentor (¶46);

(iii)   Defendants knew that Synopsys was increasingly challenging Mentor for "virtually every" customer (¶44), including taking all of Intel's $80 million a year emulation business which had formerly accounted for up to 70% of Mentor's emulation sales, and that it was releasing new versions of its emulator causing longer evaluations (¶¶41-42);

(iv)    Defendants knew that Mentor had already been forced to lower pricing even for the business it retained.  ¶45;

(v)     Defendants knew that Cadence's next-generation emulator was imminent and would be shipped in the second half of 2015.  ¶¶71-73.  They also knew as a result of their historical experience and real time feedback that emulation customers were already delaying purchases and that Cadence would see a favorable shift in market share as a result of its next-generation emulator.  ¶¶66-70; and

(vi)    Defendants knew that the contracts for 70% of its semiconductor customers, rather than the normal 50%, required renewal in FY16, such that Defendants knew that the year-over-year growth they forecast had to come in large measure from customers that had announced significant spending cuts and consolidations, which in turn led to further cuts and to customers switching suppliers and delaying purchasing decisions.  ¶92.

168.    Despite the lengthy sales cycle for emulators, Cadence's and Synopsys' new products, the trial preparation for the loss of business to Synopsys, and the tens of billions in announced semiconductor consolidations for 2014 and 2015, and hundreds of millions in announced reductions in R&D expenditures, ***Defendants raised FY16 guidance*** on August 20, 2015 to ~$1.285

billion and issued revenue guidance of $440 million for 4Q FY16, affirming Mentor's guidance on August 31, 2015 as set forth in ¶¶157-160.

169.     This guidance was undermined by undisclosed adverse facts known to Defendants when issued.  As was Defendants' false assurance to investors on August 20, 2015 that the guidance was "prudent" and something that Defendants "fe[lt] quite comfortable with."  ¶159.

170.     In context, when raising guidance on August 20, 2015, Defendants denied any impact of the semiconductor consolidations and weakness, claiming that consolidations "simply add to the strength of the *de facto* standard leader" and that if reductions in spending resulted from consolidations they would be made up "later."  And that the increase in revenues was "[a]s we see our business right now."  Yet, Defendants knew that there was an immediate "negative effect" of the consolidation and that Mentor's business was suffering.  Likewise, Defendants had primed the market during the earnings call on August 20, 2015 into believing that "[w]e were impressed by the breadth of demand growth in our [business segments that primarily sold to semiconductor companies] . . . ."  "With Calibre's golden status in the semiconductor industry and over 1,000 customer companies, we've come to expect steady growth."  This reinforced earlier messages that Mentor's business was successful and there was a solid foundation for growth.  For example, Defendants' statements made on May 22, 2015 that: (i) "activity for evaluations is so strong, that we are booked to capacity in the number of customers we can evaluate" (¶125); (ii)  "customers asked us to renew in the first quarter . . . that we expected to do later in the year" (¶126); and (iii) that "business is robust."  (¶126);

171.     Defendants' August 20, 2015 and August 31, 2015 statements, including increased guidance and reassurances regarding the state of Mentor's then existing business, were undermined

by undisclosed adverse facts known to Defendants at that time, including all of those described above in ¶167 and the following facts:

(i)    Defendants knew that increased competition from Synopsys and Cadence, and semiconductor consolidations and reduced spending, were all negatively impacting Defendants' business (¶¶33-107);

(ii)   Defendants knew no later than July 1, 2015 that IBM had renewed its contract with Mentor at "a decrease in annual run rate," which was the "one major contract" that Defendants blamed in-part for missing FY16 guidance by $104 million.  ¶96;

(iii)  Defendants knew from Mentor's long sales cycle for its emulators and SAP system the Company did not have the bookings in order to recognize revenue in FY16.  Mentor would have had to have already completed the evaluation process to book deals and have them in the process of manufacturing that took up to a year or more before shipment and then revenue recognition.  There was only five months left in the fiscal year.  ¶¶51-56; and

(iv)   Defendants, given their visibility into their business and backlog of bookings and sales, knew that bookings were down significantly by August 20, 2015, as they belatedly disclosed when they reported on November 19, 2015 that bookings were down 20% across the business and down 25% in Scalable Verification (including emulators) (¶174).

172.    Defendants provided this false revenue and earnings guidance in order to: (i) reap millions in personal gains from the sales of insider stock (¶¶193-201); (ii) mask the delayed and lost bookings and corresponding millions in lost revenue long enough to replace it with new business (*see generally* ¶¶173-188); and (iii) prevent a hostile takeover.  ¶¶189, 202.

## THE RELEVANT TRUTH BEGINS TO BE DISCLOSED

173.    On November 19, 2015, Mentor issued a press release for its 3Q FY16 reporting disappointing bookings and substantially reducing its 4Q FY16 financial outlook – instead of $440 million in revenue for 4Q FY16, the Company announced that its 4Q FY16 revenue forecast would be reduced by ***a whopping $104 million*** to $336 million.  The Company also reduced FY16 revenue guidance from $1.285 billion to $1.18 billion and FY16 EPS guidance from $1.25 to $0.63.  The press release provided:

**Mentor Graphic Reports Fiscal Third Quarter Results**

Mentor Graphics Corporation today announced financial results for the company's fiscal third quarter ended October 31, 2015. The company reported revenues of $291 million, non-GAAP earnings per share of $0.28, and GAAP earnings per share of $0.12.

"Mentor achieved third-quarter guided results . . . . Active evaluations of Mentor's Veloce emulator increased in the third quarter, but *the time required for completion of evaluations also increased. This, along with semiconductor industry consolidations, is having a negative impact on our business.* However, demand for EDA software for system design, particularly in the transportation industry, remains robust."

\*        \*        \*

"*Semiconductor consolidation and delays in emulator decisions are now having an adverse impact on our ability to close business*," said Gregory K. Hinckley, president of Mentor Graphics. "Because we recognize revenue upfront on product sales, changes in market outlook and demand are reflected in real time in Mentor's results. Nevertheless, with appropriate scaling of the business and continued attention to expenses, we expect to deliver FY16 non-GAAP operating margins consistent with our strategic objective."

**Outlook**

For the fourth quarter of fiscal 2016, *the company expects revenues of about $336 million*, non-GAAP earnings per share of about $0.47 and *GAAP earnings per share of approximately $0.32. For the full year fiscal 2016, the company expects revenues of about $1.18 billion*, non-GAAP earnings per share of about $1.40, and *GAAP earnings per share of approximately $0.63.*

174. Following the issuance of the press release, Defendants held an earnings call with analysts and investors to discuss the Company's reported financial performance and prospects and its sharply reduced financial guidance. During the earnings call, Defendants explained that: (i) bookings were flat to down for all of Mentor's products; (ii) at least one semiconductor industry consolidation had already impacted the Company's Design to Silicon business; (iii) Mentor experienced a delay in decisions on adoption and expansion of emulation; (iv) the anticipated release of competitive products had already frozen demand for the Company's emulation products; and (v)

these poor business conditions were expected to continue and were also responsible for the

Company's dramatically reduced financial guidance:

> [RHINES:]  There are two changes that will negatively impact our outlook for the fourth quarter of FY16 and cause us to reduce our guidance. *First, we experienced a delay in decisions on adoption and expansion of emulation.  And second, we were negatively affected by at least one of the semiconductor industry consolidations.*
>
> *. . . [T]he time required for completion of evaluations has been increasing, I believe due to anticipation of competitive product announcements during the quarter.*

*        *        *

> [RHINES:]  With regard to semiconductor industry restructuring, *our third quarter growth in contract renewal value was affected by one major contract* where a portion of the company was spun off from the parent.  *While the parent company executed an early renewal contract for the portion of the business they retained, we expect the renewal of the contract for the portion of the business that was spun off will not be concluded until the fourth quarter.*

*        *        *

> [HINCKLEY:]  *Total bookings were down 20% year-over-year and were flat to down across all product categories.  After two consecutive quarters of record growth, Design to Silicon, which includes our Calibre product family, was down 35% . . . .*
>
> *Scalable Verification was down 25%.  It's probable that a competitor's recent announcement of the release of their next generation emulation product has temporarily frozen activity in that market.*

*        *        *

> [HINCKLEY:]  Guidance.  *Appropriate longer than our typical guidance, our fourth quarter and FY16 guidance reflects three challenges.  First, there has been an unprecedented level of semiconductor M&A activity recently, approaching $100 billion of announced transactions in the past 12 months, well over 10% of the global IC industry's market capitalization.  This is on top of a challenging demand environment for ICs.*

*        *        *

> [HINCKLEY:]  Second, *immediate demand for emulation has stalled as the result of the expected introduction of competitive products.*

*        *        *

[HINCKLEY:]  Taking into account these challenges, we are reducing fourth quarter and FY16 guidance.  *For the fourth quarter of FY16, we are now forecasting revenue to be approximately $336 million* and non-GAAP and *GAAP earnings per share of about* $0.47 and *$0.32*, respectively.  *For the full year, we are projecting revenue* of approximately *$1.18 billion*, with non-GAAP and *GAAP earnings per share of* $1.40 and *$0.63, respectively*.

175.    On November 20, 2015, Mentor's stock price plunged 36%, closing at $17.85 per share, down from the previous day's close of $27.78 per share, on over 19.9 million shares traded, compared to only 574,873 on November 19, 2015.

## ADDITIONAL POST-CLASS PERIOD EVENTS

176.    Following the publication of the Company's November 19, 2015 financial results, *The Wall Street Journal* reported on November 19, 2015, in an article entitled "Mentor Graphics Shares Plunge Amid Lower Forecast, Quarterly Profit," that the Company's stock price was declining because of the poor 3Q FY16 financial results, lowered guidance and what that revealed about the Company's business conditions performance and prospects:

> *Shares of Mentor Graphics plunged as the company slashed its profit and revenue outlooks*, said it was having *problems closing business* and *reported that profit in its latest quarter declined*.
>
> *The stock fell 23% after hours to $21.42, which would be its lowest level since January.*
>
> For the fourth quarter, *Mentor projected adjusted earnings per share of about 47 cents and revenue of about $336 million, far lower than analysts' expectations of 97 cents and $439 million*.

177.    That same day, on November 19, 2015, Pacific Crest Securities issued an analyst report entitled "Mentor Graphics Corp.[:] Impact of Semiconductor Consolidation Could Linger; Downgrading to Sector Weight."  In the report, Pacific Crest described Mentor's explanation for the drastically lowered guidance as "puzzling," explaining that the numbers did not add up:

> *Mentor's FQ4 shortfall of $105 million is a significant miss.  Taking out currency impact, Mentor still had $92 million shortfall, per our estimates*.

\*        \*        \*

***Mentor lowered its FQ4 guidance significantly by $105 million.  The company cited delayed adoption of emulation, impact from consolidation and currency as the reasons for the lower guidance.***  Cadence released its new emulation tool during the quarter.  Mentor said this led customers to ***delay decisions around emulation in anticipation of Cadence's release***.

The company said revenue was down $25 million y/y due to FX.  Assuming 50% less currency impact in FQ4 (a $13 million negative impact) ***still leaves a $92 million shortfall due to emulation and lower core EDA sales***.

Then assuming about $42 million adverse impact from emulation means core EDA sales could be down $50 million.  (Our previous emulation revenue estimate for Mentor was about $145 million.  Assuming a $42 million negative impact to emulation means ***emulation sales could be now down 29%*** compared with our previous estimate.)  ***Since Mentor recognizes 60% revenue upfront, this would mean core EDA license sales could be down close to $83 million, which is a significant license shortfall, in our view***.  Mentor sounded confident when it said the company has not lost any customers, so ***the magnitude of negative impact from consolidation is puzzling***.

178.    In the same report, Pacific Crest also explained that, contrary to Defendants' previous denials, consolidation among the Company's customers was not a short-term and minor risk:

> **Preliminary F2017 Guidance Was Meaningfully Lower Than Our Estimates**
>
> Mentor guided growth for F2017 to low single digits.  Mentor's guidance implies that revenue could grow only $45 million y/y in F2017.  ***Revenue growth could be even lower than the negative impact in FQ4.  We are concerned that consolidation in the semiconductor industry could continue*** for some time; more semiconductor M&A deals were announced recently.  This means ***consolidation could have more impact on Mentor in the coming years***.

179.    Like Pacific Crest, who found Defendants' explanations "puzzling," analysts were skeptical of Defendants' stated explanations for Mentor's dramatically reduced guidance.  RBC Capital Markets, for example, in a November 19, 2015 report on Cadence entitled "EDA – ***Mentor miss likely company specific***, no implication for SNPS/CDNS" concluded that "[w]e find the logic behind the miss a little confusing.  We believe that the big miss is the feature of upfront revenue recognition which lends itself to pull in/push out of recognition."

180.    On December 2, 2015, in a publication by Semiconductor Engineering called "Consolidation's Aftermath," Defendant Rhines was quoted admitting his knowledge that the normal delay in booking new business as a result of consolidations could be "measured in years" and that announced consolidations renewals impacted:

> ***Short-term, there is a lot of uncertainty***.  If you don't know the size or strength of the company, you're generally less aggressive about renewal commitments. Historically, M&A has had only a temporary effect on the semiconductor industry. That could be ***measured in years, not months*** . . . .

181.    The next day, on December 3, 2015, Defendants filed the Company's 3Q FY16 Form 10-Q.  The Form 10-Q confirmed what investors and analysts had already surmised from Defendants' November 19, 2015 reports and statements – Mentor's problems were systemic with bookings down 20% year-over-year, while the number of new customers was down 15% for the fiscal year, not just the most recent quarter:

> Bookings during the first nine months of fiscal 2016 increased by approximately 5% compared to the first nine months of fiscal 2015 primarily due to the timing of term license contract renewals. ***Bookings for the three months ended October 31, 2015 decreased by approximately 20% compared to the three months ended October 31, 2014 primarily due to a decrease in term license contract renewals***.  Bookings are the value of executed orders during a period for which revenue has been or will be recognized within six months for software products and within twelve months for emulation hardware systems, professional services, and training. Ten customers accounted for approximately 40% of total bookings for the first nine months of fiscal 2016 and 2015. ***The number of new customers during the first nine months of fiscal 2016 decreased approximately 15% from the levels experienced during the first nine months of fiscal 2015***.

> \*        \*        \*

> System and software revenues decreased $(9.4) for the three months ended October 31, 2015 compared to the three months ended October 31, 2014, ***primarily due to a decrease in sales of emulation hardware systems***.

182.    Mentor also admitted in its 3Q Form 10-Q filed on December 3, 2015 that "[w]e believe the expected release of a competitor's emulation product ***earlier this year*** may have resulted in the deferral of orders for our emulation products."

183.    These additional disclosures evidence facts Defendants had known but did not disclose.  Namely, deferral of emulation orders, loss of customers, reduction in spending and stronger customer negotiating power with respect to pricing.

184.    Summit Research also issued a report on Synopsys, in a December 4, 2015 article, entitled "SNPS F4Q15 Results=Good.  MENT's Issues with Semi-M&A Specific to MENT," concluding that any effect from consolidations was muted for the Company's competitor:

> **MENT Problems Seem Company Specific**: While this note is about SNPS, the most relevant topic in EDA is now MENT's shortfall.  *It would seem that Mentor's lower guide was a unique, company-specific issue.*  Alternatively put, *Synopsys said they aren't observing any problems with respected to the emulation market.*  We think that Mentor had previously overestimated growth in all its markets, especially in its emulation market.  In addition, Global Foundries, which got IBM's foundry biz, is on the sales block with Mubadala corp. trying to sell it.  In that scenario, *MENT does not get to count on both IBM and Global Foundries, both of which were paying customers of MENT.*  Synopsys' results and guide confirm that MENT's issues are unique to the company.

185.    On March 3, 2016, Mentor held an earnings call which offered further clarification regarding the impact of competitive product introductions during the Class Period, with Defendants telling investors:

- "Last quarter, we attributed *this slowdown largely to an increase in evaluation time, as some customers were able to wait for competitive product introductions*.";

- ". . . *the evaluations are taking longer and longer to close.  Pricing is also more challenging and has reduced the values of many of our opportunities*.";

- ". . . we've had, generally *the evaluation periods for emulation have stretched out from approximately a quarter to now it seems like it's closer to nine months*.  So that's part of what's going on.  So it's taking more time to close business.";

- Rhines admitted when asked about what was driving the six-month extra stretch in emulation evaluation:  "So we don't know exactly.  But our *judgment says that a year or two ago, we were pretty much the only game in town.  Now with announcements this past year, there are now competitors to evaluate*.  Those people really didn't have much that could compete with the Veloce in the past.  So I think customers are both squeezed and they feel

they need to evaluate, and evaluations are not easy to do.  So it seems to have stretched out."; and

- Rhines when asked, "*maybe three years or so ago, maybe around 2013*, give or take, is when you guys started gaining traction against Cadence on emulation.  During that timeframe, how long did it take for customers to switch from your competitor to you guys?" Rhines responded: "*We typically planned for nine months from initial contact to actually completing the sale. But of that, about six months was the evaluation cycle.  And clearly, this has gotten longer*."

186.    Defendant Rhines further explained during the March 3, 2016 4Q FY16 earnings call that "[i]n the largest of [the post-consolidation contract renewals Mentor Graphics had negotiated], the acquiree [IBM] renewed in the third quarter, *just before completion of the merger*, with a *decrease* in annual run rate . . . ."  Because the IBM/GlobalFoundries acquisition was completed on July 1, 2015, that means that Mentor had secured a contract renewal from IBM "just before" July (calendar 3Q), and knew by then that the renewal came with a decrease in annual run rate.

187.    On May 19, 2016, during an earnings call, Defendants further clarified of the impact of emulation competition and consolidations in the semiconductor market:

- "[I]n almost all cases of consolidation, it's a negative effect.  That is it either slows the growth rate or even causes a negative growth rate.";

- "[] the *total industry emulation revenue has stalled in the $300 million to $315 million range per year*, likely due to *price erosion* after rapidly doubling from the previous long-term run rate in just two years, from 2010 to 2012.";

- "*Continued weakness in semiconductor* related design software, *including emulation* . . . .";

- "Weakness in bookings from semiconductor companies in Q4 of FY16 accurately reflected what has become *general weakness in semiconductor revenue and R&D spending*.";

- ". . . our *Japan bookings in FY15 reflected weakness in EDA demand* by Japan's semiconductor companies . . . ."; and

- ". . . there is more competition [for all small and medium-sized customers] because *all three vendors have viable products*."

188.    Three days later, on May 23, 2016, Griffin Securities issued a report stating that Defendants had confirmed that for emulation "*the evaluation/procurement cycle had lengthened*

*substantially*," due not just to the release of "Cadence's new Z1," ***but also because "Synopsys [is]
now [] a clearly more material competitor in this space*** []."

189.    Only days later according to a Law360 article entitled "Mentor Taps Longtime Atty
for $4.5B 'Hell or High Water' Sale."  Mentor was exploring a sale of its business.  As Mentor's
longtime attorney and adviser Paul Scrivano indicated "our strategic process had already gotten
underway by June 2016."

## ADDITIONAL ALLEGATIONS OF SCIENTER

190.    As alleged herein, each of the Defendants acted with scienter in that each Defendant
knew or recklessly disregarded that the public documents and statements issued or disseminated in
the name of the Company were materially false and misleading or omitted to state facts necessary in
order to make the statements made, in light of the circumstances under which they were made, not
misleading.  Each Defendant knew that such statements or documents would be issued or
disseminated to the investing public and knowingly and substantially participated or acquiesced in
the making, issuance or dissemination of such statements or documents as a primary violation of the
federal securities laws.  By virtue of their receipt or reckless disregard of information reflecting the
true facts regarding Mentor, their control over and/or receipt and/or modification of Mentor's
materially misleading statements, and/or their other associations with the Company, each Defendant
was privy to confidential information concerning Mentor and knowingly or recklessly participated in
the fraudulent scheme and conduct alleged herein.

191.    ***Defendants Had Substantial Visibility to Mentor Customer Bookings and Sales.***  In
addition to Defendants' statements on the very topics that misled investors, their knowledge of
Mentor's core operations (including important products and key customers) and knowledge of the
material adverse facts alleged herein, Defendants had substantial visibility into the Company's
bookings and backlog.  In turn, Defendants had substantial visibility into Mentor's future revenues

and the timing of those revenues based on: (i) the timing of software contract renewals, typically

every three years (¶86); (ii) the technical and financial evaluation process of up to two years (¶¶51-

54); and (iii) delivery lead times for its emulation hardware exceeding a year (¶¶51-54).[11]  The

Company's onsite employees at existing customers also provided realtime feedback on competitors

as Mentor's executive testified at trial (¶49).  And Mentor's SAP system kept track of sales and other

customer data, a system widely used at Mentor (¶¶55-56).

192.    Defendants also personally met with customers and tracked new customers giving

them further visibility into whether customers were engaged in competitive evaluations and the

impact of economic changes of those customers expenditures:

- "I have **met with more than 20 present and perspective [sic] emulation customers** [th]is [sic] quarter . . . ."  (Rhines – Aug. 21, 2014 Mentor earnings call 2Q FY15);

- Rhines referred to his "***meetings with leading customers*** in Korea, China and the US . . . ."  (Rhines – Feb. 26, 2015 Mentor earnings call 4Q FY15);

- "***We track new customers*** . . . ."  (Hinckley – May 22, 2014 Mentor earnings call 1Q FY15);

- ". . . we [] ***track new customers***, both in terms of number of transactions, and the value of those transactions."  (Hinckley – Feb. 26, 2015 Mentor earnings call 4Q FY15); and

- "We [] ***track new customers***, both in count and average transaction, because we've seen through the years that small customers react more quickly to economic changes than the larger companies do."  (Hinckley – May 19, 2016 Mentor earnings call 1Q FY17).

193.    ***Defendants Capitalized on Mentor's Artificially Inflated Stock Price Selling Stock***

***for Proceeds of over $10.5 Million***.  During the Class Period, Rhines sold 270,000 shares of Mentor

stock at artificially inflated prices for proceeds of more than $6.8 million.  Rhines' sales were also

---

[11]    For example, Defendants claimed on May 23, 2013 that those emulation hardware orders booked in 1Q FY14 would not be shipped and revenue recorded until the 4Q FY14.

significant as a percentage of total shares owned, 18.17%,[12] including sales on April 13, 2015 (proceeds of ~$2.5m), October 9, 2015 (proceeds of ~$3.8m) and October 12, 2015 (proceeds of ~$516k). And because Rhines, according to the Company's proxy materials, was to maintain a 3x multiple of his base salary in stock at all times, his percentage of total shares available for sale was much higher than 18.17%.

194.   Rhines' sales were also suspiciously timed. Rhines sold 100,000 shares on April 13, 2015 for proceeds of ~$2.5 million following Defendants' misleading warnings on March 16, 2015 that: (i) customers "may" acquire competitive products; (ii) pre-announcements of unspecified competitive products "can result" in customer purchasing delays; and (iii) customers "may" consolidate, which "could result" in an "adverse effect." ¶¶122-124, 146. At the time of Rhines' sales, he knew, *inter alia*, that: (i) Synopsys had acquired an emulator adversely impacting Mentor's business (¶¶49, 57-65); (ii) Mentor was facing longer evaluation times, lost bookings and lower prices in emulation as a result of Synopsys' and Cadence's new emulators (¶¶74-76); and (iii) unprecedented semiconductor consolidations were adversely impacting Mentor's business (¶¶80-85, 93-107).

195.   Rhines also suspiciously sold 170,000 of his shares between October 9, 2015 and October 12, 2015, for proceeds of $4.3 million. These massive sales were suspiciously made at or near the stock's Class Period high (¶21) and were made on the heels of Mentor's raised FY16 guidance on August 20, 2015 (and confirmed on August 31, 2015), and other false and misleading statements that concealed material adverse information from investors. At the time of sales, Rhines knew, *inter alia*: (i) that Mentor had not booked the emulator business that they would belatedly admit contributed to the $104 million FY16 miss because that business had to have already been

---

[12]   This percentage is calculated by dividing shares sold by the total number of shares held by each insider.

booked to be recorded as revenue in FY16; and (ii) on or before July 1, 2015 that Mentor's customer, IBM, had renewed a "major" contract at a reduction in run rate, a deal that Defendants disclosed also contributed to the $104 million FY16 miss.  And the sales were made just weeks before Defendants disclosed, on November 19, 2015, that: (i) bookings declined 20% across the Company's products and 25% in Scalable Verification (including emulation); (ii) that Mentor's business had been negatively impacted by the "expected introduction of competitive products"; (iii) that "one major contract" (*i.e.*, with IBM) had been renewed at a decrease in run rate following one specific acquisition, and that other consolidations had or would negatively impact the Company's business in FY16; and (iv) that Defendants would miss FY16 revenue guidance by $104 million. ¶¶173-174.

196.    Rhines' trades were also inconsistent with his trading history before and after the Class Period, or at times when Defendants had adverse inside information.  Rhines' 2013 and 2014 sales were made when Defendants knew Synopsys had acquired EVE's ZeBu emulator (October 2012, ¶49), and his 2014 sales were all made after Defendants knew they had lost Intel's business going forward to significant competitor Synopsys and been forced to lower prices (May 2013). ¶¶42, 45.  Rhines then made no sales for more than seven months before the Class Period, and made *no* sales of Mentor stock since.  Rhines' Class Period trade were thus inconsistent with his trading history, as follows (Class Period sales in bold-highlight, all sales for the period 2013-2016 shown):

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 04/11/13 | 87,115 | $17.57 | $1,530,611 |
| 04/12/13 | 87,215 | $17.56 | $1,531,495 |
| 09/12/13 | 217,953 | $22.82 | $4,973,687 |
| 01/08/14 | 145,347 | $23.40 | $3,401,120 |
| 01/09/14 | 82,688 | $23.47 | $1,940,687 |
| 01/09/14 | 10,000 | $23.56 | $235,600 |
| 01/10/14 | 207,495 | $23.41 | $4,857,458 |
| **04/13/15** | **100,000** | **$24.71** | **$2,471,000** |

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 10/09/15 | 150,000 | $25.63 | $3,844,500 |
| 10/12/15 | 20,000 | $25.82 | $516,400 |
| | 1,139,893 | | $26,483,597 |

197.    Defendant Hinckley also sold 157,000 shares of Mentor stock during the Class Period for proceeds of more than $3.7 million, including sales on March 9, 2015 (proceeds of ~$2.5m) and September 2, 2015 (proceeds of ~$1.2m). Hinckley's sales were also significant as a percentage of total shares owned, 11.87%.[13] And because, like Rhines, the Company's proxy materials compelled Hinckley to maintain a 3x multiple of his base salary in stock at all times, his percentage of total shares available for sale was much higher than 11.87%.

198.    Hinckley's sales were also made at suspicious times. He sold shares on March 9, 2015 immediately following false statements including his misrepresentations on February 26, 2015 that the decline in activity of Mentor's largest emulation customer was "quite isolated." At the time of his trades, Hinckley was aware, *inter alia*, that the loss of Intel to Synopsys was not isolated but rather involved ~30% of the emulation market and had negatively impacted sales to other companies. ¶¶40-43.

199.    Hinckley also suspiciously sold 47,000 shares on September 2, 2015, for proceeds of $1,174,530, days after Defendants raised guidance and denied the negative impact of semiconductor consolidations. ¶¶149,157-159. At the time of his trades, Hinckley knew that, *inter alia*: (i) Mentor was facing longer evaluation times, lost bookings and lower prices in emulation as a result of Synopsys' and Cadence's new emulators (¶¶33-76); (ii) Mentor had not booked the emulator business that they would belatedly admit contributed to the $104 million FY16 miss because at a minimum that business had to have already been booked to be recorded as revenue in FY16 (¶¶51-

---

[13]    This percentage is calculated by dividing shares sold by the total number of shares held by each insider.

56); (iii) before July 1, 2015 Mentor's customer, IBM, had renewed a "major" contract at a reduction in run rate (¶96); and (iv) Defendants knew of the unprecedented semiconductor consolidations. ¶¶77-107. Like Rhines, these sales were suspiciously made at or near the stock's Class Period high (¶21), and immediately following the August 20 and 31, 2015 announcements raising guidance and before the November 19, 2015 disclosures that caused Mentor's stock price to plummet.

200.    Hinckley's trades were also entirely inconsistent with his trading history before and after the Class Period, or at times when he was in possession of adverse inside information. Hinckley's 2013 and 2014 sales were made when Defendants knew Synopsys had acquired EVE's ZeBu emulator (October 2012, ¶49), and his 2014 sales were all made after Defendants knew they had lost Intel's business going forward to significant competitor Synopsys and been forced to lower prices (May 2013, ¶¶42, 45).

201.    Hinckley made no sales for more than seven months before the Class Period, and for more than six months afterwards, and then only to make a single 2016 sale for proceeds of $692,303, a sum dwarfed by the $3.7 million he made selling in 2015 and during the Class Period. Hinckley's Class Period trade were thus dramatically out of line with his trading history, as follows (Class Period sales in bold-highlight, all sales for the period 2013-2016 shown):

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 04/11/13 | 72,536 | $17.57 | $1,274,458 |
| 04/12/13 | 72,636 | $17.55 | $1,274,762 |
| 09/12/13 | 8,281 | $22.86 | $189,304 |
| 01/08/14 | 98,995 | $23.40 | $2,316,483 |
| **03/09/15** | **110,000** | **$23.11** | **$2,542,100** |
| **09/02/15** | **47,000** | **$24.99** | **$1,174,530** |
| 05/27/16 | 32,396 | $21.37 | $692,303 |
|  | 441,844 |  | $9,463,939 |

202.    ***Defendants Sought to Prevent Another Hostile Takeover***.  In 2008, Cadence had tried to acquire Mentor in an unsolicited bid of $16.00 per share.  Mentor rejected the hostile

takeover in-part claiming the price was insufficient.  Later, in early 2011 Mentor fought off activist

Carl Icahn who tried unsuccessfully to acquire Mentor with a bid of $17 per share, with Mentor

indicating the bid undervalued the Company.  Following these hostile efforts, Mentor's management

was under pressure to prevent another hostile takeover bid by inflating Mentor's stock price.  A

lower stock price would have made Mentor vulnerable to a hostile takeover.  By June 2015, there

was renewed discussions of Mentor being subject to an acquisition as reported by The Oregonian on

June 1, 2015 in an article entitled "Chip industry: $65 billion in deals already this year; Who's

next?"  The Oregonian reported that analysts at Pacific Crest had put together a target list in the

spring of top candidates for a takeover that included Mentor.  Accordingly, Defendants had an

incentive to conceal the state of Mentor's emulation business in order to inflate the stock price and

prevent a hostile takeover.

## ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS

203.    As detailed herein, Defendants engaged in a fraudulent and wrongful course of

business, which was designed to and did deceive Class Period purchasers of Mentor's common stock

as Defendants misrepresented and/or omitted material information about Mentor's growth, sales,

market share and financial performance.  When the market learned that Mentor was negatively

impacted by its competitors' products and the anticipated release of another competitor's new

product as well as by semiconductor customer consolidations, Mentor's stock fell precipitously as

the prior artificial inflation came out of the price.  As a result of their purchases of Mentor's common

stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss,

*i.e.*, damages, under the federal securities laws.

204.    Defendants' false statements and omissions, identified herein in at ¶¶108-109, 111-114, 116-120, 122-126, 128-129, 145-150 and 156-160, had the intended effect and caused Mentor stock to trade at artificially inflated levels during the Class Period.  ¶21.

205.    As a direct result of Mentor's disclosures on November 19, 2015, including a 20% decline in bookings across the Company's products year-over-year, a 25% decrease in Scalable Verification bookings and a $104 million reduction in projected 4Q FY16 year revenues, as well as that Mentor's business had been negatively impacted by, *inter alia*, the "expected introduction of competitive products, pricing pressures," delays in booking business and that contract renewals in the third quarter had been negatively impacted by the IBM/GlobalFoundries deal (*see also* ¶¶133, 135-136, 138, 152-155, 165, 167, 171), the Company's stock price plunged 35.7%, from a close of $27.78 on November 19, 2015 to $17.85 on November 20, 2015.  As demonstrated in the chart in ¶21 above, this drop removed the inflation from Mentor's stock price, causing real economic loss to investors who had purchased Mentor's common stock during the Class Period.

206.    The decline in the Company's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' prior false statements and omissions being revealed to investors and the market.  The timing and magnitude of Mentor's stock price declines negate any inference that the loss suffered by Lead Plaintiff and other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

207.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class, was a direct result of Defendants' concealing from investors the negative impact of competitive emulation products, Mentor's reliance on a few customers, as well as the weakening semiconductor business and the impact of the consolidations in the semiconductor industry on

Mentor's sales.  Indeed, financial analysts explicitly arrived at that same conclusion.  Summit Research, for example, concluded that Mentor's issues "were specific to" Mentor.  ¶¶179, 184.  Defendants' false and misleading statements and omissions artificially inflated Mentor's stock price and maintained the price at artificially inflated levels until the subsequent significant decline in the value of the Company's stock occurred when Defendants' prior misrepresentations and omissions were revealed.

208.    Investment analysts attributed the stock price decline on November 19, 2015, to Defendants' revelations. *The Wall Street Journal*, for example, reported on November 19, 2015, that the Company's stock price was declining because of the poor 3Q FY16 financial results, lowered 4Q FY16 guidance and what that revealed about the Company's performance and prospects:

> ***Shares of Mentor Graphics plunged as the company slashed its profit and revenue outlooks***, said it was having ***problems closing business*** and reported that profit in its latest quarter declined.

> ***The stock fell 23% after market hours to $21.42, which would be its lowest level since January.***

> For the fourth quarter, ***Mentor projected adjusted earnings per share of about 47 cents and revenue of about $336 million, far lower than analysts' expectations of 97 cents and $439 million***.

209.    On November 10, 2016, Linda Baker of Oregon Business reported on her interview with Rhines.  Rhines directly attributed the decline of Mentor's stock price in 4Q FY15 to the following:

> **It's been a year of ups – and downs.  In the fourth quarter of 2015, Mentor's stock price plummeted.**

> Unique market events presented in the fourth quarter of last year.  ***The growth of our emulation business temporarily stalled as two competitors came into the market.  The other thing was major mergers in the semiconductor industry.***  When two big companies join together, the growth of the amount of software they have in annual renewals does a temporary reset.  Normally our customers increase their usage of our software about 25% every three years.  The companies that merged didn't show an increase.

210.     Defendants' disclosures on November 19, 2015 are casually connected to the alleged fraudulent activity by virtue of Rhines' own admission.  As to the "two competitors," the first was Synopsys who became a significant competitor after it acquired EVE's emulator Zebu (and issued subsequent releases) and stole the dominant customer Intel, resulted in longer evaluation times, lost bookings to other customers and lower prices.  The second was Cadence, whose anticipated next-generation emulator caused delays in evaluation, and lost sales.  Finally, the "major mergers" in the semiconductor business negatively impacted Mentor's business by delaying business and reducing expenditures.

## CLASS ACTION ALLEGATIONS

211.     Court appointed Lead Plaintiff Western Pennsylvania brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Mentor common stock during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their family members, directors and officers of Mentor and their families and affiliates.

212.     This action meets the requirements of Federal Rules of Civil Procedure Rule 23(a) because the members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Mentor had more than 110 million shares of stock outstanding, owned by hundreds or thousands of persons.

213.     This action meets the requirements of Federal Rules of Civil Procedure Rule 23(a) because there is a well-defined community of interest among class members in the questions of law and fact involved in this case, common questions of law and fact predominate, Lead Plaintiff's claims are typical of the members of the class and Lead Plaintiff can fairly and adequately request the interests of the Class.

214.     This action satisfies the requirements of Federal Rules of Civil Procedure Rule 23(b)(3) because it involves questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members, including but not limited to:

      (a)      Whether the 1934 Act was violated by Defendants;

      (b)      Whether Defendants omitted and/or misrepresented material facts;

      (c)      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      (d)      Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

      (e)      Whether the price of Mentor common stock was artificially inflated; and

      (f)      The extent of damage sustained by Class members and the appropriate measure of damages.

215.     Western Pennsylvania's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

216.     Western Pennsylvania is an institutional investor that was appointed by the Court as Lead Plaintiff.  It suffered significant financial losses as a result of Defendants' misconduct, and Western Pennsylvania's interests are therefore aligned with those of other class members. Accordingly, Western Pennsylvania will be an adequate representative and will adequately protect the interests of the Class.

217.     Lead Plaintiff has also retained counsel who are experienced in class action securities litigation, and Western Pennsylvania has no interests which conflict with those of the Class.

218.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Lead Plaintiff knows of no difficulty that will be encountered in the

management of this litigation that would preclude its maintenance as a class action under Rule 23(b)(3).

## THE STATUTORY SAFE HARBOR DOES NOT APPLY

219.    The statements alleged herein to be false and misleading are not subject to the protections of the Private Securities Litigation Reform Act's ("PSLRA") statutory safe harbor for forward-looking statements because they are either: (i) not forward-looking; (ii) subject to exclusion; or (iii) not identified as forward-looking or accompanied by meaningful cautionary language.

220.    Under the PSLRA's statutory safe harbor for written statements, a forward-looking statement is protected if it is: (i) identified as such; ***and*** (ii) accompanied by ***meaningful*** cautionary language.  15 U.S.C. §78u-5(c)(1)(A)(i).

221.    For oral statements, an oral forward-looking statement must be: (i) accompanied by a cautionary statement that it is forward-looking, that actual results may differ materially and that additional information concerning risk factors is contained in a readily available written document; (ii) the oral statement must identify the written document, or portion thereof that contains such factor; and (iii) the referenced written documents must contain *meaningful* cautionary language.  15 U.S.C. §78u-5(c)(2)(B).

222.    The safe harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K.  15 U.S.C. §78u-5(b)(2)(A).

223.    Statements of historical fact, current condition, or a mixture thereof are not "forward-looking" and thus not protected by the safe harbor.  Nor are Defendants' omissions of historical fact protected by the safe harbor.  Among the false statements alleged herein, the following false oral and

written statements are actionable and the safe harbor does not apply because they are statements of current or historical fact or omitted historical facts:

- "*how you're seeing the year* in terms of the emulation business, either on a bookings or a revenue perspective[?]"    "We expect we will grow substantially this year in the emulation business."  ¶108;

- "*we haven't seen* much direct competition from Cadence . . . ." (¶120);

- "our emulation business is affected by a big decline in the level of activity with our single-largest customer. *It's quite isolated.*  This has nothing to do with *what is going on* in the overall emulation market" (¶120);

- "*no material portion of our business is dependent on a single or a few customers*.  We do not believe that the competitive loss of one or more individual products at one or more of our customers would have a material adverse effect on our revenues" (¶¶113, 124, 148);

- "at this point, that the activity for evaluations *is so strong, that we are booked to capacity* in the number of customers we can evaluate" (¶125);

- "we think the most compelling indicator of the strength of the business is actually what our bookings are. . . .  Bookings for the quarter were, in fact, up 65%. So, *the business is* robust" (¶126);

- "even a one-year change in outlook, unless it's really severe, *doesn't have* that much ripple-through" (¶149); and

- "While the actual number of mergers and acquisitions is up only modesty in 2015 compared to prior history, the magnitude of announced deals is up dramatically. Historically, *these changes simply add* to the strength of the *de facto* standard leader in EDA in each tool category . . . ." (¶149).

224.    None of the historic or present-tense statements, or omissions made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.  The safe harbor simply does not apply to Defendants' statements or omissions of current or historical fact.

225.    To the extent that the false and misleading statements are forward-looking, Defendants are still liable.  Defendants knew at the time they spoke or failed to speak fully that each of their forward-looking false and misleading statements were false and misleading.  Defendants' false and misleading forward-looking statements were authorized or approved by an executive officer or director of Mentor, who knew that the forward-looking statements were false when made. The forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statement would not be misleading.  And the safe harbor warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.  *See* 15 U.S.C. §78u-5(c)(1)(A)(i).

226.    For example, no safe harbor applies to Defendants' statements contained in the Company's 2Q FY15 Form 10-Q, 3Q FY15 Form 10-Q, FY15 Form 10-K, 1Q FY16 Form 10-Q, 2Q FY16 Form 10-Q and September 5, 2014 Form S-8 regarding: (i) the pre-announcements of competitors' products; (ii) the competitive loss of one or more individual products; and (iii) that semiconductor consolidations should they occur could result in reduced spending (¶¶111-112, 116-117, 122-123, 128-129, 145-146, 150) because those statements omitted then existing facts and were knowingly false when issued.  Legislative history on the safe harbor clearly specifies that "[a] cautionary statement that misstates historical facts[, however,] is not covered by the safe harbor . . . ." (citing H.R. Rep. No. 104-369, at 44 (1995) (Conf. Rep.), as reprinted in 1995 U.S.C.C.A.N. 730, 743.)

227.    Close examination of other purportedly cautionary language contained in the Company's Class Period quarterly and annual filings (summarized below) shows that this language was likewise inadequate because Defendants knew that these risks had already materialized:

- "Our *pipeline estimates* may prove to be unreliable either in a particular quarter or over a longer period of time, in part because the "conversion rate" of the pipeline into contracts *can be very difficult to estimate* and requires management judgment.  A variation in the conversion rate could cause us to plan or budget incorrectly and materially adversely impact our business or our planned results of operations.  In particular, a slowdown in customer spending or weak economic conditions generally can reduce the conversion rate in a particular quarter as purchasing decisions are delayed, reduced in amount, or canceled.";

- "We derive a substantial portion of our revenues from sales of relatively few product groups and related support services.  As a result, *any factor adversely affecting sales of these products*, including product release cycles, market acceptance, product competition, performance and reliability, reputation, price competition, and economic and market conditions, *could harm* our operating results.";

- "*Price competition* in the EDA industry is intense, which *can lead to*, among other things, price reductions, longer selling cycles, lower product margins, loss of market share, and additional working capital requirements.";

- "*Sales of our products* and services *are sometimes discretionary* and *may be delayed* if customers delay approval or commencement of projects due to budgetary constraints, internal acceptance review procedures, timing of budget cycles, or timing of competitive evaluation processes.";

- "Any loss of our leadership position in certain categories of the EDA market could harm our business."; and

- "*Our competitors may acquire technology* or companies offering competing or complementary product offerings which could adversely impact our ability to compete in the marketplace.  They may be able to deliver better or broader product offerings, offer better pricing, or otherwise make it more desirable for our customers to buy more of the tools in their design flow from the competitor after the acquisition."

228.    Mentor's purported cautionary language was inadequate to insulate Defendants' false statements under the statutory safe harbor because each of the disclosures was also vague and boilerplate language that remained unchanged throughout the Class Period.  For example, warning that "customer demand and the timing of significant orders" are not within Mentor's control and could affect the Company's results could apply to nearly any company.  Similarly, warning that "a slowdown in customer spending or weak economic conditions generally can reduce the conversion rate in a particular quarter as purchasing decisions are delayed, reduced in amount, or canceled" also applies to virtually any company.  The language is so vague as to be meaningless particularly in light

of Defendants' knowledge of adverse historical facts regarding the semiconductor industry. Likewise, the boilerplate warnings that "[p]rice competition in the EDA industry is intense, which can lead to, among other things, price reductions, longer selling cycles" could have applied to any of Mentor's competitors.  Similarly warning that "[s]ales of our products . . . are sometimes discretionary and may be delayed" applies to any company.  Rather than meaningful, the risk warnings were misleading because there already were "longer selling cycles" and "price reductions" as a result of Synopsys and Cadence's competition.  Mentor's executives, in fact, testified that these very risks had come to fruition.

229.    None of Mentor's purported risk disclosures were meaningful because they failed to warn investors of the known risks that materialized during the Class Period, including, *inter alia*: (i) Mentor's competitors' new emulation products were causing delays in emulation orders and negatively impacting Mentor's bookings; (ii) with Synopsys' acquisition of the ZeBu it was a competitive threat for virtually all of Mentor's emulation accounts and Mentor's business had changed dramatically; (iii) Mentor's loss of its largest emulation customer, Intel, to Synopsys had an adverse effect on Mentor's revenue and sales; and (iv) due to the overall downturn in the semiconductor industry and consolidations among semiconductor companies, Mentor's sales were negatively impacted as semiconductor customers were declining to renew contracts, delaying contracts, decreasing contracts and/or price erosion.

## PRESUMPTION OF RELIANCE

230.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Lead Plaintiff and other members of the Class purchased Mentor common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

231.     At all relevant times, the market for Mentor common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Mentor filed periodic public reports with the SEC; and

(b)     Mentor regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

232.     Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiff and the Class is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## COUNT I

### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

233.     Lead Plaintiff incorporates ¶¶1-232 by reference.

234.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

235.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Mentor common stock during the Class Period.

236.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Mentor common stock.  Lead Plaintiff and the Class would not have purchased Mentor common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements or material omissions.

## COUNT II

### For Violation of Section 20(a) of the 1934 Act
### Against All Defendants

237.    Lead Plaintiff incorporates ¶¶1-236 by reference.

238.    The Individual Defendants acted as controlling persons of Mentor within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of Mentor stock, the Individual Defendants had the power and authority to cause Mentor to engage in the wrongful conduct complained of herein.  Mentor controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment and relief as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

      B.      Awarding Lead Plaintiff and the members of the Class damages and interest;

      C.      Awarding Lead Plaintiff and the members of the Class their reasonable costs and

expenses incurred in this action, including counsel fees and expert fees; and

      D.      Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED:  October 18, 2017

s/ WILLOW E. RADCLIFFE
ROBBINS GELLER RUDMAN & DOWD LLP
**Shawn A. Williams**, *pro hac vice*
shawnw@rgrdlaw.com
**Willow E. Radcliffe**, *pro hac vice*
willowr@rgrdlaw.com
**Kenneth J. Black**, *pro hac vice*
kennyb@rgrdlaw.com
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:    (415) 288-4545
Facsimile:    (415) 288-4534

Lead Counsel for Plaintiff

**Gary M. Berne**, OSB No. 774077
gberne@stollberne.com
**Jennifer S. Wagner**, OSB No. 024470
jwagner@stollberne.com
STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.
209 S.W. Oak Street, 5th Floor
Portland, OR  97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840

Local Counsel

## CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

WESTERN PENNSYLVANIA ELECTRICAL EMPLOYEES PENSION FUND ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re Silver Wheaton Corp. Sec. Litig.*, No. 2:15-cv-5146 (C.D. Cal.)

6.  The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ⅃O day of ___March___, 2016.

WESTERN PENNSYLVANIA
ELECTRICAL EMPLOYEES PENSION
FUND

By: _____

Its: __Designated Representative__

- 2 -

MENTOR

## SCHEDULE A

### SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 08/07/2015 | 5,200 | $25.90 |
| 08/10/2015 | 100 | $26.09 |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 18, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 18, 2017.

s/ WILLOW E. RADCLIFFE
WILLOW E. RADCLIFFE

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail:willowr@rgrdlaw.com

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS